IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL )
COALITION, et al., )
    Plaintiffs, )
v. ) Civil Action No. 3:08-0979
)
UNITED STATES ARMY CORPS OF )
ENGINEERS,  et al., )
    Defendants. )
)

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION AGAINST THE
FOLA IKE FORK NO. 1 AND NO. 2 SURFACE MINES**

**Introduction**

The Corps' response to Plaintiffs' motion for a preliminary injunction confirms that the

Corps' procedures for issuing Fola Coal Company's (Fola's) individual § 404 permit for the Ike

Fork Surface Mines are not only illegal, but fundamentally unfair.  The Corps issued a public

notice that lacked environmental data and mitigation information that is critical to a meaningful

review of the potential impact and lawfulness of the proposed permit.  Plaintiffs filed generic

comments opposing the permit because they lacked essential, site-specific information.  Years

later, Fola submitted its environmental report (EID) and mitigation plan (CMP) containing

hundreds of pages of data and analysis, which the Corps circulated to other agencies, but not to

the public.  The Corps then issued the permit accompanied by a lengthy decision document

relying on the previously secret information, and dismissed Plaintiffs' comments for lack of

specificity.

When Plaintiffs now challenge the Corps' procedures in this Court, the Corps argues that

circulating Fola's reports to the public was not required by its regulations and would have been a

"waste of resources."  Corps Mem. 11.  At the same time, the Corps relies on Fola's previously-undisclosed mitigation plan to demonstrate that it "has undertaken an assessment of the streams' ecological functions," as required by § 404 of the Clean Water Act (CWA).  Id. at 31.  Then, when Plaintiffs challenge that plan at their first available opportunity in this Court, the Corps seeks to quash that challenge on the ground that Plaintiffs' expert criticism "should be excluded because it is outside the administrative record."  Id. at 31 n.19.  The Corps has turned a system designed to operate with a level of public notice necessary to facilitate the maximum practicable public participation, and thus benefit the Corps' decision making process, into an unfair game of hide-the-ball permitting and "gotcha" litigation.

The Corps' procedural errors in failing to circulate Fola's EID and CMP for public review and comment are sufficient by themselves to justify granting a preliminary injunction without a hearing due to the harm these errors have caused to Plaintiffs and will cause to the environment if allowed to stand.  Alternatively, Plaintiffs are prepared to present expert scientific testimony that the Corps' findings of environmental insignificance and lack of significant degradation are based on a functional assessment methodology that has no rational basis or scientific credibility.

I.    **Plaintiffs Are Likely To Succeed on the Merits of Their Claims**

  A. **The Corps Violated the CWA and NEPA by Issuing an Inadequate Public Notice and Failing to Circulate Fola's EID and Mitigation Plan for Public Review Prior to Its Decision**

Plaintiffs contend that the Corps violated the procedural requirements of NEPA and the CWA by not disclosing and allowing public comment on Fola's EID and CMP before making its decision.  The Corps has now publicly disclosed the EID for the first time as an exhibit to its

brief.  It is dated January 17, 2007, fifteen months after the April 2005 public notice, and the main document, excluding appendices, contains 276 pages describing the environmental impacts of the project.  In addition, excluding appendices, Fola's initial CMP has 63 pages and the supplemental CMP has 26 pages.  Pl. Ex. 13, 14.  Fola submitted the initial CMP in October 2006 and the supplemental CMP in December 2007, more than two and a half years after the close of the public comment period.  This plan is the centerpiece of the Corps' claim that the project's environmental impacts will be offset by mitigation.  Thus, taken together, these documents total 365 pages of highly relevant material that was never subject to public review.

The sheer volume and detail of these documents provide a stunning contrast to the paucity of information in the public notice, which only contained about two pages describing Fola's project.  Pl. Ex. 1, pp. 1-3.  Nevertheless, the Corps argues that these two pages were sufficient for the public to submit meaningful comments, and that the Corps had no responsibility to provide any of the information in the 365 pages of the EID and the CMP to the public before making its decision.  The Corps' argument is inconsistent with its regulations and would eviscerate the public notice and participation requirements of the CWA and NEPA.

## 1.  The Corps Violated the CWA and Its CWA Regulations on Public Notice

The Corps argues that it was <u>compelled</u> by its regulations to issue public notice of the Fola permit application without the EID and CMP information, because the application was "complete" without those documents and public notice must be issued within 15 days after an application is complete.  Corps Mem. 5, 10-11.  The Corps claims that "a complete application does not include either a mitigation plan or detailed environmental analysis of potential impacts."  <u>Id.</u> at 11.  The Corps even claims that requiring such documents would be "a waste of

resources."  Id.   The Corps also argues that the original public notice was adequate because it is judged based on the information available to the Corps at the time that notice was issued.  Corps Mem. 11.  By this logic, since the EID and CMP were not available at that time, the notice is ipso facto adequate.

The Corps' arguments cannot be squared with the plain language of its regulations or its guidance documents to permit applicants.  An application is complete "when sufficient information is received to issue a public notice."  33 C.F.R. § 325.1(d)(10), as amended by 73 Fed. Reg. 19670 (April 10, 2008).  This definition of completeness specifically cross-references the public notice regulation at § 325.3(a), which provides that a public notice must contain "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."  This category of required information includes "available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest."  Id. § 325.3(a)(13) (emphasis added). Thus, a permit application is not complete unless and until it contains sufficient information on the nature, magnitude, and impacts of the proposed activity.  If that information is not yet available, the application is not complete and the public notice cannot be issued.

Fola's application could not reasonably have been considered complete without the EID and the CMP.  Those documents are necessary for a clear understanding of the nature, magnitude, and likely impacts of the proposed activity.  Indeed, the Corps' own guidance documents on how applicants must prepare EIDs and CMPs demonstrate this.  In a July 2004 public notice, the Corps' Huntington District office advised applicants "what information . . . must be submitted with an IP [individual permit] request" under § 404 of the CWA.  Pl. Ex. 15,

p. 1.  That information includes both a compensatory mitigation plan and an EID.  The mitigation plan "must be submitted before the Corps can render a final decision on a proposed project" and is required by the § 404(b)(1) Guidelines under the CWA.  Id. at 2.  To comply with NEPA, the applicant must submit information on alternatives, the affected environment, environmental impacts, and cumulative effects.  Id. at 3.  According to the Corps, permit applicants "begin the environmental review process by preparing an Environmental Information Document (EID)" that contains this information.  Id. at 4 (emphasis added).

The Corps attached a NEPA guidance document to the July 2004 public notice to provide further guidance to applicants "in developing your EID."  Id.  That guidance document describes what information "must be collected to comply with NEPA and how that information should be analyzed [in the EID] to determine the nature, extent, and duration of impacts to the human environment."  Pl. Ex. 16, p. 1.  "The goal of [the environmental impacts] section [of the EID] is to provide sufficient information for the Corps to determine if the environmental impacts of the project are in compliance with the Section 404(b)(1) Guidelines or contrary to the public interest."  Id. at 6 (emphasis added).  The guidance document evaluates each of the public interest factors under the Guidelines and identifies numerous gaps where additional information is needed in the EID to comply with NEPA.  Id. at 6-21.

In light of these Corps statements in its own guidance documents, it is disingenuous for its lawyers to now argue that these documents are irrelevant to a determination of application completeness and need not be provided to the public for review and comment.  It is indisputable that the EID and the CMP contain extensive information that is necessary to evaluate the nature, magnitude, and likely impacts of the project.  Indeed, that information is necessary before the

5

Corps can even "begin the environmental review process." Pl. Ex. 15, p. 4. If this information is needed at the beginning, an application cannot be deemed complete without it.

The table of contents for the EID shows that it contains over 60 pages analyzing alternatives, actions to minimize environmental effects, and factual determinations under the 404(b)(1) guidelines. Corps Ex. 2. It also contains nearly 200 pages analyzing the affected environment and environmental impacts. Id. When it circulated the EID to other state and federal agencies for review and comment, the Corps stated that "it was the Corps intention to use the information contained within the EID, to the maximum extent, in order to comply with the NEPA and the Guidelines." DD, p. 11 (emphasis added). Thus, the Corps admitted that it relied heavily on the EID for its analysis. A comparison of the Corps' decision document with the EID shows that the Corps simply lifted large sections out of the EID and used them for its decision document. Compare, e.g., EID, p. 57 with DD, pp. 91 (discussing water circulation).

Similarly, Fola's CMP tries to measure stream losses and describes a plan for mitigating and offsetting those losses. Pl. Ex. 13, 14. The CMP was central to the Corps' decision to grant the Fola permit. The Corps' decision document devotes nearly forty pages to discussing the CMP in great detail. DD, pp. 38-78. The Corps' memorandum devotes four full pages of its memorandum in this Court to explaining how Fola applied the Corps' new functional assessment model and gathered biotic assessment data in its CMP to determine stream impacts. Corps Mem. 28-31. The Corps relies on this analysis to support its argument that the Corps properly considered the impact of Fola's project on the structure and function of the aquatic ecosystem, as the 404(b)(1) Guidelines require. Id. Consequently, the Corps' claim that circulating the CMP to the public for review and comment would be a "waste of resources" (id. at 11) is belied by its

own treatment of this document.

The Corps' argument about permit completeness is also disingenuous because it conflicts with the Corps' own conduct in circulating the EID and CMP to other agencies for review and comment.  Unless those documents are necessary to review a permit application it is unclear why the Corps circulated them to other agencies.  The Corps' lawyers now offer the post hoc rationalization that the Corps was merely "acting in harmony" with newly-promulgated regulations allowing the Corps to circulate mitigation plans to other agencies.  Corps Mem. 12. However, that explanation does not appear anywhere in the Corps' decision document, but rather conflicts with that document, and does not explain why the Corps circulated the EID to other agencies, in addition to the mitigation plan.

Even if an application could sometimes be deemed complete without an EID and a CMP, the notice required by the statute, 33 U.S.C. § 1344(a), and accompanying regulations is incomplete without the critical factual material upon which the Corps proposes to base its permit decision.  See, e.g., National Wildlife Federation v. Marsh, 568 F. Supp. 985, 994-96 (D.D.C. 1983); Friends of the Earth v. Hall, 693 F. Supp. 904, 948 (W.D. Wash. 1988).  Courts interpreting similar notice requirements have consistently decided that the technical basis for a proposed agency decision must be disclosed in order for public notice requirements to be satisfied.  See Indep. U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 924-26 (D.C. Cir. 1982); U.S. Lines v. FMC, 584 F.2d 519, 534-35 & n.44 (D.C. Cir. 1978); see also Am. Radio Relay League v. FCC, 524 F.3d 227, 236-40 (D.C. Cir. 2008); Riverkeeper, Inc. v. EPA, 475 F.3d 83, 111-13 (2d Cir. 2007).  It is not just the fact that these documents take the form of a CMP and an EID, per se, that requires the Corps to give public notice of them as part of a permit

application.  Notice is required because the factual basis of the Corps' issuance of the permit and

FONSI in the face of the proposed environmental degradation depends upon the sufficiency of

this CMP and EID, and because the Corps relied upon these documents to provide the central

rationale for its final permit decision.

In addition, these documents contained a "change in application data" sufficient to trigger

the need for a supplemental notice when they were later submitted.  33 C.F.R. § 325.2(a)(2).

While the Corps cites several cases that have upheld Corps decisions not to issue a supplemental

public notice, none of those cases involved a data gap as large as the one represented by the EID

and CMP in this case.  B&B P'ship v. U.S., 133 F.3d 913, 1997 WL 787145, at *6-*7 (4th Cir.

1997) (unpublished) (alleged failure to submit the applicant's plan modification for supplemental

comment); Fund for Animals, Inc. v. Rice, 85 F.3d 535, 545 (11th Cir. 1996) (alleged failure to

list in the public notice an affected endangered species and an access road affecting less than

one-half acre of wetlands); Sierra Club v. U.S. Army Corps of Eng'rs, 450 F. Supp.2d 503, 535-

36 (D.N.J. 2006) (alleged failure to allow supplemental comment on data submitted with the

applicant's response to public comments); Sierra Club v. U.S. Army Corps of Engineers  935 F.

Supp. 1556, 1581 (S.D. Ala. 1996) (alleged failure to allow supplemental comment on

applicant's third proposal).  In contrast, the EID and CMP contain all of Fola's environmental

analysis and the central basis for the Corps' decision.

The Corps relies most heavily on Northwest Environmental Defense Center v. Wood,

947 F. Supp. 1371, 1381 (D. Or. 1996).  In that case, the court approved the Corps' failure to

allow supplemental comment on the applicant's alternatives analysis and mitigation plan.  In

doing so, the court provided no analysis of the importance of that information or the

8

completeness of the applicant's application, and merely noted that the plaintiffs had had an opportunity for comment on similar issues earlier in the process.  Id. at 1381.  Picking up on that same theme, the Corps argues that, despite the unavailability of the EID and the CMP, Plaintiffs in this case still submitted comments on mitigation issues.  Corps Mem. 14.

The Wood decision is not inconsistent with the two decisions cited by Plaintiffs which require the Corps to "present for public scrutiny the rationale and pivotal data underlying its proposed action before the close of the comment and hearing period." Marsh, 568 F. Supp. at 994-96.  Accord, Hall, 693 F. Supp. at 948.  In Wood, the court found that the Corps had received public comment on the data (even though it had not been officially submitted for public notice) and addressed those comments, 947 F. Supp. at 1381, which was not true in Marsh or Hall and is not the case here.  Even if Wood were inconsistent, these two decisions are more persuasive and, to the extent that Wood is inconsistent with them, it was wrongly decided, particularly in view of the significant precedent that has interpreted similar provisions requiring meaningful notice consistently with Marsh and Hall.  See, e.g., Am. Radio Relay League, 524 F.3d at 236-40; Riverkeeper, Inc., 475 F.3d at 111-13; Indep. U.S. Tanker Owners Comm., 690 F.2d at 924-26; U.S. Lines, 584 F.2d at 534-35 & n.44.

Furthermore, the Corps is wrong that, just because Plaintiffs submitted "extensive" comments in May 2005 and the Corps responded to them, Plaintiffs had an adequate opportunity to comment.  Corps Mem. 14.  The Corps rejected those comments as being "very general in form" and containing "little specific content" about Fola's project.  DD, p. 129.  Plaintiffs could not comment meaningfully until they saw the CMP and EID that form the core of this case.  The Corps also argues that there was no need for more specific notice because Fola is using "familiar

mitigation approaches." Corps Mem. 15.  This argument is contradicted by the Corps' own

assertion that the Fola permit "is supported by its own administrative record and is different in

important respects from the four permits invalidated by this Court nearly two years ago."  Id. at

1.  Furthermore, Fola's mitigation approach is not "familiar," since there is no evidence that it

has ever worked.

The Corps also argues that Marsh is inapposite because in that case, the Corps made a

sudden shift in rationale, while here Fola's mitigation plan "did not mark any change in the

project's scope, goal or rationale."  Corps Mem. 15.  However, the shift here is as bad or worse

than in Marsh.  There, the new study devoted 10 of 100 pages to the critical issue of reduced

transportation costs, while the documents available at the time of public comment contained only

eight sentences.  568 F. Supp. at 994.  Here, the EID and CMP devote 365 pages to

environmental impact analysis and mitigation, while documents available at the time of the

public notice contained nothing whatsoever on these topics.  A shift from no mitigation plan and

no impact analysis to a 89-page CMP and a 276-page EID that are discussed in at least sixty

pages of the Corps' decision document is a sudden change by any measure.  Marsh therefore

clearly supports Plaintiffs' position.[1]

Finally, in applying the CWA notice requirement, which is governed by the

Administrative Procedure Act (APA) standard of review, 5 U.S.C. § 706(2)(D) (under which the

court must set aside the Fola permit because it was promulgated without observance of

procedure required by law), it is appropriate to consider cases interpreting the analogous public

---

[1] The Corps' attempt to distinguish the Hall decision is similarly flawed.  The Corps argues that Hall turned on the
requirement to submit a detailed mitigation plan, while no such requirement applies here.  Corps Mem. 15 n.2.  In
fact, however, the Corps' own July 2004 guidance document unequivocally states that "[r]equired compensatory
mitigation plans must be submitted before the Corps can render a final decision on a proposed project."  Pl. Ex. 15,
p. 2.

notice requirements under other similar statutes such as the APA.  Compare 33 U.S.C. § 1344(a) ("notice and opportunity for hearing") with 5 U.S.C. § 553(b)-(c) ("notice" and "opportunity to participate").  See Discover Bank v. Vaden, 489 F.3d 594, 605 (4th Cir. 2007) (when two statutes or statutory schemes employ similar language, the language should be interpreted in the same way); Air Transport v. FAA, 169 F.3d 1, 7 (D.C. Cir. 1999)  Under the APA, as a long line of precedent demonstrates, "[i]t would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment." Am. Radio Relay League, 524 F.3d at 236-40 (citing cases).  The same is true under the CWA's notice provision and the Corps' regulations which direct the Corps not to issue a permit based upon critical information not made available in time for meaningful public comment, because the notice requirements in the APA and CWA are consistent even though the type of agency action being reviewed is different.  "Enforcing the APA's notice and comment requirements ensures that an agency does not 'fail[ ] to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary' so that 'a genuine interchange' occurs rather than 'allow[ing] an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs.'"  Id. at 236-37 (quoting Conn. Light & Power Co., 673 F.2d 525, 530-31 (D.C. Cir. 1982).  See also Riverkeeper, Inc., 475 F.3d at 111-13.  Thus, the Corps' interpretation cannot stand as it contravenes established principles of public notice under both the CWA and the APA.

### 2.    The Corps Violated NEPA Public Participation Requirements

The NEPA regulations require the Corps to "involve environmental agencies, applicants,

and the public, to the extent practicable, in preparing" environmental assessments.  40 C.F.R. §

1501.4(b).  There is no doubt that it was practicable for the Corps to circulate Fola's EID and

CMP to the public.  The Corps admits that it circulated those documents to other government

agencies.  DD, p. 11.  The obvious reason why the Corps circulated the EID and CMP was

because those documents were necessary  to allow other agencies to evaluate Fola's project.  The

law is clear that "[a]n agency, when preparing an EA, must provide the public with sufficient

environmental information, considered in the totality of circumstances, to permit members of the

public to weigh in with their views and thus inform the agency decision-making process." Bering

Strait Citizens for Responsible Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938, 953 (9th Cir.

2008).

        The Corps argues that its conduct was reasonable and adequate under this standard,

because the Corps "provided an initial comment period, and received comments from Plaintiffs

on mitigation and provided a detailed response to those comments."  Corps Mem. 17.  However,

the mere fact that comments were made and reviewed does not prove that the public participation

met the NEPA standard for circulation of "sufficient environmental information" about a project.

Plaintiffs' lack of access to over 365 pages of the EID and the CMP during the public comment

period violated this standard and denied Plaintiffs a meaningful opportunity to comment.

Furthermore, by rejecting Plaintiffs' comments as too general, the Corps' response to those

comments demonstrates that its dissemination of information was inadequate and failed to

provide a sufficiently specific picture of the action the Corps was proposing to take.  The Corps'

selective circulation of documents to agencies but not to the public also violates the NEPA

regulation which expressly grants "environmental agencies, applicants, and the public" equal

rights of access to the environmental assessment process.  40 C.F.R. § 1501.4(b).

As the court stated in <u>Marsh</u>, "if the public is not apprised of the rationale behind a proposed decision, or if the public is informed of the rationale only after the close of the comment and hearing period, then the agency cannot be said to have provided a realistic opportunity for public hearings or meaningful comments." 568 F. Supp. at 993.  And, as the court quoted from <u>U.S. Lines</u>, 584 F.2d at 540:

> Only when the public is adequately informed can there be any exchange of views and any real dialogue as to the final decision.  And without such dialogue any notion of real public participation is necessarily an illusion.

568 F. Supp. at 993.  The Corps therefore violated the CWA and NEPA by issuing an inadequate public notice and failing to circulate the EID and CMP for public review prior to its decision.

### 3.     Plaintiffs Were Prejudiced by the Corps' Procedural Violations

Plaintiffs were prejudiced because they were precluded from commenting on the specific information in the EID and CMP, and instead could only comment on the incomplete and general information in the April 2005 public notice.  The comment period closed two years before the Corps issued its June 2007 IFAA method and two and half years after Fola applied that method in its December 2007 supplemental CMP.  It is only now that Plaintiffs have seen Fola's CMP that they are prepared to provide expert testimony that the methodology used in that CMP has no scientific credibility and fails to measure stream functions, and therefore the Corps has no basis for relying on this document to offset stream losses caused by the project's ten valley fills.  See pp. 20-21 below.  If Plaintiffs had been able to present that criticism in the public comment process, rather than in the pending preliminary injunction hearing, the Corps' decision should have been different, in order to comply with the CWA and NEPA.  At the very

13

least, the Corps would have had to respond to that criticism with a reasoned explanation, thereby providing some basis in the record for effective judicial review.

The prejudice to Plaintiffs from the Corps' procedural violations is substantial because of the impact these violations have had on the permit, the FONSI, and on this litigation.  Plaintiffs were forced to prepare their public comments in the dark, raising only general objections in anticipation of what they believed the Corps might do based on past experience.  Then the Corps could sit back and review a mountain of undisclosed information, rely upon this information as the basis for its resulting permit decision, and only release the information when it issued the permit accompanied by a lengthy decision document.  Plaintiffs then had to scramble to digest this information and prepare their legal papers while the mining companies assemble their bulldozers to destroy the streams as quickly as possible to try to moot the case – a case that might never have been necessary if the Corps had disclosed and received comments regarding the data upon which it centrally relied and which forms the core of this litigation.  Absent judicial intervention to enforce the law, this makes a mockery of the public participation requirements of the CWA and NEPA.  It also resembles trial by ambush, where one side resists all discovery and then unleashes all of its material on the eve of trial.

The Court is also prejudiced by the Corps' violations.  The purpose of having robust public comments and the agency's reasoned response to those comments is to ventilate the issues in the administrative record.  "The agency's explanation must simply enable a reviewing court 'to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.'"  State of S.C. ex rel. Tindal v. Block, 717 F.2d 874, 886 (4th Cir. 1983); see Am. Radio Relay League, 524 F.3d at 236-37 (quoting Sierra Club v. Costle,

657 F.2d 298, 334, 397-98 & n. 484 (D.C. Cir.1981) ("Public notice and comment regarding

relied-upon technical analysis, then, are "[t]he safety valves in the use of . . . sophisticated

methodology.")).  The reviewing court can then determine if the agency's decision was arbitrary

and capricious based on that record.  Here, the Corps' violations have prevented the development

of such a record, and have left it as a one-sided statement of the Corps' position.  No public

participation has actually occurred because there "was no opportunity for a real dialogue or

exchange of views."  U.S. Lines, 584 F.2d at 540.  The Corps has stacked the deck in its favor by

suppressing meaningful public input.

> **B.**  **The Corps' Determination that the Fola Mines Would Have Insignificant Cumulative Effects Under NEPA Is Arbitrary and Capricious**

> **1.**  **The Corps' Analysis of the Relevant Significance Factors Is Irrational**

The Corps' decision document does not contain a reasoned analysis of four of the CEQ

factors for determining significance: (1) cumulatively significant impacts; (2) highly uncertain or

unknown risks; (3) effects that are highly controversial; and (4) ecologically sensitive areas.  40

C.F.R. § 1508.27(b)(3), (4), (5), and (7).

a**. Cumulative Impacts**.  In terms of affected watershed acreage, the Corps found that

past, present, and future actions in the cumulative impact area related to the Fola mine have

impacted or will impact 66.8% of the riparian area acreage in the Lily Fork watershed and 20.8%

of the riparian area acreage in the Buffalo Creek watershed.  DD at 84; id., App. H at 13-14.  The

Corps does not rationally explain how impacts of this magnitude in these two watersheds are not

cumulatively significant.  Plaintiffs' expert believes that a cumulative watershed impact of a

magnitude greater than 10% should be considered environmentally significant.  Palmer

Declaration, Pl. Ex. 11, p. 5.

In response, the Corps ignores this expert conclusion. Instead, it makes two arguments. First, it claims that although CEQ guidance "ideally" requires identification of a threshold for cumulative significance, a permissible alternative is to "assess the capacity of the resource to continue to perform its function." Corps Mem. 20. Second, the Corps claims that, on this basis, "all indicators show" that the watersheds continue to provide their "expected functions," "mitigation will ensure future viability of the system," and the watersheds are "not significantly degraded." Id.

As this Court has found, the Corps' assumption that mitigation can eliminate all adverse cumulative effects "is a fallacy" with no rational support, and "suggests no limits on the number or length of headwater streams that can be buried before the cumulative impact analysis identifies an adverse impact." OVEC v. U.S. Army Corps of Eng'rs, 479 F. Supp.2d 607, 659 (S.D. W. Va. 2007). Furthermore, the Corps' argument that the watersheds are performing adequately is belied by its own decision document, which finds that the Buffalo Creek watershed is "biologically impaired." DD, p. 104. Moreover, in its 2006 list of impaired waters under § 303(d) of the CWA, WVDEP listed both Buffalo Creek and Lilly Fork as biologically impaired. Corps Ex. 1, App. K, State 401 Certification, p. 1.[2] The Corps' argument in its memorandum that "all indicators" are positive and the Corps' claim in its cumulative impact analysis that "in-stream water quality is within NPDES and CWA standards" are therefore false. DD, p. 108. The Corps simply ignored the facts to reach its irrational conclusion of cumulative

---

[2] Each state is required to identify water-quality limited segments on its § 303(d) list that require development of total maximum daily loads (TMDLs). 40 C.F.R. § 130.7. A water-quality limited segment is "[a]ny segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards, even after the application of the technology-based effluent limitations required by sections 301(b) and 306 of the Act." Id. § 130.2. Thus, the placement of Buffalo Creek and Lilly Fork on this list means that they do not comply with water quality standards.

insignificance.

   **b.  Uncertainty and Risk.**  This Court has stated that "[i]f the effects of a proposed action are uncertain, that uncertainty precludes the finding that the impact to the environment is not significant."  OVEC, 479 F. Supp.2d at 641.  The Corps argues that the effects of Fola's mine and its plan to mitigate stream loss through new stream creation are "not highly uncertain" and "do not involve unique or unknown risks."  Corps Mem. 20-23.  However, as Plaintiffs have shown, the Corps admitted in its decision document that "[s]tream mitigation is relatively new and evolving science and has the risk of failure that is inherent in efforts with limited experience or history."  DD, p. 36; Pl. PI Mem. 15.  The success of mitigation is so uncertain that the Corps insists on monitoring the site for 10 years or longer to see what happens.  Id. at 38.  The Corps states that "[m]onitoring is an important aspect of mitigation, especially in areas of scientific uncertainty."  DD, App. J, p. 14 (emphasis added).  Dr. Palmer has previously testified in this Court that "stream creation has not succeeded and is not scientifically credible."  OVEC, 479 F. Supp.2d at 648.  The Corps' decision document for the Fola mine contains nothing to rebut that opinion.  This scientific uncertainty about the effectiveness of stream creation precludes a finding of insignificance.

   **c.  Scientific Controversy.**  On the scientific controversy criterion, the Corps fails to rebut this Court's finding, based on expert scientific testimony, that "[t]he scientific community is skeptical of the likelihood that important headwater stream functions will actually be achieved in manmade streams."  OVEC, 479 F. Supp.2d at 648.  Instead, the Corps argues NEPA does not require "scientific unanimity" to support a FONSI.  Corps Mem. 23.  However, the Corps' evidence in this case is at the opposite end of the scientific spectrum from unanimity.  The Corps

has cited no scientific studies, no scientific evidence, and no scientific experts that support its position.  The Corps instead relies solely on its own self-serving statements and its unsupported claim that mitigation is "progressing" at an unspecified rate at only <u>one</u> other site.  Corps Mem. 23-24. The Corps' FONSI violates NEPA by failing to disclose and analyze responsible opposing scientific viewpoints on the effectiveness of stream creation as a mitigation method. <u>Ctr. for Biological Diversity v. U.S. Forest Serv.</u>, 349 F.3d 1157, 1167-69 (9th Cir. 2003).  In addition, because of the scientific controversy over the feasibility of stream creation, there is "a substantial dispute [about] the size, nature, or effect of the major Federal action . . ." which is sufficient to meet the "controversial" standard for significance. <u>Anderson v. Evans</u>, 371 F.3d 475, 489 (9th Cir. 2004).

    **d.  Ecologically critical areas.**  As we have shown, the Corps admits that headwater streams are critical to the ecological health of watersheds in West Virginia, and that Fola's valley fills will cause harmful physical, chemical, and biological changes to these streams.  Pl. PI Mem. 17.  In addition, the Corps seriously underestimated the harmful chemical effects of the two Ike Fork mines, because it erroneously assumed that Fola's Material Handling Plan addresses selenium, when in fact it does not. <u>Id.</u> at 17-18.  Thus, the Corps did not take a "hard look" at the selenium issue and misinterpreted the facts.

    In response, the Corps' position is that, even if its analysis of the stream losses and selenium contamination were wrong, that error is irrelevant because the Corps is conclusively bound by WVDEP's findings in its CHIA and § 401 certification that water quality standards will be met.  Corps Mem. 24-27.  That argument is wrong both legally and factually.

18

As a legal matter, a § 401 certification does not abrogate the Corps' duty under the CWA and NEPA to analyze the water quality impacts of a proposed activity under § 404.  Section 401(b) of the CWA provides that "[n]othing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements."  33 U.S.C. § 1341(b).  That section means the Corps retains its authority and duty to analyze the water quality impacts of a § 404 activity.  National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 453 F. Supp.2d 116, 134 (D.D.C. 2006).  The Corps has a clear duty under the 404(b)(1) Guidelines to "[d]etermine the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants."  40 C.F.R. § 230.11(d).  The language of § 401(b) precludes a finding that the Corps can delegate this duty to a state.  U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir. 2004) ("[T]he case law strongly suggests that subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization").  The Corps therefore has an independent duty to assure compliance with federal law.

As a factual matter, the Corps acknowledges that Fola will be mining and disturbing coal seams containing "elevated selenium concentrations."  DD, p. 74.  "More recent information on the regional geology also demonstrates the highest concentrations of selenium in the area strata are likely to be from the coal seams themselves and the near-coal black shales adjacent to the coals . . ."  DD, App. J, p. 20.  Yet the Corps has misread WVDEP's CHIA and 401 certification and Fola's core samples, Material Handling Plan (MHP), and NPDES permit and erroneously claimed that selenium concerns have been analyzed and addressed.  Those documents show that selenium contamination is a concern, but the documents do nothing to regulate or control it.

CHIA and 401 Certification.  The CHIA acknowledges that a stream downstream from the mines contains selenium in excess of the water quality standard.  Corps Ex. 6, p. 15 ("At the raw water site No. 913, which is below the valley fill in Little Dragon hollow, selenium was above the chronic waste [sic, water] quality standard for selenium.").  The CHIA also states that the material damage criteria for selenium is the water quality standard.  Id., p. 26 ("The water quality standard . . . for . . . selenium . . . will be the material damage criteria . . .").  Thus, the CHIA implicitly finds material damage for selenium.  WVDEP's 401 Certification makes no finding on compliance with selenium water quality standards and imposes no limit on selenium discharges.  Corps Ex. 1, App. K, State 401 Certification, p. 1.

Core Samples, MHP, and NPDES Permits.  The Corps claims that Fola "has conducted analyses to determine the selenium concentrations within the coal and overburden in the proposed project area."  DD, App. J, p. 20.  That is incorrect.  Selenium levels can be measured in the coal and overburden by taking core samples, but WVDEP has admitted that Fola's core samples for the Ike Fork mines do not analyze selenium concentrations.  WVDEP Letter, Pl. Ex. 19.  In addition, Fola's EID discusses Fola's MHP, but contains no statement that this MHP is designed to control selenium.  Corps Ex. 2, pp. 22-23, 41-44, 46, 55-56, 65, 68, 138, 165.  Selenium is mentioned only twice in the EID, and neither reference pertains to the MHP.  Id., pp. 163, 166.  Furthermore, Fola's NPDES permits contain no effluent limits or monitoring requirements for selenium.  Pl. Ex. 18.  The Corps has therefore failed to provide a reasoned explanation of how selenium will be effectively managed and why there is no potential for contamination of ecologically critical areas.  Absent that analysis, the Corps cannot rationally conclude that this impact on ecologically critical areas is insignificant.

For those reasons, Plaintiffs submit that the four factors in the CEQ regulation support a finding of significance that requires the preparation of an EIS rather than an EA under NEPA. The Corps' contrary findings are irrational and unsupported.

### C.     The Corps' Failure to Perform the Functional Assessment Required by the 404(b)(1) Guidelines Violates the CWA

As Plaintiffs have shown, the 404(b)(1) Guidelines require the Corps to analyze the effects of a proposed discharge on the "structure and function of the aquatic ecosystem and organisms."  33 C.F.R. § 230.11(e); <u>OVEC,</u> 479 F. Supp.2d at 624, 631.  The Corps must take a "hard look" at the evidence and "explain its decision on an objective or scientific basis sufficient to provide a reasoned basis for its conclusions."  <u>Id.</u> at 635-36.  Plaintiffs contend that the Corps' reliance on its June 2007 Interim Functional Assessment Analysis (IFAA) to measure structure and function is irrational and has no scientific credibility.  Pl. PI Mem. 18-19.

In response, the Corps argues that, in response to this Court's March 2007 decision in the <u>OVEC</u> case, the Corps developed the IFAA as a new and improved approach for measuring stream function.  Corps Mem. 28.  However, the Corps' own documents adopting this method explain that the IFAA is nothing new, because it still assumes "that structural measures of stream condition can be used to <u>infer</u> ecological function."  Corps Mem. 29 (quoting Ex. 5, 7/16/07 Memo, p. 1) (emphasis added).   See also Corps Mem. 31 n.19 (the IFAA "measure[s] indicators or surrogates of function").  This is the same assumption that underlay the Corps' previous method in <u>OVEC</u>.  479 F. Supp. 2d at 633 ("'structure' factors . . . serve as surrogates for functional characteristics").  That assumption is analogous to assuming that a person's height and weight are surrogates for one's blood pressure and heart rate.  <u>Id.</u> at 632.

Plaintiffs' scientific experts will testify at the preliminary injunction hearing, as Dr.

Palmer already has in <u>OVEC</u>, that this assumption has no scientific basis.  Those experts will also challenge several other assumptions in the IFAA, including the following:

- The Corps' IFAA relies on a "visual evaluation" of structure to generate a functional assessment and assumes that the method can "be applied to potential or actual impact and mitigation sites by one experienced person in half a day or less."  Corps Ex. 5, IFAA, Introduction, p. 1.  Fola's 2006 field survey forms show that Fola's three assessors (Andrew, Ashley, and Mike) measured these indicators for 38 stream segments on a single day—August 9, 2007.  Pl. Ex. 17.

- The Corps' IFAA assumes that certain structural indicators can be used to infer stream functions and can be measured on a scale of 0 to 1, even though the Corps admits that "[n]o field studies have been conducted in the region specifically to calibrate the indicators."  <u>Id</u>., Ex. 5, 7/16/07 Memo, p. 1.

- The Corps' IFAA assumes that one of its indicators measures the hydrological function, even though Fola's CMP admits that this indicator "<u>does not consider channel flow status</u> which strongly influences a channel's ability to achieve its full potential with regard to its ability to transport materials which is a major portion of its hydrologic function" and generates a value representing "what a reach is capable of (in terms of hydrology) <u>under ideal conditions</u>."  Pl. Ex. 14, p. 7 (emphasis added).

- The Corps' IFAA assumes that these indicators can be inserted into certain equations to generate a numerical Functional Capacity Index (FCI) for each stream segment, even though there is no reference to, or support in, the scientific literature for those equations.

- The Corps' IFAA assumes that the future functionality of newly created streams on the

mitigation site can be predicted in advance, without any reference to any history of past performance or effectiveness of stream creation efforts, and that Fola's mitigation plan will successfully raise the FCI score at those sites from zero to 0.74 (on a scale of 0 to 1). See Pl. Ex. 14, p. 11 ("The average predicted FCI value for these reaches was 0.74. Because these channels do not exist, the baseline value is 0.0.").

The Corps argues that Plaintiffs should be barred from introducing any scientific testimony challenging the IFAA because it postdates the Corps' decision and is outside the administrative record. Corps Mem. 31, n. 19. But Plaintiffs never had an opportunity to present such testimony earlier because the Corps illegally failed to circulate Fola's CMP to the public for review and comment. Fola did not apply the IFAA method to its sites until it submitted its supplemental CMP to the Corps on December 7, 2007, some two and a half years after the public comment period closed in May 2005. The Corps cannot limit judicial review to the administrative record when it violated procedural requirements designed to allow citizens to create that record in the first place. Save Our Wetlands v. Conner, 1999 WL 508365, at *2 (E.D. La. July 15, 1999) ("deviation from the record rule to review procedural integrity in NEPA claims is a logical conclusion").

### D. The Corps Has No Authority to Permit Discharges of Sediment in the Stream Segments Between the Toes of the Valley Fills and the Sediment Control Ponds

The Corps does not dispute the fact that Fola would discharge sediment into 3903 feet of stream segments between the toes of its ten valley fills and the downstream sediment ponds. Pl. PI Mem. 19-20. Fola does not have a § 402 NPDES permit authorizing discharges into these stream segments, because its § 402 permit only regulates "the discharge point of each pond

below each valley fill." DD, p. 63.  In its decision document, the Corps describes the stream

segments upstream from each pond as "temporary waste (sedimentation) treatment systems."

DD, p. 94.  Plaintiffs therefore believed that, to authorize these discharges, the Corps was relying

on its previously-stated interpretation in the <u>OVEC</u> case that these stream segments are excluded

from waters of the United States because they are waste treatment systems, and therefore do not

need § 402 permits.  <u>OVEC v. U.S. Army Corps of Eng'rs</u>, 2007 WL 2200686 (S.D. W.Va. June

13, 2007).

      However, the Corps has now abandoned that interpretation.  It claims that it "did not

purport to permit discharges from the toes of the fills to the ponds and . . . has made no decision

of this issue for Plaintiffs to challenge in this matter."  Corps Mem. 32.  If that is true, then

Fola's plan to issue sediment into the stream segments violates § 402, and the Corps cannot issue

the § 404 permit.  By the Corps' own standards, it cannot issue a § 404 permit that would violate

federal law:

> These permits all must comply with applicable federal, stale and local law. The Corps has
> evaluated the proposed action based on Section 404(b) of the CWA. <u>If the proposed
> action violated any applicable environmental law, the Corps could not issue the permit</u>.

DD, App. J, p. 7 (emphasis added).  "The proposed operation must comply with all state and

federal laws regarding water quality."  <u>Id</u>.  Fola's operation violates this principle, because Fola

does not have a § 402 permit for the discharges into segments upstream from the ponds.

      The record contains no authorization for these discharges.  The Corps says that it has not

made any decision to authorize these discharges under Fola's § 404 permit.  If so, then

WVDEP's 401 certification of that § 404 permit also did not authorize them.  The scope of the

401 certification is co-extensive with the scope of proposed federal permitting decision.  The 401

certification cannot consider other actions that are not being permitted under § 404.  The Corps

has therefore created a regulatory vacuum and is making a decision that would facilitate a clear

violation of federal law.

For these many reasons, Plaintiffs are likely to succeed on the merits of their claims that

the Corps' permitting decision violates the CWA and NEPA.

## II.     The Public Interest Supports an Injunction

The Corps argues that the public interest would not be served by an injunction, because

the Corps has "invested significant resources in the permit proceeding," and an injunction would

hurt mine-related economic and energy interests.  Corps Mem. 33.  This Court addressed these

same issues in the context of the injunction on the Callisto mine, and found that public interest in

enforcing federal law and maintaining the environmental balance struck by Congress in the

CWA and NEPA outweighed the interests cited by the Corps.  OVEC v. U.S. Army Corps of

Eng'rs, 528 F. Supp.2d 625, 633-34 (S.D. W. Va. 2007).  The Court found that the Corps'

interest in defending the validity of the permits it issued "seems rather inconsequential" and was

"only slightly affected, if at all, by the issuance or denial of an injunction."  Id. at 632.  The

Court also found that the economic harm to mining and energy interests was temporary, while

the harm to the environment was permanent.  "Money can be earned, lost, and earned again; a

valley once filled is gone."  Id. at 632.

## III.    The Balance of Harms Favors Plaintiffs

The irreparable harm to Plaintiffs is both procedural and concrete.  Absent an injunction,

the Corps would be able to approve a project without a legally adequate public notice or

opportunity for comment, and without the full consideration of public comments that the CWA

and NEPA require.  NEPA creates a procedural right, the violation of which creates the risk of

"real environmental harm [as a result of] inadequate foresight and deliberation."  Catron County

v. U.S. Fish and Wildlife Serv., 75 F.3d 1429, 1433 (10th Cir. 1996).  Plaintiffs are harmed by

the Corps' procedural violations because they use the natural resources that would be harmed by

Fola's project.  See Texas Indep. Producers and Royalty Owners Ass'n v. EPA, 410 F.3d 964,

976-77 (7th Cir. 2005) (holding that plaintiffs who regularly used the water bodies at issue had

procedural standing to challenge EPA's failure under the Clean Water Act to make documents

available for public review and comment prior to issuing a general permit).

Plaintiffs are also directly threatened by the permanent burial of natural headwater

streams with mining waste.  The Corps argues that this is not irreparable harm, because Congress

intended to authorize the filling of streams when it enacted § 404.  Corps Mem. 34.  As this

Court has found, however, "[w]hile it is true that these statutes contemplate a certain amount of

environmental degradation," they also protect the "integrity of the biological and ecological

systems."  528 F. Supp.2d at 633-34.  Section 404 mandates compliance with the § 404(b)(1)

Guidelines, which in turn prohibit "significant degradation" of the aquatic ecosystem.  33 U.S.C.

§ 1344(b)(1); 40 C.F.R. § 230.10(c).  Filling which exceeds this threshold, or which is

authorized without observance of procedures required by law, therefore causes cognizable

irreparable harm.

The Corps next argues that Plaintiffs' concern about the harm from the future failure of

mitigation is too speculative to support a finding of irreparable harm.  Corps Mem. 34-35.

Again, as this Court has stated, "[w]hether or not the applicable regulations are sufficient to

adequately minimize and mitigate the loss of streams, forest, and the organisms that depend on

them is precisely the question that the Court will address on the merits." 528 F. Supp.2d at 631. But if the Court allows streams to be destroyed while it addresses that question, and then finds that the permit conditions based upon the mitigation plan are inadequate, the damage cannot be undone. Id. In any event, the testimony of Plaintiffs' experts at the hearing will demonstrate that the inadequacy of Fola's mitigation plan is more than mere speculation, and is supported by credible scientific opinion and analysis. The balance of harms therefore favors Plaintiffs.

## Conclusion

For these reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction against the Corps ordering it to suspend the § 404 permit for the Fola Ike Fork No. 1 and Ike Fork No. 2 Surface Mines.

Respectfully submitted,

/s/ Joseph M. Lovett
JOSEPH M. LOVETT
Appalachian Center for the
          Economy and the Environment
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
jlovett@appalachian-center.org

James M. Hecker
Public Justice
1825 K Street, N.W. Suite 200
Washington, D.C. 20006
(202) 797-8600
jhecker@publicjustice.net

Counsel for the Plaintiffs

## LIST OF ADDITIONAL EXHIBITS

13        Fola Coal Company, Compensatory Mitigation Plan, dated October 2006.

14        Fola Coal Company, Supplement to a Compensatory Mitigation Plan, dated

27

December 7, 2007.

15      U.S. Army Corps of Engineers, Huntington District, July 14, 2004 Public Notice, Individual Permit Requirements for Surface Coal Mining Activities in the Southern District of West Virginia.

16      NEPA Guidance Document, attached to the July 14, 2004 Public Notice.

17      Site Assessment Forms in Appendix B of Fola's Supp. CMP.

18      NPDES permits for Fola Ike Fork No. 1 and No. 2 Surface Mines.

19      September 24, 2008 Letter from Ken Politan, WVDEP, re Fola's core samples.

**CERTIFICATE OF SERVICE**

I, Joseph M. Lovett, hereby certify that on October 15, 2008, I electronically filed the

foregoing Plaintiffs' Reply Memorandum in Support of its Motion for a Preliminary Injunction

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the following CM/ECF participants:

Cynthia J. Morris
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
*c.j.morris@usdoj.gov*

Ann D. Navaro
U. S. Army Corps Of Engineers
Great Lakes and Ohio River Division
P. O. Box 1159
Cincinnati, OH 45201

Robert McLusky
Jackson Kelly PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, WV 25322

James Crockett
Allyn Turner
Spilman, Thomas & Battle, PLLC
Post Office Box 273
Charleston, WV 25321-0273

/s/ Joseph M. Lovett
JOSEPH M. LOVETT
