IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, et al.,

                Plaintiffs,

v.                                               CIVIL ACTION NO. 3:08-0979

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiffs' Motion for a Preliminary Injunction Against the Fola Ike Fork No. 1 and No. 2 Surface Mines (Doc. 36). The Court heard evidence and argument related to this motion October 22nd through 24th of 2008. After considering the information presented, the Court **GRANTS** the plaintiffs' motion for preliminary injunction, but simultaneously **STAYS** the injunction with respect to Valley Fills 2 and 3 on the Ike Fork 1 permit.[1] The parties are **ORDERED** to confer and decide upon the precise boundaries within those valley fills to be exempt from this injunction by the stay.

### Introduction

This is not my first entrance into the controversy surrounding permits for valley fills issued by the U.S. Army Corps of Engineers ("Corps"). On March 23, 2007, I issued an opinion and order finding, among other things, that the Corps had not fulfilled its regulatory duty to assess the

---

[1] The Court understands Fola is already using other valley fills pursuant to a prior agreement with the plaintiffs. This injunction is not intended to apply to those areas.

permanent environmental impacts caused by valley fills. *See Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs,* 479 F.Supp.2d 607 (S.D. W.Va. 2007) ("*OVEC I*"). I found that the Corps was arbitrary and capricious in its assessment of stream functions and by relying on stream creation to mitigate the loss of these streams. *Id.* In this case, the plaintiffs allege that Fola's permit suffers from many of the same defects I previously found to invalidate other Corps issued permits. The Fourth Circuit Court of Appeals is in the process of reviewing my previous opinion and its decision may offer substantial guidance in the resolution of these issues. A decision is expected within the next few months and will likely affect this Court's decision on the merits. The appeal also colors the factors to be considered in this preliminary injunction; it is important to maintain the status quo not only in anticipation of this Court's final decision, but also pending the outcome of the appeal.

  I will begin this opinion where I ended the hearing, recognizing that the issues presented in this controversy are of exceptional public importance. I am certain that most citizens in West Virginia recognize both the contribution of coal to our economy and the value of this state's tremendous natural resources. These interests are not mutually exclusive, and achieving a balance which advances both is the goal of the statutes implicated in this action. With proper legislative or executive guidance, it may be possible to reach common ground in balancing these important values. However, a judge cannot make law, but must apply it to the facts before him.

  Considering the degree of passion held by supporters on both sides of the issue, all of the parties involved in this matter deserve recognition for the level of their efforts and the respect they have afforded the opposition. For their part, Fola Coal appears to be a conscientious corporate citizen. The evidence shows that they take serious their environmental responsibility under the permit and have, at times, gone above and beyond the restoration and remediation efforts required

of them.  I realize that my prior decision placed the Corps and many of its employees in a difficult position.  Nothing in this opinion should be taken as a reprimand of Corps employees who were asked to complete a daunting task and worked diligently in their attempts to accomplish it.  Lastly, the Court's decision to grant a preliminary injunction shows that it is impressed with the plaintiffs' advocacy and the role of citizens in these matters.  Beside that, however, both the plaintiffs and Fola deserve commendation for the reasonableness of their positions at this hearing.  Because neither has taken and all or nothing approach, this Court is able to reach a decision which will ensure both that environmental resources are protected and Fola is able to continue its business through the remainder of this litigation.  By that time, we all hope to benefit from some degree of clarity offered by either the Fourth Circuit Court of Appeals or, perhaps, a separate branch of government.

## Analysis

In considering a motion for preliminary injunction there are a few separate steps the Court must consider.  First, it must "balance the likelihood of irreparable harm to the plaintiff, against the likelihood of harm to the defendant." *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg., Co., Inc.*, 550 F.2d 189, 195 (4th Cir.1977) (internal quotations omitted).  If the Court determines that the balance of harm favors the plaintiffs, it must then consider the likelihood of success on the merits.  *Id*.  This test may be flexible depending upon the degree of harm shown by the plaintiff.  "The importance of probability of success increases as the probability of irreparable injury diminishes."  *Id*.  But, ordinarily, when irreparable harm is demonstrated, it will be sufficient, "that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."  *Id.*  Finally,

and in addition to these factors, the Court must always consider the effect of the injunction on the public interest. *Id*. at 196.

**I.    The Balance of Harm in this Case Favors the Plaintiffs**

Permanent environmental damage is often justification for an injunction. The Supreme Court has held, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co., v. Vill. of Gambell, Ala*., 480 U.S. 531, 545 (1987); *accord, Nat'l Audubon Soc'y v. Dept. of Navy,* 422 F.3d 174, 201 (4th Cir.2005). The plaintiffs argue that this kind of permanent injury will occur if an injunction is not issued. The Corps contends that mitigation efforts, monitoring, and performance standards will ensure that the project will have no significant impact on the environment.

After considering the parties' arguments and the evidence presented at hearing, the Court must agree with the plaintiffs that the environmental injury presented here is of the type described in *Amoco Prod. Co.*: significant damage which is permanent or at least of long duration. No party denies that without an injunction Fola will proceed to bury streams that currently exist in a natural state and a functioning ecosystem. The permits allow for the placement of fill in 32,731 linear feet of stream, in conjunction with the creation of 11 valley fills. Whether these existing streams have been adequately assessed, so that their functions and value are known and may be recreated or replaced, must be decided on the merits. Other questions relate to the likelihood the proposed mitigation will be successful. The Court recognizes that Fola's permits require monitoring for a minimum of ten years, and that additional mitigation may be required if restoration and stream

creation projects are not successful. If, however, the function of existing streams is not known, it will be impossible to evaluate the efficacy of mitigation. As there is no evidence of successful stream creation, it is plausible that mitigation may never be completely successful. In other words, while damage to existing streams is certain, the mitigation of this damage is uncertain. Even though Fola's permit contains conditions which may require additional effort, the near term mitigation of environmental degradation is unlikely. If damage is not permanent it is at least "of long duration." The issuance of an injunction will maintain the status quo until the Court can more fully evaluate the merits of the case.

Harm to the United States is slight at best. While the U.S. has an interest in maintaining the integrity of the permitting process and ensuring the validity of the permits it issues, this injunction will not harm those interests. The assessment tool used for Fola's permit was only developed to be used in the interim – a final assessment tool is already under development. The issuance of an injunction is not a decision on the merits and should not delay the development of a final assessment method.

The harm to Fola is economic. (Impacts to Fola employees and the local economy will be considered as public interest). The company is already behind its contract obligations, a shortfall of approximately 30,000 tons of coal per month. Fola estimated that if this injunction issued it would continue to operate until June of 2009, with increasing shortfalls. After June of 2009 the company would not be able to operate with the workforce it now maintains and may even cease operations. While the plaintiffs' motion sought to enjoin all activities under the challenged permit, counsel informed the Court during argument they would seek a partial stay to allow some activities to continue pending trial to reduce the harm to Fola and the public interest concerns related to the

possible loss of jobs and tax revenue to the county. If Fola is allowed to operate in Valley Fills 2 and 3 of its Ike Fork 1 Permit, the economic harm is somewhat different. Using these fills should allow Fola to continue operating and meet its contract obligations well into 2009. The partial stay of this injuction alleviates most, if not all, of Fola's economic harm in the near term. The Court would expect to resolve the case on the merits and benefit from the guidance of the Fourth Circuit Court of Appeals by the time substantial economic harm would be felt by Fola. Considering the stay and the injunction together, the harm to Fola is slight.

**II.     The Plaintiffs Have Established a Sufficient Likelihood of Success on the Merits.**

Because the plaintiffs have demonstrated irreparable harm balanced against only slight harm to either the United States or Fola, the burden to show a likelihood of success on the merits is not high. *See Blackwelder Furniture Co. of Statesville, Inc*., 550 F.2d at 195. The plaintiffs must only demonstrate that they have raised "questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* The plaintiffs have met this burden.

The plaintiffs raised two main arguments at hearing: first, that the Corps failed to follow the required public notice procedures when they issued Fola's Ike Fork permits; second, that the Corps Finding of No Significant Impact (FONSI) was arbitrary and capricious, specifically because it relied upon an inadequate assessment of existing stream functions. The plaintiffs' procedural argument is being presented to this Court for the first time. In a prior case, this Court held that four permits were invalid because the Corps failed to properly assess the function of streams and relied upon unproven projects, such as stream creation, to mitigate the impacts caused by burying streams. *See generally, OVEC I*, 479 F.Supp.2d 607 (S.D. W.Va. 2007). Since that time the Corps has

developed an assessment tool known as the interim Functional Assessment Approach ("FAA") to assess stream function. In its current state, the FAA is meant as an interim tool, to be used until a final assessment protocol can be completed.

### A. THE PLAINTIFFS HAVE DEMONSTRATED A SUBSTANTIAL QUESTION: DID THE CORPS COMPLY WITH REQUIRED NOTICE PROCEDURES?

The Corps must follow public notice regulations promulgated under both the National Environmental Protection Act ("NEPA") and the Clean Water Act ("CWA"). Pertinent regulations under NEPA require the Corps to "[m]ake diligent efforts to involve the public in preparing and implementing" their NEPA procedures, 40 C.F.R. § 1506.6(a), and to "involve environmental agencies, applicants, and the public, *to the extent practicable*, in preparing [Environmental Assessments]." 40 C.F.R. § 1501.4(b) (emphasis added). Regulations under the CWA mandate, "[t]he notice must, therefore, include sufficient information to give a clear understanding of the nature and magnitude of the activity *to generate meaningful comment*." 33 C.F.R. § 325.3(a) (emphasis added).

Case law interpreting these regulations further defines the level of public notice required under NEPA and the CWA. The Ninth Circuit recently held, "[a]n agency, when preparing an [Environmental Assessment], must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs.,* 524 F.3d 938, 953 (9th Cir. 2008). Pursuant to the CWA, an agency must "present for public scrutiny the rationale and pivotal data underlying its proposed action *before* the close of the comment and hearing period." *Nat'l Wildlife Fed'n v. Marsh*, 568 F.Supp. 985, 994 (D.C. D.C. 1983) (emphasis in original). An agency need not issue a supplemental

public notice every time new information is obtained. *See e.g. Nw. Envtl. Def. Ctr. v. Wood*, 947 F.Supp. 1371 (D.C. Ore 1996). The basis for the agency's rationale, however, must be disclosed to the public in order to provide them with an opportunity for "meaningful comment." *See Nat'l Wildlife Fed'n*, 693 F.Supp. at 995-96.

Here, the plaintiffs have raised a question about whether Corps procedures involved the public "to the extent practicable" and allowed them "meaningful comment." The Corps relied on mitigation measures in the issuance of a FONSI for the Ike Fork permits. These measures were not mentioned, much less explained, in the public notice. Rather, they were described, in detail, in a Compensatory Mitigation Plan, Supplemental Compensatory Mitigation Plan, and Environmental Decision Document submitted after the close of the public comment period. The Corps referenced these materials extensively in their Decision Document. The Supplemental Compensatory Mitigation Plan was submitted after the FAA was put into use by the Corps, so Plaintiffs had no opportunity to comment on its application to the proposed permit. Whether the public was involved to the extent required by law is fair grounds for litigation and deserves more deliberate inquiry.

   B.  THE PLAINTIFFS HAVE RAISED A SUBSTANTIAL QUESTION: WHETHER THE ISSUANCE OF A FONSI WAS ARBITRARY AND CAPRICIOUS?

NEPA requires federal agencies to take a "hard look" at environmental impacts before taking major action. *Nat'l Audubon Soc'y.* 422 F.3d at 184. If an action might have a substantial environmental impact, the agency must prepare a detailed Environmental Impact Statement (EIS). *State of N.C. v. FAA* 957 F.2d 1125, 1131 (4th Cir. 1992). The preparation of this EIS can be avoided through the issuance of a FONSI after a hard look through the development of a more limited Environmental Assessment (EA). *Id.* When the Corps issues a permit under section 404 of

-8-

the CWA, as it did with the Ike Fork permits, this hard look must include a determination that significant degradation of waters of the United States will not occur. 40 C.F.R. § 230.10.

In issuing a FONSI for the Ike Fork permits, the Corps relied on the FAA to assess functions of existing streams and predict the functions of mitigation projects. During the hearing, the plaintiffs provided credible evidence which raises a substantial question about whether or not the FAA is adequate to provide a hard look at potential environmental degradation. The regulations do not define functions but, although there may be some variations as to its precise meaning, all the witnesses agree that stream functions are different from stream structure. It is undisputed that the FAA relies on structural features of streams as a surrogate for stream function – stream function is never measured directly in this approach. This use of structure as an estimate of function is well established for the assessment of wetlands. It is the basis of numerous regional guidebooks, based in the HGM approach, and is used routinely by the Corps when the agency issues permits for wetlands. These guidebooks, however, typically take years to develop and rely on large amounts of scientific research linking wetland structure to wetland function. There does not seem to be the same scientific basis for linking structure and function in the Appalachian high gradient headwater streams assessed in the Ike Fork permits. Additionally, the FAA was developed on a much accelerated time scale – in less than two months compared with the two or more years typically involved with the creation of a guidebook  - with correspondingly less vetting by persons will relevant expertise.

The United States asserts that the Corps has done the best job possible under the circumstances and that the development of the FAA was only meant to be a temporary measure. The Court understands the amount of work that went into the development of the FAA, but finds the

-9-

plaintiffs have raised a fair question about its validity. The use of an interim tool does not eliminate the Corps' duty under NEPA to take a hard look or its duty under the CWA to ensure no significant degradation of waters of the United States.

The evidence presented at hearing shows that the plaintiffs have raised substantial questions about the Corp's compliance with the required public notice procedures and also whether the issuance of a FONSI was arbitrary and capricious. Therefore, the plaintiffs have met their burden to show a likelihood of success on the merits.

### III. The Public Interest Is Furthered by the Issuance of this Injunction.

The Court's final consideration must be the effect of the injunction upon the public interest. During the hearing Fola presented evidence about the effect a shutdown of its mine would have on its workforce and Clay County, West Virginia. Three different surface miners testified about their personal stake in the company's future. A company representative, Gary Patterson, testified that Fola employs approximately 350 surface miners and another 45 underground miners, all of whom depend upon the continued validity of the Ike Fork permits. The average wage for these employees is $62,500 plus benefits, making them a substantial part of the local economy. Jerry Linkinoggor, a Clay County commissioner, testified even more specifically about the impact Fola has on the local economy. Fola Coal Company is the largest employer, either public or private, in the county. Direct taxes and severance taxes from Fola together comprise approximately 65% of the county budget. The economy of Clay County would undoubtedly be impacted if Fola shutdown.

The public also has an interest in maintaining the balance struck by Congress between economic gain and environmental degradation. NEPA ensures that federal agencies make an informed and conscientious choice when they engage in an action with potential environmental

impacts. *See Nat'l Audubon Soc'y.,* 422 F.3d at 184. The CWA was written to "restor[e] and maintain[] the chemical, physical, and biological integrity of the Nation's waters." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 166 (2001) (quoting 33 U.S.C. § 1251(a)). Allowing permanent environmental damage to occur before thoroughly considering the applicability of the law to the facts at hand would be an abdication of this Court's duty to uphold the Congressional balance.

While some may decry the loss of jobs for the sake of a handful of valleys and streams, there is a real and substantial public interest in maintaining the quality of natural resources. Representatives from the plaintiff organizations have submitted sworn affidavits testifying to the negative impacts they have felt as a result of these permits and of Fola's mining. Headwater streams such as those that may be buried pursuant to the Ike Fork permits play a key role in keeping watersheds healthy. At hearing, various experts testified about crucial functions of these streams related to hydrology, chemistry, and ecology. These streams are an important part of the environment and should not be permanently destroyed if the activity fails to meet environmental standards. As this Court is well aware, the streams and valleys of the Ike Fork permits are not the only ones which may be lost beneath valley fills. Each such stream and valley needs to be evaluated and considered appropriately or in the end West Virginia may itself an environmental catastrophe, arrived at one small step at a time.

While environmental damage from the burial of streams is real and imminent, the relationship between Fola Coal and Clay County is unique. Fola is the only mining operation in the county, and as such is a foundation of the economy. Fola has also demonstrated that it takes its environmental responsibilities seriously, and its track record shows that it will undertake the efforts

necessary to comply with its permit conditions. Recognizing this situation, the plaintiffs suggested at the end of the hearing that they would be satisfied if an injunction were issued, but Fola was allowed to use Valley Fills 2 and 3 on Ike Fork 1 permit so that it could continue to operate at full capacity well into 2009. Pursuing such a course alleviates the above-mentioned economic concerns and will allow the Court to address the merits of the case in a more typical time frame. By the time Fola has exhausted the capacities of Valley Fills 1 and 2 it is likely that the Court will have decided the case on the merits or the Fourth Circuit Court of Appeals will have ruled on this Court's previous opinion providing guidance and offering clarity about the law. This suggestion comes close to the proposal offered by Fola at the outset of the hearing, when it requested that any injunction be fashioned to allow some activities. The plaintiffs' suggestion is adopted, therefore, as this Court's Order.

## CONCLUSION

The Court **GRANTS** the plaintiffs' motion for preliminary injunction (Doc. 36), but simultaneously **STAYS** the injunction as it applies to Valley Fills 2 and 3 on the Ike Fork 1 permit. The parties are **ORDERED** to confer and decide upon the precise boundaries within those valley fills exempted from the injunction by the stay.

ENTER: October 31, 2008

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE