**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, et al.,

                Plaintiffs,

v.                                  CIVIL  ACTION  NO.  3:08-0979

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are several motions by the parties for full or partial summary judgment: Plaintiffs' Motion for Partial Summary Judgment Against the Loadout Nellis Surface Mine (Doc. 112); Intervenor-Defendant, Loadout, LLC's, Motion for Summary Judgment (Doc. 115); Intervenor-Defendant, Fola Coal Company, LLC's, Motion for Partial Summary Judgment (Doc. 135); Plaintiffs' Cross-Motion for Partial Summary Judgment (Doc. 139); and Intervenor-Defendant, Fola Coal Company, LLC's, Motion for Summary Judgment (Doc. 150). For the reasons explained below, the Court **GRANTS in part and DENIES in part** Parties' motions.

More specifically, the Court **RULES** as follows:

1.        The Court **FINDS** the Corps violated the Clean Water Act and the National Environmental Policy Act by failing to provide adequate public notice and comment regarding Loadout's § 404 permit. Therefore, Plaintiffs' Motion for Partial Summary Judgment Against the Loadout Nellis Surface Mine on Count 5 of their Third Amended Complaint [Plaintiffs' claim that the Corps violated its obligations under the CWA and NEPA to provide adequate notice and comment and to involve the public in its environmental impact analysis when it issued a § 404 permit for

Loadout's Nellis Surface Mine (Doc. 112)][1] is **GRANTED**.

2.      Intervenor-Defendant Loadout's motion for summary judgment on Counts 5, 6 and 7 of Third Amended Complaint [Plaintiffs' claims that: the Corps violated the CWA and NEPA because (1) they failed to provide adequate public notice and comment on Loadout's § 404 permit and adequate pre-decisional public involvement in its preparation of the relevant Environmental Assessment (Count 5); (2) the Corp's determination that Loadout's Nellis Surface Mine will not cause significant degradation of water of the U.S. is illegal, arbitrary and capricious (Count 6); and (3) the Corps' Finding of No Significant Impact on the Nellis Surface Mine violates NEPA and is arbitrary and capricious because the Corps failed to take a hard look at the environmental impacts of the project (Count 7) (Doc. 115)] is **GRANTED in part and DENIED in part**.  The motion is **GRANTED** insofar as it is controlled by the Fourth Circuit's decision in *Ohio Valley Environmental Coalition v. Aracoma Coal Co.,* 556 F.3d 177 (2009) (Counts 6 & 7).  However, it is **DENIED** with regard to Count 5, Plaintiffs' claim that the Corps failed to provide adequate public notice and comment.

3.      The Court **FINDS** the Corps violated the CWA and NEPA by failing to provide adequate public notice and comment regarding Fola's § 404 permits.  Therefore, Intervenor-Defendant Fola's motion for partial summary judgment on Count 1 of Plaintiffs' Fourth Amended Complaint [Plaintiffs' claim that the Corps violated the CWA and NEPA by failing to provide adequate notice and comment on, and pre-decisional public involvement in, the § 404 permit for Fola's Ike Fork No. 1 and Ike Fork No. 2 Surface Mines (Doc. 135)] is **DENIED** and Plaintiffs' cross-motion for partial summary judgment on the same claim (Doc. 139) is **GRANTED**.

4.      Intervenor-Defendant Fola's motion for summary judgment as to each count against it in Plaintiffs' Fourth Amended Complaint (Counts 1-4) [(1) Plaintiffs' claim regarding notice and comment (Count 1); (2) Plaintiffs' claim that the Corp's determination that Fola's mines will not cause significant degradation of waters of the U.S. is illegal, arbitrary and capricious (Count 2); (3) the claim that the Corps' Finding of No Significant Impact on the Ike Fork permits violates NEPA and is arbitrary and capricious (Count 3); and (4) Plaintiffs' claim that the Corps does not have jurisdiction to issue a § 404 permit for discharges from the toes of valley fills

---

[1]In their motion papers, Plaintiffs state they are moving for summary judgment on "Count One of their Third Amended Complaint ... that the Corps violated its obligations under [the CWA] and [NEPA] to provide adequate notice and comment and to involve the public in its environmental impact analysis when it issued an individual permit under § 404 of the CWA for Loadout, LLC's Nellis Surface Mine."  *See* Doc. 112.  This claim, however, appears as Count 5 in Plaintiffs' Third Amended Complaint.  The Court therefore addresses summary judgment with respect to Count 5.

and, thus, the attempt to permit these discharges violates the CWA (Count 4) (Doc. 150)] is **GRANTED in part, DENIED in part, and partially HELD IN ABEYANCE**. The motion is **GRANTED** insofar as it is controlled by the Fourth Circuit's decision in *Ohio Valley Environmental Coalition v. Aracoma Coal Co*. (Counts 2 & 4, and all of Count 3 except ¶ 76 g.); it is **DENIED** with regard to Count 1, Plaintiffs' claim that the Corps failed to provide adequate public notice and comment; and the motion is **HELD IN ABEYANCE** with regard to Plaintiffs' claim that the Corps had no reasoned basis or substantial evidence to conclude that the selenium discharges from Fola's Ike Fork mines would be individually or cumulatively insignificant (Count 3, ¶ 76 g.).

## I.   Background

### A.    Procedural History and Relevant Case Law

In a complaint filed on August 7, 2008, Plaintiffs sought declaratory and injunctive relief on claims that the U.S. Army Corps of Engineers ("the Corps") failed to comply with § 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, when issuing a permit for a large surface mine – the Hobet Surface Mine No. 22 – in Lincoln County, West Virginia. Since that time, Plaintiffs' claims regarding Hobet Mining's § 404 permit have been resolved. *See Pl.'s Mot. for Leave to File a Third Am. Compl.* (Doc. 85) (dismissing claims against the Corps related to Hobet Surface Mine No. 22). However, in the year that followed the original complaint, Plaintiffs amended their suit to add several claims against the Corps regarding surface mines operated by three additional companies: Fola Coal Company, LLC ("Fola"), Loadout, LLC ("Loadout"), and Appalachian Fuels, LLC ("AppFuels"). *See Pl.'s Second Am. Compl.* (Doc. 58) (adding claims related to Fola's Ike Fork No. 1 and Ike Fork No. 2 Surface Mines); *Pl.'s Third Am. Compl.* (Doc. 120) (adding claims related to Loadout's Nellis Surface Mine); *Pl.'s Fourth Am. and Supplemental Compl.* (Doc. 121) (adding claims related to AppFuels' Fourmile North Surface Mine). These claims took two primary forms:

(1) substantive, and (2) procedural.  With regard to their substantive claims, Plaintiffs argued that the permits violated the CWA § 404(b)(1) Guidelines ("CWA Guidelines") and that the Corps' Findings of No Significant Impact ("FONSI") and related Environmental Assessments ("EA") violated NEPA.  With regard to their procedural claims, Plaintiffs contend that the Corps failed to comply with its duties under the CWA and NEPA to provide adequate public notice, public comment, and other public involvement in its review process for the mines' § 404 permits.

For the most part, Plaintiffs' substantive claims are controlled by the Fourth Circuit's decision in *Ohio Valley Environmental Coalition v. Aracoma Coal Company*, 556 F.3d 177 (2009). In *Aracoma*, the Fourth Circuit reversed two orders by this Court regarding the legality of the Corps' conduct in issuing four § 404 permits.  The facts surrounding the permits at issue in *Aracoma* are similar to the facts in the instant case.  There, the Corps issued each of the contested permits after an EA and a FONSI.  Plaintiffs then challenged the permits, arguing their issuance violated  both substantive and procedural provisions of the CWA and NEPA.  Specifically, Plaintiffs claimed: (1) that the individual and cumulative adverse impacts of the permits were significant and, thus, the Corps was required under NEPA to complete an Environmental Impact Statement ("EIS"); and (2) that the permits were invalid because the Corps failed to properly determine the adverse individual and cumulative impacts as required by the CWA and the CWA Guidelines.  This Court agreed with Plaintiffs, granting summary judgment in their favor and finding that: the probable impacts of the permitted valley fills would be significant and adverse under the CWA and NEPA; the mitigation plans for the permits were not sufficient to compensate for these impacts; the Corps improperly limited its scope of NEPA review to jurisdictional waters, rather than the impact of an entire valley fill project; and the Corps did not adequately evaluate cumulative impacts.  *See id.* at 188.

4

However, the Fourth Circuit disagreed and reversed this Court, holding: (1) the Corps' decision regarding the scope of its NEPA analysis was entitled to deference and the Corps was reasonable in limiting the scope of its analysis to the impact of filling jurisdictional waters; (2) the Corps adequately supported its mitigated FONSIs under NEPA and its findings of no significant degradation under the CWA[2]; and (3) the Corps did not exceed its § 404 authority in permitting "unitary waste systems" consisting of sediment ponds together with the stream segments that connect them. *Id.* at 197, 200-01, 206-07, 209, 216. For each of its holdings, the Fourth Circuit relied heavily on a theory of agency deference. Specifically, the Circuit Court relied on *Auer* or *Seminole Rock* deference, a "highly deferential" kind of review that is appropriate when a court reviews an agency's interpretation of its own regulations, *see, e.g., id.* at 193 (citing *Auer v. Robbins*, 519 U.S. 452 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)), as well as on *Baltimore Gas & Electric Company v. Natural Resources Defense Council,* 462 U.S. 87 (1983), which holds that a court must be at its "most deferential" when reviewing agency decisions involving complex predictions based on specialized, technical expertise. *Aracoma*, 556 F.3d at 201, 205.

The Fourth Circuit's mandate in *Aracoma* controls the majority of Plaintiffs' substantive claims. Specifically, the deference accorded to the Corps under *Aracoma* requires this Court to **FIND**: (1) the Corps' determinations that Loadout and Fola's surface mines will not cause significant degradation to the waters of the U.S. are reasonable and, thus, in accordance with

---

[2]This includes the Corps' findings regarding: the impact of the permitted fills on the structure and function of affected streams; the sufficiency of the proposed mitigation measures for purposes of CWA and NEPA; and the Corps' NEPA and CWA assessments of cumulative impacts. *Id*. at 197.

existing law; (2) the Corps' FONSIs are reasonable and therefore also in accordance with existing law; and (3) Plaintiffs' claim that the Corps does not have jurisdiction to issue a § 404 permit for discharges from the toes of valley fills is unpersuasive.  Thus, the Court **GRANTS** summary judgment to Intervenor-Defendants on these counts.

In light of *Aracoma*, the only issues remaining in the instant matter are: (1) whether the Corps complied with its duties under the CWA and NEPA to provide adequate public notice and comment and predecisional public involvement in issuing the mines' § 404 permits, and (2) whether the Corps had a reasoned basis to conclude that the  selenium discharges from Fola's surface mines would be individually or cumulatively insignificant.  Because it has not been fully briefed, the Court refrains from deciding the selenium issue herein.  With regard to the public notice issue, however, the Court **GRANTS** summary judgment in favor of Plaintiffs.  Accordingly, the public notice and comment requirements established by the CWA and NEPA are discussed below.


**B.      Regulatory Framework**

"A complex statutory framework undergirds the regulation of [mountaintop mining operations.]"  *Aracoma*, 556 F.3d at 189.  At the federal level, this framework is composed of four statutes: the CWA, NEPA, the Surface Mine Control and Reclamation Act ("SMCRA") and the Administrative Procedure Act ("APA").  It is the Corps' responsibilities under the CWA and NEPA that are at issue in the instant matter.

1.      THE CLEAN WATER ACT

Congress passed the CWA with the express intent to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251.  This goal is achieved,

in large part, by a general prohibition on the discharge of pollutants into navigable waters of the United States.  *Id.* at § 1311.  The Act contains two major exceptions to this prohibition, however.  First, § 402 permits the discharge of pollutants through a national pollution discharge elimination system, *id.* at § 1342, and, second, § 404 permits the discharge of dredged or fill material into the navigable waters at specified disposal sites.  *Id.* at § 1344.  Pursuant to § 404, permits for the discharge of dredged or fill material may be issued by the Secretary of the U.S. Army Corps of Engineers ("Secretary"), after notice and an opportunity for public hearing.  *Id.*; 33 C.F.R. § 320.2(f).  Such authority must be exercised in accordance with the guidelines developed by the Administrator of the U.S. Environmental Protection Agency ("EPA") and published in 40 C.F.R. Part 230 (hereinafter "CWA Guidelines" or "404(b)(1) Guidelines"), as well as in accordance with the Corps' own regulations.  33 C.F.R. § 320.2(f).

The overall purpose of the § 404 permit evaluation process and the attendant public notice is to determine whether a proposed project will result in significant, unacceptable adverse effects to the waters of the United States.  *See* 40 C.F.R. §§ 230.1, 230.10, 230.12; 33 C.F.R §§ 320.2(f), 320.4.  This is consistent with the CWA's purpose of restoring and maintaining the waters of the United States, *see* 33 U.S.C. § 1251, and is achieved through a process known as the public interest review.  According to the Corps' regulation at 33 C.F.R. § 320.4(a)(1), the decision whether to issue a § 404 permit must be "based on an evaluation of the probable impacts ... of the proposed activity and its intended use on the public interest."[3]  33 C.F.R. § 320.4(a)(1).  There is a presumption that "a permit will be granted unless the district engineer determines that it would be contrary to the

---

[3]According to this review, the decision to issue a permit "should reflect the national concern for both protection and utilization of important resources."  33 C.F.R. § 320.4(a)(1).

public interest," *id.*, which is defined in terms of environmental degradation.  A permit is contrary

to the public interest if the "discharge of dredged or fill material ... will cause or contribute to

significant degradation of the waters of the United States."  40 C.F.R. § 230.10(c).  If a project is

determined not to have significant adverse environmental effects, the Corps will issue a finding of

no significant degradation and the proposed permit will be found in compliance with the CWA and

CWA Guidelines.  *See* 40 C.F.R. § 230.12.  Such a permit may be issued without conditions and

without further environmental review.  *Id.*  If a proposed project is found to cause or contribute to

significant degradation, however, the permit may not be issued unless appropriate and practicable

conditions to minimize and compensate for this degradation are included in the permit.  *See* 40

C.F.R. §§ 230.10, 230.12.

The Corps protects the public interest, fulfilling its statutory and regulatory obligations under

§ 404, by engaging in the permit evaluation process outlined by the CWA and CWA Guidelines.

To initiate this process, an interested party files a § 404 permit application with the Corps.  Such an

application "must include a complete description of the proposed activity including necessary

drawings, sketches, or plans sufficient for public notice."  33 C.F.R. 325.1(d)(1) (2007)[4]; *see also*

---

[4]The Corps CWA regulations were amended in 2009.  Thus, this opinion cites to the 2007
version of the Corps' CWA regulations – the operative regulations at the time of the Nellis and
Ike Fork mines' permit evaluations and issuance.  The 2009 version of the CWA regulations
contains a requirement that "[f]or activities involving discharges of dredged or fill material into
waters of the United States, the application must include a statement describing how impacts to
waters of the United States are to be avoided and minimized.  The application must also include
either a statement describing how impacts to the waters of the United States are to be
compensated for or a statement explaining why compensatory mitigation should not be required
for the proposed impacts."  33 C.F.R. 325.1(d)(9) (2009).  The Corps and Intervenor-Defendants
cite this revision as evidence that no statement on mitigation was necessary to render a public
notice sufficient under the 2007 CWA regulations.  The Court finds this argument unpersuasive,
however.  The decision to amend the CWA regulations in 2009 to specifically state that
information on mitigation is necessary to complete a § 404 application is not convincing

*id.* ("Detailed engineering plans and specifications are not required," however, the application must describe "the location, purpose and need for the proposed activity; scheduling of activity; the names and addresses of adjoining property owners; the location and dimensions of adjacent structures; and a list of authorizations required by other federal, interstate, state, or local agencies ... including all approvals received or denials already made."). "[W]ithin 15 days of receipt of an application the district engineer will either determine that the application is complete ... or that it is incomplete and notify the applicant of the information necessary for a complete application." 33 C.F.R. 325.2(a)(2). Once the application is deemed complete, public notice must be issued within 15 days. 33 U.S.C. § 1344(a) ("Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish notice required by this subsection."); 33 C.F.R. 325.2(d)(1) ("The public notice will be issued within 15 days of receipt of all information required to be submitted by the applicant in accord with paragraph 325.1.(d) of this Part.").

"[T]o the maximum extent practicable, a decision with respect to an application for a permit ... will be made not later than the ninetieth day after the date the notice for such application is published[.]" 33 U.S.C. § 1344(q); 33 C.F.R. 325.2(d)(3) ("District engineers will decide on all applications not later than 60 days after receipt of a complete application.").[5] To this end, the CWA

_____

evidence that such information was not required under the 2007 version of the regulations, for, as readily as the change in regulations can be attributed to a previous lack of the necessity to include information on mitigation, the revision can be seen as clarifying and explicitly stating a previously implied requirement. This is especially true in light of the fact that standard established in 33 C.F.R. 325.2(a)(2), which establishes the standard for the sufficiency of public notice, did not change in 2009.

[5]According to 33 C.F.R. § 325.1(d)(3), this should be done "unless" one of a set of specific circumstances exists, including: "[i]nformation needed by the district engineer for a

instructs the Secretary to enter into agreements with the appropriate federal agencies "to minimize,

to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of

permits[.]"  *Id.*

    2.      THE NATIONAL ENVIRONMENTAL POLICY ACT

    NEPA was enacted with lofty goals.  The Congressional declaration of purpose provides,

> The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321.  NEPA is an "action-forcing" statute, which "promotes its purpose in two ways.

First, NEPA ensures that a federal agency will carefully consider the effects of its actions on the

environment by specifying formal procedures the agency must follow before taking action.  Second,

NEPA requires an agency to disseminate widely its findings on the environmental impacts of its

actions.  *Nat'l Audubon Society v. Dep't of Navy*, 422 F.3d. 174, 184 (4th Cir. 2005) (internal

citations and quotations omitted); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S.

---

decision on the application cannot reasonably be obtained within the 60-day period."  33 C.F.R. § 325.2(d)(3)(vi). Said differently, the regulations create a presumption that once an application is deemed complete a decision should be made on that application within 60 days.  Further, in the case where it is unreasonable that all the information required to make the decision be obtained within 60 days, the regulations provide that "[o]nce the cause for preventing the decision from being made within the normal 60-day period has been satisfied or eliminated, the 60-day clock will start running again from where it was suspended," *id.*; meaning that even if the decision cannot be made 60 days after the initial determination of completion, the clock is reset and the Corps is still required to abide by the 60-day time limit as soon as all the necessary information is available.

332, 350 (1989) ("The sweeping policy goals announced in § 101 of NEPA are [] realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences and that provide for broad dissemination of relevant environmental information.") (citations omitted). In other words, NEPA is a purely procedural statute, focused on ensuring informed decision-making, rather than compelling particular results or imposing substantive obligations. *Methow Valley*, 490 U.S. at 350 ("Although [NEPA] procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."); *Nat'l Audubon*, 422 F.3d at 184 ("NEPA merely prohibits uniformed – rather than unwise – agency action.") (citing *Methow Valley*, 490 U.S. at 351) (internal quotations omitted); *Hodges v. Abraham*, 300 F.3d 432, 445-46 (4th Cir. 2002).

An agency discharges its NEPA responsibility to take a "hard look" at environmental consequences by completing an environmental review prior to undertaking a proposed action. *Hodges*, 300 F.3d at 446. Generally, this environmental review takes one of two forms: an EIS or an EA. *See, e.g., Id.*; 42 U.S.C. § 4332. An EIS is a detailed statement required for "major Federal Actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). Significance is determined by evaluating the context of the proposed action and the intensity of its potential environmental impacts. *See, e.g., Aracoma*, 556 F. 3d at 191 (citing 40 C.F.R. § 1508.27). An EA, on the other hand, is prepared when the significance of the adverse environmental impacts of a proposed action are either unknown or unclear. 40 C.F.R. § 1501.4(b). The EA is "a concise public document," which follows an abbreviated environmental review. *See, e.g., Aracoma*, 556 F.3d at 191. The purpose of the EA is to determine whether (1) the proposed action can proceed

11

without further environmental review, or (2) an EIS will be required.  40 C.F.R. § 1501.4(b).  If, after an EA, the lead agency determines that a project may continue without further environmental review, it will issue a finding of no significant impact, or FONSI.  *See Aracoma,* 556 F.3d at 191 ("An EA ... serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or [FONSI].") (citations omitted).

A § 404 permit requires environmental review pursuant to NEPA.  Additionally, the § 404 permitting process implicates an intermediate form of environmental review known as the "mitigated EA."  The "so-called mitigated EA" is used when an agency determines that, although they will be significant, the adverse environmental impacts associated with a proposed project can be reduced below significance using mitigation.  *Id.* at 191-92 ("Even where an EA determines that a proposed action will have a significant environmental impact, an agency may avoid issuing an EIS where it finds that mitigating measures can be taken to reduce the environmental impact of the project below the level of significance.  In these situations, the agency can issue a 'so-called mitigated FONSI.'") (internal citations and quotations omitted).  The mitigated EA and mitigated FONSI are relevant here because they are commonly used in the  mountaintop coal-mining context.  *See Id.* at 187 ("For each of the four permits, the Corps prepared Environmental Assessments that concluded that the permitted activity would not result in significant environmental impacts given planned mitigation measures.  On that basis, the Corps issued a "Finding of No Significant Impact" for all four permits.").

Whether used in the context of an EIS, EA or mitigated EA, public involvement is critical to NEPA's function.  *See, e.g., California v. Block*, 690 F.2d 753, 770 (9th Cir. 1982) ("NEPA's public comment procedures are at the heart of the NEPA review process.").  "NEPA ensures that

[an] agency will not act on incomplete information," *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989), at least in part, by "ensur[ing] that the public will be able to analyze and comment on [an] action's environmental implications."  *Nat'l Audubon*, 422 F.3d at 184  (citing *Hodges*, 300 F.3d at 438).   The critical role public involvement plays in realizing NEPA's goal of achieving informed decision-making is reflected in the CEQ Guidelines.  *See Block*, 690 F.2d at 771("We agree with the CEQ Guidelines' interpretation of NEPA's procedural requirements. NEPA's public comment procedures are at the heart of the NEPA review process."); *Nat'l Audubon,* 422 F.3d at 184 ("To supplement the statute, the Council on Environmental Quality (CEQ) has set forth regulations that agencies are required to follow[.]") (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004)).

> First, 40 C.F.R. § 1500.1, the section entitled "Purpose," provides, in relevant part:
>
> NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.  Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.  40 C.F.R. § 1500.1(b).

Additionally, the CEQ Guidelines mandate that the lead agency on an EA "shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments," 40 C.F.R. § 1501.4(b); a duty which includes "[m]ak[ing] diligent efforts to involve the public in preparing and implementing their NEPA procedures," 40 C.F.R. § 1506.6(a), and "[s]olicit[ing] appropriate information from the public."  40 C.F.R. § 1506.6(d).

## C.    Factual Background

Plaintiffs claim that the public notices issued for the § 404 permit applications for Loadout's

13

Nellis Surface Mine and Fola's Ike Fork mines were deficient under the CWA and NEPA. Therefore, an evaluation of this claim requires an understanding of the facts surrounding the issuance of each permit.

    1.    PERMIT APPROVAL FOR THE LOADOUT NELLIS SURFACE MINE

    Loadout filed its application for a CWA § 404 permit for its Nellis Surface Mine on April 10, 2005.  The Corps deemed the application complete on May 25, 2006, and issued public notice of the application on June 2, 2006.  Public comment on the notice was open for 30 days, until July 2, 2006.[6]  The notice document for the Nellis Surface Mine is three and a half pages long.  Loadout Notice (Doc. 86-1).  It includes several standard sections, including but not limited to descriptions of: the purpose of the notice, the relevant regulatory program, the requirements of § 404, the § 401 water quality certification requirement, the public interest review, and the § 404 comment procedures.  *Id.*  Additionally, the notice contains some project-specific information, including the location of the proposed project and a description of the proposed work.  *Id.*  The location of the project is described with longitude and latitude measurements and by tributary names.  *Id.*  The section entitled "Description of Proposed Work" consists of two paragraphs, where the Corps: (1) specifies the purpose of the proposed project; (2) describes the type of structures proposed (four valley fills, two permanent sediment ponds, and one temporary sediment pond); and (3) provides the linear footage of the expected permanent and temporary impacts to waters of the United States, including whether the impacts would be to an intermittent or ephemeral stream.  *Id.*  Finally, a summary of the proposed impacts is provided in table form and several maps and drawings,

---

[6]Pursuant to 33 C.F.R. §325.2(d)(2) the comment period on a § 404 permit application may not be less than 15 days nor more than 30.

including cross sections of the proposed valley fills, are included in the notice.[7]  *Id.*

The notice, however, contains little to no detail regarding the nature of the expected environmental impacts or the character of the lands and waters to be affected by the project.  Further, the section entitled "Mitigation Plan" states, in total, "The applicant has not submitted a Compensatory Mitigation Plan (CMP) to compensate for permanent and temporary impacts to waters of the U.S. that are regulated by USACE."  *Id.*  The notice therefore contains no information on  proposed mitigation, or on how this mitigation is expected to account for the project's adverse environmental effects.  *Id.*

The Corps received ten comments in response to the Loadout Notice, including a twenty-nine page comment letter submitted on behalf of Plaintiffs by Margaret Janes of the Appalachian Center for the Economy and the Environment ("Appalachian Center").   *See* Appalachian Center's Loadout Comments (Doc. 86-11).  Plaintiffs' comments cover a wide range of topics, including but not limited to: criticism of the Corps' analysis of practicable alternatives; criticism of the scope of the overall analysis; and the suggestion that the permit may not sufficiently protect water quality standards.  *Id.*  Additionally, Plaintiffs' comment letter scrutinizes the expected use of mitigation to offset the project's adverse environmental impacts.  *Id.*  Attached to their comments, Plaintiffs provide expert reports produced by Drs. Bruce Wallace and Margaret Palmer as well as published articles on stream restoration.  However, neither through their comments nor at any time later in the permitting process did Plaintiffs request a public hearing on the application.

---

[7]A total of ten maps and drawings are attached to the notice.  As a whole, the drawings are skeletal in nature, providing basic information regarding the structure, size, and location of the proposed valley fills.

Shortly after the close of public comment on its application, on July 7, 2006, Loadout submitted an Environmental Information Document for the Nellis Surface Mine ("Loadout EID"). The EID contains a detailed analysis of practicable alternatives; a comprehensive description of how mining would proceed under the proposed plan; a lengthy explanation of actions the company will take to mitigate adverse impacts; and a detailed proposal regarding post-mining land use.[8]  Loadout EID (Doc. 86-5).  Next, in July 2007, approximately one year after the comment period closed, Loadout submitted an initial Compensatory Mitigation Plan ("Loadout CMP") to the Corps.  That same month, the Corps circulated the Loadout CMP to the U.S. Fish and Wildlife Service ("USFW"), the U.S. Office of Surface Mining ("OSM"), the West Virginia DEP ("WVDEP"), the West Virginia Division of Natural Resources ("WVDNR"), and the West Virginia Division of Culture and History ("WVDCH") for review and comment.   Then, in December 2007 and March 2009, respectively, Loadout sent the Corps two letters with information to supplement the CMP.

The Loadout CMP was not made available for public comment.  Additionally, none of the federal or state agencies to which the CMP was circulated made comments on it.  Together, the CMP and its supplements provide a detailed analysis of the potential adverse environmental impacts of the Nellis Surface Mine's §404 permit, including the expected severity of these impacts and the mitigation measures proposed to counter them.[9]  *See* Loadout EID (Doc. 86-5); Loadout CMP (Doc. 86-2).  In its CMP, Loadout proposes to mitigate adverse impacts by using

---

[8]The Loadout EID is 63 pages long, with 245 pages of attached appendices, for total length of 308 pages.  *See, e.g., Id.*; Attached Appendices F & H (Docs. 86-7 & 86-9).

[9]The combined length of the Loadout CMP and its supplements is 397 pages.

16

stream creation and stream restoration.  Specifically, Loadout proposes to mitigate the permanent impacts its project will have to 11,162 feet of intermittent and ephemeral streams by creating approximately 13,564 feet of ephemeral and intermittent stream channels within seven sediment and perimeter ditches at the site (on-site stream creation) and by conducting stream enhancement activities on 8,900 feet of Fork Creek, a site located approximately two miles downstream of the impact site and within the affected Fork Creek Watershed (off-site stream restoration).  *See* Loadout CDD (Doc. 86-3), 18-21.  In the CMP, the company also predicts that the proposed mitigation – which includes a monitoring plan to assure success – will alleviate adverse environmental impacts, and provides that, in the case that the proposed mitigation does not perform as expected, the company will undertake remedial measures and/or additional mitigation in order to avoid significant environmental degradation.  *See* Loadout CMP (Doc. 86-2).  In short, the Loadout CMP provides how – as a result of the mitigation measures proposed – the Nellis Surface Mine will avoid significant environmental degradation and comply with CWA and NEPA standards.  *Id.*

The Corps issued the § 404 permit for Loadout's Nellis Surface Mine on April 21, 2008, approximately nine months after Loadout submitted its initial CMP.  Loadout Permit (Doc. 86-6). Attached to the permit, the Corps provided an 88-page Combined Decision Document ("Loadout CDD") in which it published a FONSI for the Nellis Surface Mine.  The Loadout CMP plays a prominent role in the Loadout CDD.  The Loadout CDD incorporates the entire CMP by reference and, in a section entitled "Applicant's Proposed Mitigation," the CDD contains a twenty-page discussion of the CMP.  Loadout CDD (Docs. 86-3 & 86-4).  Additionally, the CMP is referenced throughout the Corps' discussions of the significance (or lack thereof) of the

individual and cumulative impacts of the §404 permit and the Corps refers to the mitigation plan in response to a large portion of Plaintiffs' comments.[10]  *Id.*  Finally, the Loadout FONSI, which is issued in the last section of the Loadout CDD, directly refers to the CMP as "quantitatively assess[ing] impacts to aquatic resources and present[ing] a mitigation design to compensate for the stream function loss associated with the proposed project."  *Id.* at 87.  The Loadout CDD therefore acknowledges that the Loadout FONSI is based, in large part, on the mitigation measures provided for in the CMP.

2.      PERMIT APPROVAL FOR FOLA'S IKE FORK MINES NOS. 1 AND 2

        The permit evaluation process for Fola's Ike Fork mines was similar to that of Loadout's Nellis Surface Mine.  Fola filed its initial application on October 19, 2004, and the Corps determined the application was complete and issued notice for public comment on April 13, 2005.  Fola Notice (Doc. 36-1).  The comment period on the Fola Notice was then open for 30 days, until May 14, 2005.  *Id.*  The Fola Notice is four pages long and it contains many of the standard sections present in the Loadout Notice.[11]  *Id.*  Additionally, similar to the Loadout Notice, the Fola Notice contains project-specific information in just two sections: the sections entitled "Location" and "Description of the Proposed Work."  *Id.*  These sections mirror the relevant sections in the Loadout Notice: providing project-specific information on the purpose of the

---

[10]In addition to responding to their comments in the CDD, the Corps sent Plaintiffs a forty-page document which replies to each of their comments on the Loadout Notice.  Corps' Response to Loadout Comments (Doc. 138-1).  Again, the majority of these responses expressly refer Plaintiffs to the Loadout CMP (or the Loadout EID) for answers to their concerns.  *Id.*

[11]For example, the Fola Notice contains standard language on subjects such as: the purpose of the Notice, the relevant regulatory program, § 404 of the CWA, the § 401 water quality certification requirement, the public interest review, and the process for public comment.

proposed § 404 permit; the longitude and latitude location of the project; and the number of stream feet and acreage to be adversely affected, both permanently and temporarily.[12]  *Id.* Also, similar to the Loadout Notice, the Fola Notice contains little to no project-specific information on the nature of the expected environmental impacts and no information on the mitigation measures proposed to counter such impacts.[13]  *Id.*

Pursuant to the Fola Notice, the Appalachian Center submitted comments on behalf of Plaintiffs.  These comments were nearly identical in form and substance to the comments submitted in response to the Loadout Notice.  There were five additional public comments received in response to the Fola Notice.

Similarities notwithstanding, the process by which the Corps evaluated Fola's § 404 permit differed from the Loadout permit evaluation in a few significant ways.  First, on November 2, 2004, prior to issuing public notice, the Corps wrote Fola and requested additional information on the project.  In its letter, the Corps informed Fola that its application did not provide "sufficient information regarding the extent of jurisdictional waters of the U.S. that have been or would be impacted by the [Ike Fork permit activity]" and that additional information "[was] required in order to advertise [Fola's] proposal via a public notice."  Corps' Letter to Fola, Nov. 2, 2004 (Doc 73-16).  Following this statement, the Corps provided Fola with a list of items

---

[12]The Fola Notice does not contain any maps or drawings, however.  Instead, there are two tables attached to the notice: a table depicting the acreage of the affected drainage areas by valley fill and a table portraying, in linear feet, the permanent and temporary impacts to intermittent and ephemeral streams.  *See* Fola Notice (Doc. 36-2), Attached Tables.

[13]The only information the Fola Notice contains relating to mitigation is found in the section entitled "Mitigation Plan," which states, in total, "To date, the applicant has not submitted a compensatory mitigation plan to this office."  Fola Notice (Doc. 36-2).

imperative to, and thus required before, the issuance of public notice. Although not included in this specific, pre-notice list, the letter requests that Fola provide the agency with an EID and a CMP. This request is explained as follows:

> In order to issue a Section 404 [individual permit], the Corps must conclude the project is consistent with the Section 404(b)(1) Guidelines [] and the project is not contrary to public interest. The information contained below and enclosed is intended to assist you in determining what information, beyond that already required in SMCRA and other state permits, must be submitted with an IP request. The information required by SMCRA and other state permits may be sufficient to address some of the requirements. The required information provides the factual basis for the Corps to make the aforementioned conclusions to facilitate final IP decisions. The following information is required in order to process an IP request:
>
>    1)    an alternatives analysis pursuant to the Guidelines and the NEPA,
>
>    2)    *a compensatory mitigation plan developed in accordance with the Corps' Regulatory Guidance Letter dated December 24, 2002* (attached),
>
>    3)    a description of the affected environment is necessary to help understand the environmental impacts of proposed projects and no action alternatives, and
>
>    4)    information concerning other land disturbance activities and watershed improvement projects within the same watersheds as the proposed activity on water quality and aquatic habitat. *Id.* (emphasis supplied)

This letter distinguishes the Fola permit process, at least in part, from the Loadout process because – through the letter – the Corps indicates that the Fola application was not complete upon submission and identifies what type of information and/or documents are necessary before a determination of completion can be made. Further, the letter specifically informs the company what information is necessary in order for the Corps to determine that the proposed § 404 permit will comply with CWA and NEPA standards. This list of information and documents explicitly includes a compensatory mitigation plan.

Public notice for the Fola application issued on April 13, 2005, and the comment period

on the notice ended on May 14, 2005.  Fola submitted an initial CMP for the Ike Fork mines

("Fola CMP") in October 2006, nearly a year and a half after public comment on the application

closed.  *Fola's Mem. In Supp. Of Mot. For Partial Summ. J.* (Doc. 136), 2.  Further, Fola

submitted a final EID for the Ike Fork mines ("Fola EID") in January 2007 and a supplement to

the CMP in December 2007.  Fola's EID and CMP are similar in scope and content to those

submitted by Loadout.  They contain detailed explanations of the mining plan; the environmental

quality of the land and water to be affected; the linear feet of stream to be affected (32,731); and

the mitigation techniques proposed to offset such environmental degradation.[14]  *See* Fola EID;

Fola CMP (Doc. 56-1, Doc.56-2 & Doc. 56-3).  Specifically, as the permit indicates, the CMP

provides that Fola will "compensate for unavoidable adverse impacts to waters of the United

States [by ensuring] the following mitigation measures ... [o]ff-site creation of 18,834.7 linear feet

of intermittent stream channels and 17,608.8 linear feet of ephemeral stream channels; [] [o]n-site

restoration/enhancement of 100 linear feet of ephemeral stream channel and 4,785 linear feet of

intermittent streams; and [] establishment of 47.4 acres of riparian habitat."  Fola Permit (Doc.

36-8), Special Cond. No. 9.  Further, as indicated in the Fola Decision Document ("Fola DD"),

the CMP describes the stream creation sites evaluated and selected.  Such descriptions include

whether the site was subject to previous mining activities, the elevation and topography of the

site, and the site's expected function.  *See* Fola DD (Doc. 36-4), 32-33.  Finally, as was the case

with the Loadout documents, the Fola EID and Fola CMP were submitted to multiple federal and

state agencies for review and comment, but were not released for public comment.

---

[14]According to Plaintiffs, the Fola CMP, its supplements, and the Fola EID together total
487 pages.  *Pl's Mem. In Opp. To Fola's Mot. For Partial Summ.. J.* (Doc. 140), 3.

The Corps issued the permit for Fola's Ike Fork No. 1 and Ike Fork No. 2 mines on March 5, 2008, nearly three years after the public notice issued and approximately a year and a half after Fola submitted an initial CMP for the project. The permit was accompanied by a 144-page decision document, which contained eleven appendices totaling several hundred pages. Fola DD (Doc. 36-3 through Doc. 36-7). Similar to the Loadout CMP, Fola's CMP plays a central role in the Fola DD. First, the Fola DD contains a twenty-page evaluation of Fola's CMP. Additionally, the DD's discussion of expected individual and cumulative impacts centers, in large part, upon specific mitigation measures provided for in the CMP. *Id.* Finally, in its discussion of the FONSI issued for the Ike Fork mines ("Fola FONSI"), the Corps explains that the reduction of impacts below significance results, in large part, from the proposed mitigation measures. *Id.* (Doc. 36-4). Specifically, following the 20-page discussion of mitigation found on pages 22-41 of the DD, the Corps concludes that:

> [i]n consideration of the all [sic.] of the information noted above with reference to the information documented below under Section XI(E) related to the structure and function of the aquatic ecosystem, it has been determined that the applicant's proposed compensatory mitigation measures are commensurate with the impacts to waters of the United States and aquatic resources benefits would occur as a result of implementing the applicant's mitigation work plan. *Id.* (Doc. 36-4), 41.

## II.  Standards of Review

### A.    Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment,

the Court considers the facts in the light most favorable to the nonmoving party.  *Adickes v. S.H.*

*Kress, and Co.*, 398 U.S. 144, 159 (1970).  The Court will not "weigh the evidence and determine

the truth of the matter[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  However,

it will draw any permissible inference from the underlying facts in a manner that supports the

nonmovant.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88

(1986).

Still, the party opposing summary judgment "must do more than simply show that there

is some metaphysical doubt as to material facts."  *Id.* at 586.  It must offer some "concrete

evidence from which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S.

at 256.  Summary judgment is therefore appropriate when the nonmovant has the burden of proof

on an essential element of his case and fails – after adequate time for discovery – to make an

evidentiary showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986).


**B.**      **The Administrative Procedure Act**

"Claims challenging federal agency action under the CWA and NEPA are subject to

judicial review under the APA."  *Aracoma*, 556 F.3d at 192 (citations omitted).  When issuing

§ 404 permits, the Corps is engaged in informal rule-making pursuant to Section 4 of the APA,

5 U.S.C. § 553.  *Id.* (citations omitted).  Such informal rule-making is reviewed under Section 10

of the APA, 5 U.S.C. § 706(2), "which establishes that, as a general rule, 'agency action, findings,

and conclusions' will be set aside only when they are 'found to be ... arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law.'" *Id.* (citing *Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971)).  "Review under this standard is highly deferential, with a presumption of finding agency action valid."  *Id.* (citing *Natural Res. Def. Council, Inc. v. EPA,* 16 F.3d 1395, 1400 (4th Cir. 1993).

### III.   Analysis

### A.   Plaintiffs' Notice Claims Are Not Moot

Intervenor-Defendant Loadout argues that, due to the deference the Fourth Circuit accorded the Corps in *Aracoma*,  Plaintiffs' notice claims are substantively moot.  *Loadout's Mem. in Opp. to Pl.'s Mot. for Partial Summ. J.* (Doc. 127)*,* 11.  Specifically, Loadout contends that the question of whether the Loadout Notice was sufficient is moot because, at the time of issuance, the Corps possessed sufficient information to evaluate Loadout's § 404 permit and duly considered Plaintiffs' existing substantive challenges.  Thus, Loadout argues that approval would not be affected by a more robust public notice.

Although it is correct that judgment in favor of Plaintiffs may not alter the Corps' decision to issue the Loadout permit or move the Corps to require changes to the permit as issued, the company's argument for mootness is unpersuasive.  Plaintiffs' procedural claim is that they were denied an opportunity for meaningful notice and comment under the CWA and NEPA.  Therefore, Plaintiffs assert a *procedural,* not a substantive right.

The U.S. Supreme Court's holding in *Massachusetts v. EPA* is instructive.  "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt an injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (citing *Sugar Cane*

24

*Growers Coop. of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002) ("A [litigant] who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he received the procedure the substantive result would have been altered.  All that is necessary is to show that the procedural step was connected to the substantive result.")).  Therefore, a plaintiff seeking to vindicate a procedural right need not demonstrate that the exercise of such right will change an agency's ultimate decision.  Instead, the plaintiff need only show (1) that a procedural error occurred, and (2) that some procedural remedy exists.  *See also South Carolina Wildlife Fed'n v. H.B. Limehouse,* 549 F.3d 324, 330 (4th Cir. 2008) ("The party seeking an injunction need not show that injunction of the state defendant would lead directly to redress of the asserted injury, but only that relief will preserve the federal procedural remedy.") (citing *Massachusetts v. EPA*).

Here, Plaintiffs argue that public notice for the Nellis Surface Mine and the Ike Fork Surface mines were deficient.  Further, Plaintiffs request that the Corps re-notice the permit applications with more complete information on mitigation, contending that such re-notice will (1) provide the public with a meaningful opportunity to comment on the applications, and (2) force the Corps to reconsider these permits, possibly with new information.  In contrast to Loadout's argument, Plaintiffs do not assert that re-notice and reconsideration of the permits is likely to change the Corps' decisions regarding approval.  Such a finding is not necessary to withstand mootness, however, because under *Massachusetts v. EPA* the existence of a specific, achievable procedural remedy is sufficient grounds to find in Plaintiffs' favor.  *Massachusetts*, 549 U.S. at 518 ("Congress has accorded a procedural right to protect [] concrete interests.").

25

**B. The Corps Failed to Comply with the Notice Requirements of the CWA**

The issue presented with respect to the CWA is whether – in light of the central role compensatory mitigation plays in determining whether a § 404 permit for a mountaintop coal mine will cause or contribute to significant environmental degradation – the Loadout and Fola Notices, which contained no substantive information on proposed mitigation, were sufficient under the APA, the CWA, and the Corps' regulations.

To determine whether the public notices for the Loadout and Fola mines were sufficient, the Court must consider whether the Corps' conclusion that the mining companies' permit applications were complete at the time of issuance complies with law.  Completion and public notice are inextricably linked.  A complete application is defined in terms of the sufficiency of the submitted materials to provide a meaningful opportunity for public comment, 33 C.F.R. § 325.1(d)(9) ("An application will be determined to be complete when sufficient information is received to issue a public notice (See 33 CFR 325.1(d) and 325.3(a).)"), and the 15-day deadline for the issuance of public notice is triggered by the completeness of a permit application.  33 C.F.R. § 325.2(d)(1) ("The public notice will be issued within 15 days of receipt of all information required to be submitted by the applicant in accordance with paragraph 325.1(d) of this Part."); 33 C.F.R. § 325.2(a)(2) ("Within 15 days of receipt of an application the district engineer will either determine that the application is complete (see 33 CFR 325.1(d)(9) and issue public notice as described in § 325.3 of this Part ... or that it is incomplete and notify the applicant of the information necessary for a complete application.").  The regulations instruct that "[t]he issuance of a public notice will not be delayed to obtain information necessary to evaluate an application."  33 C.F.R. § 325.1(d)(9).  However, because completion is defined by the

26

sufficiency of the submitted materials to warrant public notice, *id.*, it is controlled by 33 C.F.R. § 325.3(a), which governs the content of a public notice. 33 C.F.R. § 325.3(a) provides a non-exhaustive list of materials that must be included in a § 404 notice. Pertinent here, it mandates that "[t]he notice must ... include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. § 325.3(a).

As outlined above, the CWA and CWA Guidelines create a tension between the content and timing of a § 404 notice. First, there is the Congressional mandate that public notice be issued no later than 15 days after a § 404 permit application is complete, 33 U.S.C. §1334(a); 33 C.F.R. § 325.3(d)(3), which allows the public to participate early in the application process.[15] Then, there is the Corps' regulatory duty to issue notice that contains sufficient information to allow for meaningful comment. *See, e.g.,* 33 C.F.R. § 325.(a)(1) ("The notice must [] include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."); *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982) (holding that notice that "fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule" deprives the public of an opportunity to comment meaningfully).[16] The latter requirement presents a potential conflict with the 15-day deadline for notice because, if it is to occur early, notice must occur

---

[15]According to the Corps' argument on August 20, 2009, "[t]he clear purpose of [the 15-day] statutory requirement is to put the notice out early in the process so that people can have input, rather than very late in the process when all of the data and information has been gathered and the process is nearly complete." *Tr. for Mot. Hr'g on August 20, 2009* (Doc. 161), 24.

[16]*See also* 33 U.S.C. § 1344(q) (requiring that, "to the maximum extent practicable," a permit decision be made within 90 days of the issuance of public notice); 33 C.F.R. § 325.1(d)(3) (requiring that the Corps decide on a § 404 permit application "not later than 60 days after receipt of a complete application").

27

when substantive information on a proposed project is likely to be limited.  And – armed only with limited information – it is less likely that members of the public will be able to comment intelligently.

Here, the timing-content tension created by the issuance of notice required the Corps to exercise its discretion in balancing these potentially conflicting requirements.  Specifically, the Corps exercised such discretion when determining whether the Loadout and Fola applications were sufficiently complete to warrant public notice and when deciding what information to include in the attendant notices.   The pertinent question is therefore whether the Corps' determinations of completeness should be afforded substantial deference.

The Court is sensitive to the high degree of deference accorded to the Corps in *Aracoma* and afforded any agency under 5 U.S.C. § 706(2).  *See Aracoma,* 566 F.3d at 192.  Nonetheless, for the reasons stated below, the Court finds such deference is not appropriate in this action.

Generally, decisions made pursuant to an agency's discretionary authority are afforded substantial deference, especially if those decisions rely upon an agency's scientific or technical expertise, *Aracoma*, 556 F.3d at 201 (citing *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983), and/or are based upon an agency's interpretation of its own regulations.  *Id.* at 192-93 (citing *Auer v. Robbins,* 519 U.S. 452, 461 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413-14 (1945)).  Agency deference is applicable here; however, when the Corps' decisions are viewed in the context of the entire § 404 regulatory framework, the Court is convinced that substantial deference is not warranted and a lesser form deference is appropriate.   *See* 33 C.F.R. §§ 325.2(d)(3), 325.1(d)(9), 325.3(a). First, a determination of completion is not a "complex prediction[] based on specialized expertise"

28

afforded the high degree of deference prescribed in *Baltimore Gas*. *See Aracoma*, 556 F.3d at 201. Second, although a determination of completion requires the Corps interpret its own regulations, the Corps' determinations that the Loadout and Fola applications were complete are not afforded a high degree of deference because these determinations were inconsistent with other CWA Guidelines. *See Aracoma*, 556 F.3d at 193 ("This kind of review is highly deferential, with the agency's interpretation controlling unless plainly erroneous or inconsistent with the regulation." (citing *Auer*, 519 U.S. at 461) (internal quotations omitted). Specifically, the Court finds these determinations of completeness conflicted with the definitions and standards established in 33 C.F.R. § 325.3(a) and § 325.1(d)(9).[17] The Court finds the Corps unreasonably found the applications were complete and issued public notices that plainly did not contain sufficient information to allow for meaningful public comment. Consequently, neither the 15-day deadline established in 33 U.S.C. § 1334(a) and 33 C.F.R. § 325.3(d)(3), nor the prohibition against delay established in 33 C.F.R. § 325.1(d)(9), was triggered in the instance case because neither attaches unless and until an permit application is complete.

--------

[17]As discussed earlier, 33 C.F.R § 325.1(d)(9) provides that "[a]n application will be deemed complete when sufficient information is received to issue a public notice (see 33 C.F.R. 325.1(d) and 324.3(a).)" 33 C.F.R. § 325.1(d)(9). 33 C.F.R. § 325.1(d) describes the "Content of [a § 404] application" and, for the most part, such content is not at issue here. In fact, the only section of 33 C.F.R § 325.1(d), besides 33 C.F.R § 325.1(d)(9), which refers directly to public notice is 33 C.F.R § 325.1(d)(1), where the regulation provides that an "application must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice (detailed engineering plans and specifications are not required) ... See § 325.3 for information required to be in public notices." 33 C.F.R § 325.1(d)(1). Thus, in both instances where a portion of 33 C.F.R. § 325.1(d) mentions public notice the regulation specifically refers to 33 C.F.R. § 325.3 as providing the standard for the sufficiency of a notice. 33 C.F.R. § 325.3 therefore provides the standard that controls this decision and is the only standard discussed at length herein. Further, for the reasons stated above, by virtue of being inconsistent with 33 C.F.R. § 325.3 the Corps' determinations of completion are also in conflict with 33 C.F.R. § 325.1(d), specifically 33 C.F.R. §325.1(d)(9).

29

To explain the inconsistency between the language of the CWA and CWA Guidelines and the Corps' determinations of completion regarding the Loadout and Fola applications, the Court turns to the portions of the statute and guidelines that cabin the Corps' permit-based discretion. Specifically, the Court looks to the standard for evaluating the sufficiency of a public notice established in 33 C.F.R. § 325.3(a), which ultimately defines when an application is complete. *See* 33 C.F.R. § 325.1(d)(9). "Public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impacts on the public interest." 33 C.F.R. § 325.3(a). According to the Corps' regulations, "notice must therefore give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." *Id.* When assessing the reasonableness of the Corps' actions, the Court considers the application of this standard in the context of existing § 404 case law, as well as other administrative law cases, which address the sufficiency of notice and therefore help define what it means for comment to be "meaningful."

Pursuant to *Aracoma*, the issuance of a § 404 permit constitutes informal rule-making under the APA. 556 F.3d at 192. Thus, several federal appellate cases addressing informal rule-making provide guidance, including cases from the Fourth Circuit and the D.C. Circuit, which is afforded particular weight in the area of administrative law. First, in *Home Box Office, Inc. v. Federal Communications Commission*, the D.C. Circuit instructs that "an agency proposing informal rule-making has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." 567 F.2d 9, 36 (D.C. Cir. 1977). "Consequently, the notice required by the APA, or information subsequently

supplied to the public, must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *Id.* at 35.  Such disclosure is necessary because it is this detail and data that allow the public to generate meaningful criticism, which serves as the basis for meaningful comment.  This fact is reiterated in *Connecticut Light & Power v. Nuclear Regulatory Commission,* where the D.C. Circuit finds that "[t]he purpose of the comment period is to allow interested members of the public to communicate information, concerns, and criticism" and that "[i]n order to allow for useful criticism, it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules."  673 F.2d 525, 530 (D.C. Cir. 1982); *id.* ("If the notice [] fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposal.  As a result, the agency may operate with a one-sided or mistaken picture of the issues at stake in a rule-making.").

The standards articulated in *Home Box Office* and *Connecticut Light & Power* are discussed in *National Asphalt Pavement Association v. Train*, where the D.C. Circuit concludes that "in order to have a meaningful opportunity to comment, one must be aware of the information the agency finally decides to rely on in taking agency action," 539 F.2d 775, 779 n. 2 (D.C. Cir. 1976).  Further, these standards are elaborated upon in *Appalachian Power Co. v. EPA,* where the Fourth Circuit, citing *National Asphalt*, held that notice must "appris[e] the public of the nature and basis of the regulation or rule sufficiently to enable them to understand and identify the material issues relating to the justification for the regulation or rule so that they can comment thereon intelligently."  579 F.2d 846,852-53(4th Cir. 1978) (reviewing a challenge

to a regulation promulgated by the EPA to implement federal air quality standards).

In the instant case, Plaintiffs challenge the sufficiency of the Loadout and Fola Notices on account that these notices contained no substantive information on mitigation. The standard established in 33 C.F.R. § 325.3(a), viewed in light of the aforementioned circuit court cases, supports this argument. Compensatory mitigation is critical to the Corps' determination that a § 404 permit for a mountaintop coal mine will not cause or contribute to significant environmental degradation and, thus, is not contrary to the public interest. *See, e.g., Aracoma*, 556 F.3d at 187 ("For each of the four permits, the Corps prepared Environmental Assessments that concluded that the permitted activity would not result in significant environmental impacts *given* planned mitigation measures.") (emphasis supplied). Further, here, it is clear from the Corps' correspondence to Fola and from the relevant decision documents that the compensatory mitigation measures included in the Loadout and Fola permits were central to the Corps' determinations of no significant degradation in both cases.[18] The Corps essentially admitted this

---

[18]*See* Corps' November 2, 2004, Letter to Fola, § I(C)(2) *supra* (stating a compensatory mitigation plan is required to process the Ike Fork permit application and to "conclude the project is consistent with Section 404(b)(1) Guidelines"); Fola DD (Doc. 36-5), 45 ("In order to compensate for construction-related impacts, the applicant has proposed on-site mitigation."); *Id.* at 56 ("Impacts to aquatic ecosystems would be mitigated via the applicant's CMP."); Loadout CDD (Doc. 86-3), 18 ("As required by the Section 404 (b)(1) Guidelines, a permit to discharge fill material into waters of the United States would not be granted if it is determined the proposal would cause or contribute to significant degradation of waters of the United States. ... If impacts cannot be avoided, impacts must be minimized to the maximum extent practicable. Following minimization of impacts, all unavoidable impacts must be compensated for through mitigation activities[.]"); *Id.* at 37 ("[I]f the stream creation and restoration activities are implemented in accordance with the proposed compensatory mitigation plan, it is expected the created streams would maintain most of their functionality of the impacted streams upon maturity. There would be a temporal loss of function during the mining activities at the site, but these losses would not be permanent."); *Id.* at 50 ("It is not expected the proposal would result in long-term significant impacts to aquatic, terrestrial and avian wildlife values as ... [t]he applicant has proposed a compensatory mitigation plan that would replace the lost headwaters streams with newly created

fact in argument before this Court, on August 20, 2009, when it replied, "Absolutely," to the Court's suggestion that mitigation measures make § 404 permits for mountaintop mines issuable. *See Tr. for Mot. Hr'g on August 20, 2009* (Doc. 161), 27.

Taken together, *Aracoma*, the Loadout and Fola decision documents, the Corps' November 2 letter to Fola, and the Corps' argument before the Court confirm that compensatory mitigation is the principle factor considered when conducting a § 404 permit review. The evidence indicates that compensatory mitigation is "the information the agency finally decides to rely on in taking agency action," *Appalachian Power*, 579 F. 2d at 852 n. 12 (citing *Nat'l Asphalt*, 539 F.2d at779 n. 2). Compensatory mitigation is the single most important "material issue[] related to the justification" of such a permit. *See id.* at 852. Therefore, when it is considered in light of the basic administrative principles established in the aforementioned cases, the pertinent question regarding the sufficiency (or lack thereof) of the Loadout and Fola Notices becomes clear. Did the notices provide sufficient data and detail to provide the public with an understanding of the material justification for the permits? Or, said simply, did the notices provide sufficient information on compensatory mitigation?

Because the notices contained no substantive information on mitigation, the clear answer to this question is no. The notices did not "give [the public] a clear understanding of the nature and magnitude of the activity to generate meaningful comment." *See* 33 C.F.R. § 325.3(a)(1). Without any substantive information on mitigation, the notices failed to provide an accurate picture of the Corps' reasoning and prevented useful criticism on the part of Plaintiffs and on the

---

headwater streams at the site ... For these reasons, the Corps anticipates no significant impacts to macrovertebrate values[.]").

part of the public in general.  *See Connecticut Light & Power,* 673 F.2d at 530.  As a result, the

lack of information on mitigation in the notices deprived Plaintiffs of an existing procedural right

– the right to comment intelligently.[19]

Several federal district court cases support this conclusion, including: *National Wildlife*

*Federation v. Marsh,* 585 F.Supp. 985 (D.C. D.C. 1983), *Friends of the Earth v. Hall*, 693

F.Supp. 904 (W.D. Wash. 1988), and  *Northwest Environmental Defense Center v. Wood*, 947

F.Supp. 1371 (D. Ore. 1996).  In each case, plaintiffs brought challenges to the Corps' decision

to issue a § 404 permit based on a theory that the Corps failed to provide adequate notice and

comment on the application, as required by the APA, the CWA and CWA Guidelines.  In short,

each of these cases – although not controlling – addresses the identical issue presented in the

instant motion.  The courts in *Marsh* and *Hall* found the notice deficient and required re-notice,

whereas, the court in *Wood* found the notice sufficient.  Still, the reasoning provided in each case

is instructive.

---

[19]Because it is not necessary to the resolution of the instant motion, the Court does not decide what type, or how much, information on compensatory mitigation would be sufficient to meet the standards articulated above.  Such a determination is a fact-intensive inquiry and, for the purposes of this motion, it is sufficient to conclude that a public notice that contains *no* substantive information on mitigation denies the public a procedural right to meaningful comment and review.  Further, implicit in the Court's finding that the Loadout and Fola Notices were deficient is the finding that the Loadout and Fola applications were not complete.  Completeness requires the submission of sufficient information to issue public notice, which triggers the standard for sufficiency established in 33 C.F.R. § 325.3(a).  With respect to proposed mitigation, the Loadout Notice states, in total, "The applicant has not submitted a Compensatory Mitigation Plan (CMP) to compensate for permanent and temporary impacts to waters of the U.S. that are regulated by USACE."  Loadout Notice (Doc. 86-1).  With respect to proposed mitigation, the Fola Notice states, in total, "To date, the applicant has not submitted a compensatory mitigation plan to this office."  Fola Notice (Doc. 36-2).  Because a complete lack of substantive information on mitigation renders the notices deficient, according to the regulations, such a lack of information also renders the applications incomplete.

To begin with, *Marsh* involved a challenge by environmental groups to a § 404 permit approved by the Corps for construction of an oil refinery in the Chesapeake Bay.  585 F.Supp. at 989.  The permit application was approved after federal agencies conducted a full EIS, a process which afforded multiple opportunities for public comment, and following extensive review and comment by the Corps' District Engineer, Division Engineer, and Chief Engineer.[20] Plaintiffs challenged the permit decision based upon the fact that a 100-page staff evaluation ("Staff Evaluation") prepared for the Secretary of the Army, and upon which the Secretary's final decision relied, had not been released for public review and comment.  The *Marsh* Court agreed with plaintiffs, finding that – although the permit application had been through several levels of public scrutiny – the regulations' mandate that the public be afforded "meaningful" comment had not been met.  Specifically, the *Marsh* Court found that, because the Secretary relied upon the Staff Evaluation in his final decision, and because the analysis and reasoning provided in the Staff Evaluation differed substantially from information previously released for comment, the information ultimately released for comment did not properly apprise the public of the rationale behind the Corps' decision, thus failing to meet the burden placed on the agency by 33 C.F.R. § 325.3(a).  *Id.* at 993 ("[I]f the public is not apprised of the rational behind a proposed decision, or if the public is informed of the rationale only after the close of the comment and hearing period, then the agency cannot be said to have provided a realistic opportunity for public hearings or meaningful comments.").  According to *Marsh*, "under section 404 of the CWA, the opportunity to comment and the right to a hearing both necessarily require that the Army present

---

[20]This review led to conflicting recommendations on the part of the Engineers, with the Division Engineer and the Chief Engineer recommending approval and the District Engineer recommending denial.

for public scrutiny the rationale and pivotal data underlying its proposed action *before* the close of the comment and hearing period ... [and] ... the inclusion of the Staff Evaluation in the administrative record *after* the close of the comment and hearing period had the effect of shielding essential data and the agency's rationale from public hearing and comment." *Id*. at 994 (emphasis in original).

Applying that reasoning here, this Court finds that – because it is critical to the Corps' ability to issue a finding of no significant degradation – information on proposed mitigation, like the Staff Evaluation in *Marsh*, constitutes the rationale and pivotal data underlying the Corps' decision to issue a § 404 permit for a mountaintop mine. Accordingly, information on proposed mitigation is the rationale and pivotal data that must be entered into the administrative record and released for public review and comment *before* the close of comment on a §404 permit for a mountaintop mine.

*Hall* provides a similar conclusion. In *Hall*, environmental groups challenged the issuance of a § 404 permit to the Navy for construction of an aircraft carrier homeport near Everett, Washington. 693 F.Supp .at 915. The Corps conducted an EIS prior to approving the permit and both the draft and final versions of the EIS were released for public comment. *Id.* A detailed monitoring plan, however, was not required during the EIS process and the Corps instead allowed the Navy the option of developing a comprehensive mitigation strategy post-approval. *Id.* The *Hall* Court found this decision faulty. Specifically, it found that the Corps' decision to approve the Navy's permit without releasing the monitoring plan for public comment violated the notice requirements established by the CWA Guidelines. *Id.* at 948. The court found that the monitoring plan constituted "pivotal data" under *Marsh* and that the Corps' failure to solicit

36

comments on this plan violated 33 C.F.R. § 325.3(a) because it "[i]n effect, prevented the public from commenting on the single most important feature of the [project.]" *Id.* According to the *Hall* Court, "[w]hile section 33 C.F.R. § 325.3(a) does contain a list, it is by no means exclusive, and the analysis in [*Marsh*] is persuasive: without pivotal data and information, public comment cannot be meaningful." *Id.*

The *Hall* Court's conclusion – that the monitoring plan constituted the rationale and pivotal data underlying the Corps' permit decision – was based upon the prominent role the monitoring plan played in the two EISs conducted on the proposed project, in the Corps' Record of Decision ("ROD") published on the project, and in the Corps' finding of no significant environmental degradation. *Id.* at 948; *id.* at 938 ("Adequacy of an EIS hinges, *inter alia*, on the completeness of the mitigation plan. Here, the Corps' EIS discusses various mitigation measures. With reference to the CAD proposals, it is clear that the monitoring plan is the centerpiece of the Corps' mitigation plan. The government repeatedly relies on the monitoring plan[.]") (internal citations omitted); *id.* at 945 ("[T]he Corps relies on the EISs and the studies cited therein to conclude that the RADCAD project will not cause significant degradation."). Additionally, the finding that the Corps failed to comply with the public notice requirements of the CWA Guidelines was based on the fact that the Navy did not submit its monitoring plan – which provided the Corps a basis upon which to determine no significant degradation – until after the close of public comment. *Id.* at 948 ("As the court has already explained in the context of NEPA's requirements, a simple review of the time line in this case demonstrates that the Corps did in fact violate its own regulations, in that the Navy published its final monitoring plan in November of 1987, and the Corps approved it in April of 1988, nearly sixteen months after the

37

close of the public comment period."); *id.* at 948 ("The process used by the Corps, in effect, prevented the public from commenting on the single most important feature of the RADCAD project – the monitoring plan.").

Because the facts in *Hall* are similar to the facts in the instant case, the reasoning and conclusion in *Hall* are applicable here.  To begin with, the monitoring plan in *Hall* is the functional equivalent of the mitigation information at issue in this litigation.  As discussed, the monitoring plan served as the centerpiece of the aircraft carrier homeport's mitigation plan, providing the material justification for the Corps' issuance of a finding of no significant degradation, which allowed the project to proceed without further environmental review and/or conditions.  Similarly, here, the CMPs submitted by Loadout and Fola, and information on compensatory mitigation in general, served as the rationale and pivotal data which allowed the Corps to determine that the Loadout and Fola permits would not cause or contribute to significant degradation.[21]  The Loadout and Fola CMPs provide detailed accounts of the type, location and amount of proposed mitigation associated each application.[22]  This mitigation provided the

_____

[21]*See, e.g.,* Fola Permit (36-8), Spec. Cond. No. 8 ("The permittee shall implement and abide by the Compensatory Mitigation Plan (CMP) ... Completion of all elements of this CMP is a requirement of the Department of Army permit."); *id.* at Spec. Cond. No. 9 ("To compensate for unavoidable adverse impacts to waters of the United States, the permittee will ensure the following mitigation measures are successfully implemented and monitored[.]"); Loadout CDD (Doc. 86-3), 18 ("As required by the Section 404(b)(1) Guidelines, a permit to discharge fill ... would not be granted if it is determined the proposal would cause or contribute to significant degradation of water of the United States.  As a part of making this determination, the applicant is required to follow the mitigation sequencing process, where consideration is given to avoidance, minimization, and compensation for unavoidable impacts ... all unavoidable impacts must be compensated for through mitigation activities.").

[22]*See* Section II(C)(1), *supra* (Loadout CMP provides that the adverse impacts of the company's permit will be mitigated by requiring 13,564 feet of ephemeral and intermittent streams be created on-site and that Loadout enhance 8,900 feet of Fork Creek, a stream two

material justification for the Corps' related determinations of no significant degradation and thus allowed the permits to be issued without further environmental review and/or additional conditions.   Accordingly, with respect to the Loadout and Fola applications, information on proposed mitigation constituted the rationale and pivotal data as defined in *Marsh* and *Hall*. Thus, although the Court declines to find that the detailed information on mitigation contained in the CMPs was required to be released for public review and comment, it finds that, under *Marsh* and *Hall*, the Corps was required to release some project-specific information on mitigation for public review and comment prior to issuing its determinations of no significant degradation.

In sum, because information concerning proposed mitigation was not submitted by either permittee, in initial or final form, until after public notice was issued and comment closed on the Loadout and Fola applications,[23] the notices at issue failed to provide the public an adequate opportunity to comment.   As in *Hall*, the failure to subject any substantive information on mitigation to public review and comment "had the effect of shielding the essential data and the agency's rationale from public hearing and comment," *see Hall*, 693 F.Supp at 948, which

---

miles from the project site); Section II(C)(2), *supra* (Fola CMP provides that the adverse impacts of the company's permit will be mitigated by requiring 36,443.5 feet of ephemeral and intermittent stream creation off-site, 4,885 linear feet of ephemeral and intermittent stream creation on-site and the establishment of 47.4 acres of riparian habitat).

[23]The facts of this case are as follows.  Loadout's permit was issued on April 21, 2008, nearly two years after the public notice was issued and approximately nine months after the initial CMP was filed.  *See* Loadout Notice (Doc. 86-1); *Pl's Mem. In Supp. Of Their Mot. For Partial Summ. J.* (Doc. 113), 2-3.  Fola's permit was issued on March 5, 2008, nearly three years after the public notice was issued and approximately a year and a half after Fola's initial CMP was filed.  *See* Fola Notice (Doc. 36-2); *Fola's Mem. In Supp. Of Its Mot. For Summ. J.* (Doc. 136), 2-3.

resulted in a violation of 33 C.F.R. § 325.3(a)'s mandate that comment be meaningful.

Although the district court in *Wood* found public notice sufficient, its reasoning does not compel a different result. *See* 947 F.Supp. 1371. In *Wood*, plaintiffs challenged a § 404 permit which allowed Hyundai Electronics of America ("Hyundai") to fill 10.4 acres of wetlands in order to build a semi-conductor plant near Eugene, Oregon. *Id.* at 1374. Prior to issuance of the permit, the Corps administered an extended public comment period, during which two public hearings on the application were held. *Id.* at 1375, 1381. Additionally, the Corps considered several comment letters which were submitted after the close of the official comment period. *Id.* at 1375. Plaintiffs, nonetheless, challenged the permit under a theory of inadequate notice and comment, arguing that changes made to the project after the close of comment rendered the previous notice and comment insufficient. The *Wood* Court disagreed and found the pre-changes notice and comment sufficient under CWA Guidelines for two reasons: (1) the extended comment period and the public hearings described above afforded the public a "meaningful" opportunity to comment on the application prior to the contested changes; and (2) the post-comment changes resulted in a reduction of wetland impacts and therefore decreased adverse environmental impacts. *Id.* at 1381.

The *Wood* Court's decision is not contrary to this Court's conclusion. The ultimate purpose of the notice provisions contained in the CWA and CWA Guidelines is to ensure that a permit issued pursuant to the statute complies with the statutory intent to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251, by minimizing potential adverse effects on the environment. *See* 40 C.F.R. § 230.10; 33 C.F.R. § 320.4. Thus, a post-comment change to a permit application that reduces adverse environmental

effects does not warrant the same consideration as a post-comment CMP, monitoring plan, pivotal data, or other rationale that provides the basis for a determination of no significant degradation. *Wood* can therefore be distinguished on the facts. In *Wood*, the plaintiffs contested a post-comment change that reduced adverse impacts. Thus, the opportunity for comment that the *Wood* plaintiffs sought would not have affected the Corps' ultimate determination of no significant degradation. Here, on the other hand, Plaintiffs argue that notice was deficient because no information was released *before* the Corps' determinations of no significant degradation were made. Therefore, Plaintiffs seek to uphold their procedural right *to participate in* the Corps' public interest review. The *Wood* plaintiffs, on the other hand, sought additional opportunity to comment *after* the relevant public interest review was concluded and the determination of no significant degradation made. Accordingly, *Wood* is not contrary to this Court's finding that a complete lack of substantive information on mitigation rendered the Loadout and Fola Notices deficient. The absence of such information shielded essential data and detail from public review and comment and prevented the public from commenting intelligently on the adverse impacts associated with each application.

As is discussed more fully in the NEPA section of this Opinion and Order, the Corps' responses to Plaintiffs comments on the Loadout and Fola Notices support this conclusion. Plaintiffs submitted a 29-page comment letter in response to the Loadout Notice and a similarly detailed letter in response to the Fola Notice. However, when responding to Plaintiffs' comments, the Corps repeatedly criticizes Plaintiffs' comments for their lack of project-specific information and analysis. Thus, the Court finds that the Corps' responses to Plaintiffs' comments are more indicative of the deficiency of the relevant notices, rather than a lack of diligence on the

41

part of the Plaintiffs, because it is clear that: (1) Plaintiffs attempted, to the best of their ability, to provide meaningful comments on the *expected* adverse impacts of and mitigation associated with the companies' proposed projects; and (2) Plaintiffs were forced to make general comments which lacked project-specific information because such project-specific information was not provided to them.

**C.  The Corps Failed to Comply With the Notice Requirements in NEPA.**

NEPA contains lofty goals; including the goal of encouraging a productive and enjoyable relationship between man and his environment, while promoting efforts to prevent or eliminate damage to the environment.  *See* 42 U.S.C. § 4321.  NEPA pursues these goals strictly through the imposition of specific procedural requirements, not through the imposition of particular substantive results.  *See, e.g., Methow Valley*, 490 U.S. at 350.  Therefore, the procedural safeguards created by NEPA must be carefully adhered to.  *See, e.g., Id.*, *Hodges*, 300 F.3d at 445-46; *Nat'l Audubon*, 442 F.3d at 184.

NEPA does not contain specific public comment and review procedures.  Nonetheless, federal courts – including the Fourth Circuit – have consistently held that public involvement lies at the center of NEPA's procedural requirements.  *See, e.g., Block*, 690 F.2d at 770,771; *Hodges*, 300 F.3d at 438; *Nat'l Audubon*, 442 F.3d at 184.  Additionally, the significant role public involvement plays in achieving NEPA's lofty goals, by enforcement of its strict procedural safeguards, is reflected in the CEQ Guidelines.  *See Block*, 690 F.2d at 770,771; *Nat'l Audubon*, 442 F.3d at 184; 40 C.F.R. §§ 1500.1(b), 1501.4(b), 1506.6(a) & 1506.6(d). These guidelines: (1) instruct that environmental information be made available to the public *before* decisions are

42

made and *before* action is taken, and (2) direct that this information be of "high quality," meaning that it "must concentrate on the issues that are truly significant to the action in question." 40 C.F.R. § 1500.1(b). According to the Guidelines, such instructions are necessary because "public scrutiny [is] essential to implementing NEPA." *Id.* The CEQ Guidelines therefore create qualitative standards by which public involvement must be measured. Specifically, they require that an agency engaged in environmental review "shall involve ... the public, to the extent practicable, in preparing assessments," 40 C.F.R. § 1501.4(b), a duty that includes "[m]ak[ing] diligent efforts to involve the public" and "[s]olicit[ing] appropriate information from the public." 40 C.F.R. §§ 1506.6(a) & (d).

Here, the existence of sufficient compensatory mitigation – or the lack thereof – is the "truly significant" issue with regard to the Corps' determination whether the Loadout and Fola § 404 permits comply with the no significant adverse environmental effects standard established in the CWA, CWA Guidelines and NEPA. Therefore, in an argument that mirrors their claim under the CWA, Plaintiffs' NEPA challenge alleges that the complete lack of substantive information on mitigation provided in the Fola and Loadout Notices rendered the notices deficient under NEPA. As discussed, the Court agrees with Plaintiffs that mitigation is the centerpiece of a determination of no significant degradation and/or a FONSI issued with respect to a § 404 permit for a mountaintop mine. For, it is site-specific mitigation measures that allow the Corps to: (1) issue such determinations, and (2) issue a permit without further environmental review. *Id.* The Court therefore agrees with Plaintiffs that a public notice that contains no substantive information on mitigation is deficient under NEPA. In this case, the notice not only fails to concentrate on the "truly significant" issues posed by the application, *see* 40 C.F.R. § 1500.1(b),

but it also fails to "solicit appropriate information from the public," *see* 40 C.F.R. § 1506.6(d), meaning the agency has failed to (1) "make [a] diligent effort[] to involve the public," *see* 40 C.F.R. § 1506.6(a), and (2) "involve ... the public ... to the extent practicable." *See* 40 C.F.R. § 1501.4(b). Consequently, a public notice containing no substantive information on mitigation violates the CEQ Guidelines related to agency requirements for public involvement and deprives the public of its procedural right to an adequate opportunity to participate in the permit evaluation process. *See, e.g., Block*, 690 F.2d at 770,771; *Hodges*, 300 F.3d at 438; *Nat'l Audubon*, 442 F.3d at 184.

This determination – that the Corps failed to comply with the public involvement requirements presented by NEPA – is supported by case law. To begin with, the parties agree that the operable standard regarding the NEPA claim in this case is found in *Bering Strait Citizens for Responsible Development v. U.S. Army Corps of Engineers*, where the Ninth Circuit held that "[a]n agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit the members of the public to weigh in with their views and thus inform the agency decision-making process." 524 F.3d 938, 953 (9th Cir. 2008). *Bering Strait* involved a gold mining company's application for a § 404 permit for the disposal of fill material, which would adversely affect approximately 346 acres of wetland. *Id.* at 943. Prior to issuance, and as required under the CWA and NEPA, the Corps issued public notice of the permit. The notice elicited a large volume of responses, both in support and in opposition to the project, from the public as well as from other federal agencies. *Id.* at 943-44. The permit was issued and, following issuance, environmental groups sued the Corps, in pertinent part, for failure to comply with the public notice requirements of

NEPA during the permitting process. The *Bering Strait* plaintiffs argued that the Corps' notice was inadequate under NEPA because the agency failed and/or refused to circulate the draft EA on the project for public review and comment. *Id.* at 952.

Although the Ninth Circuit rejected the *Bering Strait* plaintiffs' argument regarding the circulation of the draft EA, in addition to articulating the standard quoted above, the Circuit Court opined that, with respect to public involvement, "[t]he way in which the information is provided is less important than that a sufficient amount of environmental information – *as much as practicable* – be provided so that a member of the public can weigh in on the significant decision that the agency will make in preparing the EA." *Id.* at 953 (emphasis supplied) (quoting *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F.Supp.2d 984, 991 (E.D. Cal. 2005)). The significant decision the Corps makes when preparing an EA is the FONSI, which allows the project to proceed without further environmental review and/or conditions. Thus, under *Bering Strait*, sufficient information has not been provided to afford the public an adequate opportunity to weigh in on a FONSI unless and until as much environmental information as practicable concerning the FONSI has been disseminated and commented upon.

Even though the Ninth Circuit found the notice sufficient in *Bering Strait*, the case's reasoning supports Plaintiffs' claim here, where, "considered in the totality of circumstances," mitigation is the most crucial issue affecting the Corps' decision to issue a FONSI for a mountaintop mine. Under *Bering Strait*, as much information on mitigation as practicable must "be provided so that a member of the public can weigh in on [this] significant decision." *Id.* In order to "weigh in," the public must have the relevant environmental information early – i.e. *before* the close of the public comment period. *See* 40 C.F.R. § 1500.1(b). The term

"practicable" therefore poses the same content-timing predicament for public notice that was discussed in the CWA portion of this decision.  Because a public notice must issue early, it often must issue when some information critical to the decision-making is lacking.  Nonetheless, according to the CEQ Guidelines, the public notice must not issue unless and until as much information as practicable can be provided and the public will be afforded an adequate opportunity to "weigh in" on "truly significant" issues.  When determining the adequacy of a public notice for a § 404 permit, therefore, the questions presented under NEPA are: (1) What are the "truly significant" issues presented by the permit application; (2) What is "practicable" for the Corps in terms of the dissemination of environmental information; and (3) What is required to find that the public has sufficiently "weigh[ed] in"?

As discussed earlier, the truly significant issue with respect to the Corps' approval of the Loadout and Fola permits was the adequacy of the proposed mitigation measures to compensate for the projects' adverse environmental impacts.  To be adequate, the Loadout and Fola Notices must therefore provide sufficient information – as much as practicable – to allow the public to weigh in on this question.

As evidence that the Corps failed to involve the public to the extent practicable, Plaintiffs cite the Corps' circulation of the relevant mitigation plans and decision documents to state and federal agencies for review and comment. *Tr. for Mot. Hr'g on August 20, 2009* (Doc. 161), 19-20.  Plaintiffs contend that if it was practical for the Corps to circulate these documents to be reviewed and commented upon by state and federal agencies, then it was practicable for the Corps to, at a minimum, release some substantive information on mitigation for public review and comment.  Considered in light of the fact that the Corps' decision on the Loadout application was

46

made approximately nine months after the submission of the company's EID and the initial CMP, and the fact that the agency's decision on the Fola application was made approximately a year and a half after the submission of the project's CMP, the Court agrees.

Next, as evidence that the Corps did not provide Plaintiffs with an adequate opportunity to weigh in on the FONSIs issued for the Loadout and Fola permits, Plaintiffs cite the Corps' responses to the comments Plaintiffs submitted in reply to the relevant public notices. First, with respect to the Loadout application, in response to the Plaintiffs' comment that "1) the proposed mine will cause or contribute to significant degradation ... 2) the mitigation plan is inadequate to offset those negative environmental impacts; [and] 3) the fill does not comply with state water quality standards ...", the Corps refers Plaintiffs to the CMP "for further details" and criticizes Plaintiffs for "[a]t no time ... identify[ing] the existing water quality at the site proposed in the application." *See* Corps' Response to Comments on Loadout Application (Doc. 138-1), 2 (emphasis in original). In response to Plaintiffs' comment regarding the ability of the *expected* Loadout CMP to adequately compensate for lost stream function, the Corps replies, "The revised [CMP] follows guidelines defined and in accordance to RGL 02-2. The comments do not apply to the type of mitigation proposed and are clearly written with no knowledge of the proposed project. Please refer to the CMP for more detail." *Id.* at 17. And, in response to Plaintiffs' comment that "[the Corps] cannot logically conclude that the mine will have no significant impact on the environment," the critical determination required by the CWA and NEPA, the Corps answers, "These comments are largely irrelevant to the Corps analysis, and cannot serve as the basis for requiring an [EIS] on [sic.] denying the permit." *Id.* at 38.

The Corps found Plaintiffs' comments "irrelevant" because "the Environmental

47

Organizations can present neither new information nor new analysis of the information applicable to the proposed permit activity[.]" *Id.*  However, Plaintiffs argue they could not provide such "new information" or "new analysis" because, at the time public comment was open, these organizations had little to no project-specific information regarding Loadout's permit application. For example, the Notices lacked practical information that would allow Plaintiffs to meaningfully comment on proposed mitigation, such as: the type of mitigation proposed (stream creation or stream enhancement); the location of the proposed mitigation (on-site or off-site and, if off-site, where); the length of the streams the company plans to create or enhance; a map; information regarding the topography and historical use of the area; and so forth. *Tr. for Mot. Hr'g on August 20, 2009* (Doc. 161), 14-17.  Consistent with CWA regulations, Plaintiffs are not requesting engineering-level detail with respect to proposed mitigation.  However, Plaintiffs do contend that some substantive information on mitigation – a "conceptual analysis" for example – is necessary, as is evidenced by the Corps' responses, to intelligently comment on a public notice.

The Court agrees with Plaintiffs' argument. *Id.* at 10 ("So what they were doing was criticizing us for lack of specificity, but the whole reason we couldn't be more specific is because the Corps had withheld the information that we needed.").  Environmental organizations could not adequately "identify the existing water quality at the site proposed in the application," comment on whether the project would cause or contribute to significant degradation, or comment on whether the mitigation plan was adequate to offset negative environmental impacts because the Loadout Notice failed to provide these organizations with site or project-specific information on mitigation.  Without such information, Plaintiffs were forced to submit their comments "with no knowledge of the proposed project."  Consequently, the Corps' dismissal of

48

Plaintiffs' comments for lacking or otherwise failing to take into account information the agency should have provided is unreasonable, arbitrary and capricious. The Corps' responses to the Plaintiffs' Loadout comments are therefore evidence of the deficiency of the Loadout Notice, not of Plaintiffs' lack of diligence or understanding. Similarly, the Corps' finding that "[n]o compelling evidence has been provided to this office which would indicate th[e] project would result in significant impacts to the quality of the human or aquatic environment," *see* Loadout CDD (Doc. 86-4) at 83, is more a reflection of the sparsity of information contained in the Loadout Notice than of an actual lack of significant adverse impacts.

The Corps' responses to Plaintiffs' comments on the Fola permit application also demonstrate the deficiency of the Fola Notice. *See* Fola DD (36-7) at 129 ("The comments and issues contained in the [Appalachian Center's] letter appear to be the same or very similar to comments that have been submitted to almost every [Corps'] application that has been submitted to the Corps for the past several years. The comments are very general in nature and contain little specific content regarding the applicant's proposed project referenced in Public Notice 200400967. ... Speculative, unsupported or unsubstantiated impacts are not considered probable and, since most of the [Appalachian Center's] comments contain little, if any, information regarding specific impacts associated with the proposed activities, such comments do not fall in the required probably category for consideration by the Corps."). The Fola Notice did not provide Plaintiffs sufficient information to weigh in on the probable adverse impacts of the Fola application and, because it failed to disseminate adequate site and/or project-specific information to allow Plaintiffs to understand and/or comment upon the project's environmental effects and/or the proposed mitigation measures' ability to compensate for such effects, the Fola Notice

49

impaired Plaintiffs' statutory right to informed pre-decisional comment under NEPA.

Taken together, the distribution of the Loadout and Fola Notices to federal and state agencies and the Corps' dismissal of Plaintiffs' comments as "too general" to warrant substantial responses demonstrate the Corps' failure to meet the standard for the sufficiency of public notice and comment established in *Bering Strait*. With no substantive information on mitigation, the Loadout and Fola Notices provided neither Plaintiffs nor the public in general as much information as practicable to allow for a meaningful opportunity to weigh in on the truly significant issues presented by the Loadout and Fola applications. As such, the Loadout and Fola Notices were deficient under NEPA and the CEQ Guidelines.

This conclusion is supported by the Eastern District of California's decision in *Sierra Nevada Forest Protection Campaign v. Weingardt*, a case the Ninth Circuit relied upon in *Bering Strait*. 376 F.Supp.2d 984. In *Weingardt*, the Eastern District ruled on a challenge to the public notices issued for four United States Forest Service ("USFS") permits. 376 F.Supp.2d at 986-88. The Eastern District found the notices insufficient because they contained relatively short descriptions of the proposed projects, with little to no detail regarding the type of environmental impacts expected. *Id.* at 992. In *Weingardt*, the close of the comment period was followed by the release of documents and reports, totaling several hundred pages, which evaluated the specific impacts of the proposed USFS project. *Id.* at 986-88. These post-notice/post-comment documents were not subject to public review and comment and, because the documents contained information critical to the USFS' EA analysis, the Eastern District found that "[w]hen compared with the extensive environmental analysis eventually produced, the two-and-three-page public scoping notices were not adequate to inform the public of the kinds of data and information that

50

the agency would rely on in the preparation of the EA." *Id.* at 992.

The *Weingardt* holding supports Plaintiffs' claim, for the facts in *Weingardt* are similar to the facts here.  In both cases, the information contained in the public notices was minimal and the information critical to the relevant agency's EA analysis – hundreds of pages of such information – was released post-notice and post-comment.  Further, because the information was released post-notice and post-comment, in both cases, the public was denied an opportunity to meaningfully comment on the proposed project.  *Id.* (finding that "the [USFS] failed to give the public an adequate pre-decisional opportunity for informed comment").

In opposition to Plaintiffs' NEPA claim, the Corps and the Intervenor-Defendants cite a series of federal circuit court cases to support the proposition that "[f]ederal courts around the country are uniform in rejecting claims that certain documents such as EAs, EIDs and CMPs are required to be drafted and circulated for public comment automatically."  *Loadout's Mem. in Opp. to Pl.'s Mot. for Summ. J.*(Doc. 127), 9.  These cases, however, do not convince the Court that Plaintiffs' NEPA claim is without merit.

A finding that a specific document (i.e., the CMP)  must be circulated for public review and comment is not essential to this Court's finding that the Loadout and Fola Notices were deficient under NEPA.  Plaintiffs' NEPA claim is not that the Corps was required to circulate the Loadout and/or Fola CMPs for public review and comment, but rather that the minimum standard for public review and comment, as established in *Bering Strait*, was not met.  As a result, the federal circuit court cases cited by the Corps and Intervenor-Defendants are distinguishable on the issues presented and on the facts.  *See Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 115 (1st Cir. 2005) (holding the circulation of a draft EA not required and

51

finding the "to the extent practicable" standard met when the Corps extended the comment period over 5 months, held two public hearings, and noted and substantially responded to public comments in EA); *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004) (holding public notice sufficient when it included maps detailing the layout of the proposal, informed the public that the project "[was] likely to adversely affect bald eagles," and invited the public to request a public hearing); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996) (holding public notice sufficient when the permit application was widely disseminated, the notice informed the public that "several threatened or endangered species may be expected to be present at the site," there were multiple state-sponsored hearings, and the permit was the result of extensive inter-agency consultation). The cases cited by the Corps and Intervenor-Defendants are distinguishable because, in each case, the truly significant issue presented by the relevant permit application – such as the potential impacts on endangered species created by the projects in *Greater Yellowstone Coalition* and *Fund for Animals* – were highlighted in the attendant public notice. Thus, in contrast to the Loadout and Fola Notices, the notices challenged in *Alliance to Protect Nantucket Sound, Greater Yellowstone Coalition,* and *Fund for Animals* each provided an adequate opportunity for informed pre-decisional comment as required by NEPA and the CEQ Guidelines.[24]

---

[24]The Corps and Intervenor-Defendants also highlight the fact that Plaintiffs did not request a public hearing on either the Fola or Loadout Notice as evidence that the notices were sufficient. The Court, however, finds this argument unpersuasive. A decision not to request a public hearing on a notice does not render the information contained in that notice sufficient under NEPA. Instead, a decision not to request a public hearing can as readily be attributed to a deficiency in the public notice as it can be considered to demonstrate the adequacy of the notice. For, without sufficient information to identify the truly significant issues presented by a permit application, interested members of the public may not have adequate information upon which to base a hearing request.

## IV. Conclusion

With respect to the Loadout and Fola Notices, the Corps failed to comply with its regulatory duties under the CWA, NEPA and the APA because it failed to provided notices that either (1) provided a clear understanding of the nature and magnitude of the Loadout and Fola proposals, or (2) allowed the public to be involved to the extent practicable in the permit process. As a result, the Court **FINDS** the Loadout and Fola Notices deficient under law and **ORDERS** that Plaintiffs be provided the remedy outlined below.

Finally, in conclusion, the Court finds it prudent to note that this litigation could have easily been avoided and the flaw in the original Loadout and Fola Notices easily remedied if the Corps had issued supplemental notices in the instant case. With regard to the Loadout and Fola applications there were periods of approximately nine months and nearly a year and a half, respectively, between the time the company submitted a CMP and permit approval.  Although supplemental notice is discretionary, *see, e.g.,* 33 C.F.R. § 325.2(a)2); *B & B P'ship v. United States*, 133 F.3d 913, *6-*7 (4th Cir. 1997) (unpublished decision); *Fund for Animals*, 85 F.3d at 545, and the Court does not therefore hold that the Corps was required to issue supplemental notice, *see id.*, the Court finds that, in both permits, the interim period between the submission of the project's CMP and the respective permit approval would have been a prudent time for the Corps to issue supplemental notice.  Such notice would have apprised Plaintiffs and the public in general of the truly significant issues raised by each proposal, therefore providing the public an opportunity to comment intelligently thereon.  Consequently, such supplemental notice would have conserved judicial and other government resources, meanwhile, preventing the expenditure

of time, money and stress on the part of Plaintiffs as well as both mining companies.

## V.   Remedy

The Court **GRANTS** Plaintiffs' motions for summary judgment on the ground that the Loadout and Fola Notices were deficient and **DENIES** the motions for summary judgment filed by the Intervenor-Defendants on these grounds.   Additionally, the Court **HOLDS IN ABEYANCE** Fola's motion for summary judgment insofar as it pertains to Plaintiff's claims related to selenium discharges and **GRANTS** Intervenor-Defendants' motions for summary judgment insofar as they are controlled by the Fourth Circuit's decision in *Ohio Valley Environmental Coalition v. Aracoma Coal Company,* 556 F.3d 177.

Further, because the Court **FINDS** the public notices for the Nellis and Ike Fork surface mines deficient, the Court **REMANDS** Permit No. 200100895 (Loadout) and Permit No. 200400967 (Fola) to the Corps for the limited purpose of correcting this procedural flaw. Consistent with the reasoning provided in this Opinion and Order, the Court **ORDERS** the Corps to: (1) re-issue an amended notice for each permit, (2) receive and respond to comments on the revised notices, and (3)  reconsider each permit with any new comments in mind.  However, because the Court is sensitive to the substantial mining activity Loadout and Fola have conducted under the existing Nellis and Ike Fork surface mine permits, and because the Court realizes that the procedural flaw identified by Plaintiffs did not stem from any wrong-doing on the part of the mining companies, the Court **STAYS** the effect of this Opinion and Order for 60 days.  The stay is **GRANTED** so that the parties may have an opportunity to appeal this decision and/or to seek other desired relief.  Over the course of the stay, Loadout and Fola may continue to conduct

limited mining activities in accord with any existing agreements between the parties and any previous Opinions and/or Orders by this Court.

     The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:     November 24, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE