IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| OHIO VALLEY ENVIRONMENTAL COALITION, et al.,<br>      Plaintiffs,<br>    v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, et al.,<br>      Defendants. | )<br>)<br>)<br>) Civil Action No. 3:08-0979<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A TEMPORARY RESTRAINING ORDER AGAINST THE
LOADOUT NELLIS SURFACE MINE**

JOSEPH M. LOVETT
DEREK O. TEANEY
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
jlovett@appalmad.org

JAMES M. HECKER
Public Justice
1825 K Street, N.W. Suite 200
Washington, D.C. 20006
(202) 797-8600
jhecker@publicjustice.net

Counsel for the Plaintiffs

Introduction

In November 2009, this Court granted Plaintiffs' motion for summary judgment and remanded Defendant Loadout, LLC's ("Loadout") § 404 permit to Defendant U.S. Army Corps of Engineers ("the Corps") for additional public notice and comment and agency reconsideration. OVEC v. U.S. Army Corps of Engineers, 674 F. Supp.2d 783 (S.D. W.Va. 2009). On April 16, 2012, the Corps reissued the permit. Plaintiffs have moved for a temporary restraining order that (1) suspends the reissued permit, and (2) restrains, preliminarily enjoins, and prohibits Loadout from allowing and proceeding with any activities that disturb the environment at its Nellis Surface Mine site and exceed the scope of activities previously authorized by this Court. The Corps failed to comply with this Court's November 2009 remand order, because it reconsidered only a small portion of its original decision, and ignored most of Plaintiffs' comments in response to the reissued public notice. The Corps' actions demonstrate a persistent and irrational refusal to comply with the law. On remand, the Corps knew that it could not approve Loadout's stream creation plan as acceptable mitigation under its 2008 Mitigation Rule, so it simply ignored the Rule and reissued the permit anyway.

Facts

In June 2006, the Corps issued a Public Notice of its proposed issuance of an individual permit under § 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, to Loadout to fill streams with mine waste from its Nellis Surface Mine in Boone County, West Virginia. Public Notice, Doc. #86-2. The Notice contained no information on the expected environmental impacts of the project, except for quantifying that the project would adversely impact 12,584 feet of streams in listed watersheds. The Notice also stated that Loadout had not yet submitted a Compensatory

2

Mitigation Plan (CMP) to compensate for these stream impacts.  Based on this extremely limited information, Plaintiffs submitted timely comments objecting to the issuance of this Permit, but criticized the Corps for failing to include the CMP in the public notice.  Doc. #86-13, p. 9.

Loadout submitted its initial CMP to the Corps in July 2007, and supplemented it in December 2007 and March 2008, long after the close of the comment period.  Doc. #86-2, 86-12, 86-3, p. 3.  In April 2008, the Corps issued Loadout's § 404 permit, with seven of its eighteen special conditions based on the CMP.  Doc. #86-5.  The permit was accompanied by the Corps' 88-page Combined Decision Document (CDD).  Doc. #86-3.

The mine has four valley fills and three sediment control ponds in an area that has only been minimally impacted by past mining activities.  CDD, p. 3.  According to the Corps, "[t]he proposed valley fill construction would permanently eliminate 11,162 feet of ephemeral and intermittent stream channel on-site" and "113 acres of forested land cover," resulting in "the permanent loss of any available habitat and associated species" in the stream channels and riparian buffer, as well as "changes to the structure of the biotic community and ecosystem function of these streams."  CDD, pp. 42, 46, 47, 69.  According to the Corps, "[i]t is well understood that the health of entire watersheds are dependent on the functions provided by headwater streams."  CDD, p. 49.  The headwater streams of Fork Creek that would be permanently filled are in unaltered watersheds that "have good aquatic system health and thriving macroinvertebrate communities," and are classified as having "near reference conditions."  CDD, pp. 27, 31, 46.  Fork Creek is listed as attaining all designated water quality standards.  CDD, p. 45.

The Corps used its Interim Functional Assessment Approach for High Gradient Streams

(IFAA) to attempt to measure the structure and function of impacted and mitigated streams. CDD, pp. 21, 25, 35-37, 78-79, 84. Loadout also created another stream rating system called a Visual Stream Functional Assessment (VSFA). CDD, pp. 20, 37. Neither method is based on any scientific analysis, measurements, or field studies that link those indicators to stream functions. CDD, pp. 20, 25; Loadout CMP, Doc. #86-5, p. 11.

To attempt to mitigate the stream loss from valley filling, the Corps approved Loadout's mitigation plan that would require it to create a total of 13,564 linear feet in two separate stream channels within the perimeter ditches located around each valley fill. CDD, pp. 18, 28. The Corps admits that, under the CMP, the created stream channels would be less functional than the buried streams and would transport less water and nutrients downstream. CDD, p. 35, 84. Those channels "may not fully support benthic communities." CDD, p. 48. The Corps "is not guaranteeing or predicting that the mitigation stream channels would replace all functions and values lost as a result of the filling of the ephemeral and intermittent streams associated with this proposal." CDD, p. 84. The Corps attempted to offset this deficit by making the created streams longer than the buried streams. CDD, p. 36. The Corps also admitted that the valley fills would cause increased discharges of acidic drainage, specific conductivity, metals, and dissolved solids. CDD, p. 42. To compensate for stream losses during the expected ten-year period between the time that the streams are filled and the time that new ones are attempted to be created, Loadout's CMP requires it to enhance 8,900 feet of Fork Creek by providing bank stability and improved stream morphology. CDD, pp. 21, 28, 35.

The Corps concluded that the impacts of the Loadout project would be insignificant and therefore no environmental impact statement was required. CDD, p. 77. The Corps'

determination of insignificance rested on its finding that the CMP "is adequate to off-set impacts to aquatic resources proposed for impact" and that the "compensatory mitigation, as proposed, is sufficient to offset unavoidable impacts to aquatic resources." CDD, pp. 79, 86.

Plaintiffs previously submitted the declaration of their member Julian Martin in support of their standing to challenge Loadout's Nellis Surface Mine. Mr. Martin was born near the mine site, still visits relatives nearby who live within earshot of expected blasting from the mine, enjoys viewing the currently undisturbed Fork Creek downstream from the mine site, and is upset by the prospect that his enjoyment of this area will be impaired by mining activities. Martin Decl., Doc. #86-7.

### Prior Proceedings in this Court Before Remand

Count Five of Plaintiffs' Third Amended Complaint raised two procedural claims that the Corps failed to comply with its duties under the CWA and NEPA to provide adequate public notice, a meaningful opportunity for public comment, and other public involvement in its review process for the Loadout § 404 permit and the similar Fola Coal Company (Fola) § 404 permit for its Ike Fork mine. Doc. #85-2. Under the CWA, the Corps' regulations provide that a public notice is not adequate unless it contains "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. § 325.3(a). NEPA regulations similarly provide that environmental information must be made available to the public before decisions are made and that agencies must involve the public, to the extent practicable, in preparing their environmental analyses. 40 C.F.R. §§ 1500.1(b), 1501.4(b). Plaintiffs contended that, since mitigation was the centerpiece of the Corps' determinations that the two mining projects would not cause significant environmental

degradation under the CWA or significant environmental effects under NEPA, a public notice that contained no substantive information on mitigation was deficient under the CWA and NEPA.

In November 2009, this Court granted Plaintiffs' motion for summary judgment on both of these procedural claims. OVEC v. U.S. Army Corps of Engineers, 674 F. Supp.2d 783 (S.D. W.Va. 2009). On the CWA claim, the Court found that "the Corps unreasonably found the applications were complete and issued public notices that plainly did not contain sufficient information to allow for meaningful comment." Id. at 802. The missing information were the mitigation plans, which this Court found to be "critical to the Corps' determination that a § 404 permit for a mountaintop coal mine will not cause or contribute to significant environmental degradation." Id. at 803. Compensatory mitigation is "the single most important 'material issue[] related to the justification" of the two § 404 permits. Id. at 804. Information on proposed mitigation "constitutes the rationale and pivotal data underlying the Corps' decision to issue a § 404 permit for a mountaintop mine." Id. at 805. Because the public notices provided no substantive information on that critical issue, they did not "give [the public] a clear understanding of the nature and magnitude of the activity to generate meaningful comment." Id. at 804, quoting 33 C.F.R. § 325.3(a). The Court concluded that the public notices were deficient under the CWA. Id. at 808, 814.

On the NEPA claim, the Court applied a three-part test which analyzed (1) what issues were "truly significant," (2) what information was "practicable" to disseminate to the public, and (3) whether the Corps gave citizens an adequate opportunity to "weigh in" with their views. Id. at 811. On the first issue, the truly significant issue was whether mitigation adequately

compensated for the projects' adverse environmental impacts, reducing them to a level of insignificance such that no EIS under NEPA was required. Id. at 809, 811. On the second and third issues, the Court found that it was practicable to disseminate the mitigation plans to the public, and that Plaintiffs had no meaningful opportunity to weigh in with detailed and specific comments. Id. at 811-13. The Court therefore concluded that the public notices were deficient under NEPA. Id. at 813, 814.

As a remedy, the Court remanded the Loadout and Fola permits to the Corps to allow it to correct its procedural violations. Specifically, the Court ordered the Corps to "(1) re-issue an amended notice for each permit, (2) receive and respond to comments on the revised notices, and (3) reconsider each permit with any new comments in mind." Id. at 815. The Court subsequently denied Loadout's motion for relief under Rule 60(b) because it was opposed by Plaintiffs and because the streams under Loadout's proposed fills had only been partially buried with mining waste. Granting Loadout's motion would have allowed Loadout to inflict significant environmental harm in high-quality watersheds under its procedurally-flawed permit before Plaintiffs had the right to comment on a new public notice. Id. at 819.

### The Corps' Remand Decision

In June 2011, the Corps re-noticed Loadout's permit for public comment. Public Notice, Pl. Ex. 1. This notice specifically solicited comment on Loadout's entire mitigation plan, including the creation of two streams and the enhancement of Fork Creek. Id. at 1-2. Both the U.S. Environmental Protection Agency and Plaintiffs submitted timely comments that criticized Loadout's permit and mitigation plan. EPA Comments, Pl. Ex. 2; OVEC Comments, Pl. Ex. 3.

On April 16, 2012, the Corps re-issued Loadout's permit and a supporting Supplement to

the Combined Decision Document (SCDD). Permit, Pl. Ex. 4; SCDD, Pl. Ex. 5. The Corps responded to EPA's comments, but ignored most of Plaintiffs' comments. SCDD, pp. 14-22.

On April 17, 2012, Loadout notified Plaintiffs that, pursuant to their prior standstill agreement, it was providing 10 days' advance notice of Loadout's intention to begin mining in all remaining permit areas on April 28, 2012. After Plaintiffs' counsel requested more time, Loadout agreed to delay mining, but only for an additional seven days until 12:01 a.m. on Saturday, May 5, 2012. Sammons Letter, Pl. Ex. 6.

In its remand decision, the Corps did not reconsider the entire Loadout permit, or even most of it. The Corps refused to reconsider its decision for three of the four valley fills and two of the three sediment control ponds. SCDD, pp. 2-3. To justify this inaction, the Corps stated that prior to the remand, "the Court and plaintiffs were aware of the CMP required to mitigate for those impacts, and based on the November 2009 Order, the Court determined that the Nellis Permit process was not arbitrary and capricious or substantively lacking other than containing a procedural flaw." SCDD, p. 2. The Corps therefore concluded that it "will rely on the compensatory mitigation as originally approved by the Nellis Permit for impacts that were completed or were substantially completed prior to the remand." Id. This includes "the Wilderness Fork Valley Fill and Pond . . ., the Dave Fork Valley Fill 1 and 2, and the Dave Fork Pond . . ." Id. These activities impact 9,180 feet of Wilderness Fork and Dave Fork, and that stream length represents 82% of the total stream impacts. Id. at 3.

The Corps also refused to reconsider the 13,564 feet of stream creation used to mitigate those stream impacts. Id. That stream length represents 60% of the total of 22,464 feet of mitigation, and all of the mitigation using stream creation. Id. The Corps found that this

mitigation was sufficient because according to its "original analysis of the Nellis Permit, the credits generated [from using the IFAA method] . . . would exceed the debits." Id. The Corps refused to evaluate stream creation based on its current statutory and regulatory authorities. Instead, "[t]he Created Stream 1 and Stream 2 compensatory mitigation will be evaluated based on the terms and conditions of the Original Special Conditions." Id. at 11.

The Corps limited its remand decision to "any future discharge of fill material into waters of the United States in Mech Fork associated with the Mech Fork Valley Fill and the Mech Fork Pond." SCDD, p. 2. Those impacts "and the mitigation required to compensate for those impacts will be reevaluated based on current statutory and regulatory authorities . . ." Id. at 4. To evaluate those impacts, the Corps abandoned the IFAA method and used its new Stream and Wetland Valuation Metric (SWVM). Id. at 4-5. Using that method, the Corps concluded that the original 8,900 feet of stream enhancement in Fork Creek would still be sufficient to compensate for the Mech Fork impacts. Id. at 5, 11. Thus, no additional mitigation was required as a result of the remand. Furthermore, the Corps only reconsidered the mitigation using stream enhancement, not the mitigation using stream creation.

By not reconsidering stream creation based on its current statutory and regulatory authorities, the Corps avoided a conflict with its 2008 Mitigation Rule. As the Corps recently explained in its February 2012 decision reissuing Nationwide Permit 21 for surface coal mining, 19598), "[i]n accordance with the 2008 rule, the Corps is not relying on stream creation as a mechanism to provide compensatory mitigation for NWP 21 activities." Final Notice, Reissuance of Nationwide Permits, 77 Fed. Reg. 10184, 10207 (Feb. 21, 2012).[1] Without stream

---

[1] The 2008 Mitigation Rule provides that "[f]or difficult-to-replace resources (e.g., bogs, fens, springs, streams, Atlantic white cedar swamps) if further avoidance and minimization is not

9

creation as an acceptable mitigation measure, the Corps could not have reissued Loadout's permit, because stream creation provided 60% of the mitigation credits.

In its July 26, 2011 comments in response to the Corps' re-notice of the permit, EPA raised this issue directly with the Corps:

> Loadout is proposing to use on-site drainage control structures constructed during mining as the basis to create intermittent and ephemeral stream channels. The difficulty of replacing streams was acknowledged by both EPA and the Corps in the preamble to the 2008 Compensatory Mitigation Rule. It is EPA's position that using natural channel design techniques and riparian plantings alone will not re-establish the naturally occurring indigenous wildlife or ecosystem functions when the water quality is limiting the diversity, abundance, and structure of aquatic communities.

EPA Letter, Pl. Ex. 2. In response to this comment, the Corps stated that:

> impacts to waters of the United States from the discharge of fill material in Wilderness Fork and Dave Fork are compensated for by Created Stream 1 and Created Stream 2. The impacts to aquatic resources from the discharge of fill material and the created stream channels proposed to compensate for those impacts, were evaluated based on statutory and regulatory authorities current at that time, which was before the Mitigation Rule. Created stream channels proposed in the compensatory mitigation plan and the Original Special Conditions of the Nellis Permit were appropriate to compensate for the project at the time of permit issuance.

SCDD, pp. 16-17. Thus, the Corps implicitly admitted that stream creation is inconsistent with the Mitigation Rule. In addition, the Corps took the inconsistent position that the Mitigation Rule did apply to Loadout's stream enhancement activities, but did not apply to its stream creation activities for the same project.

The Corps ignored most of Plaintiffs' comments in response to the re-issued public

---

practicable, the required compensation should be provided, if practicable, through in-kind rehabilitation, enhancement, or preservation since there is greater certainty that these methods of compensation will successfully offset permitted impacts." 33 C.F.R. § 332.3(e)(3). That language was "intended to discourage stream establishment and re-establishment projects while still requiring compensation for unavoidable stream impacts in the form of stream corridor restoration (via rehabilitation), enhancement, and preservation projects, where practicable." 73 Fed. Reg. 19594, 19596 (April 10, 2008).

notice.  Plaintiffs submitted 55 pages of comments with 58 exhibits.  SCDD, p. 19.  The Corps summarily rejected all comments prior to page 37 without responding to them at all, claiming that they did not "pertain to Nellis Permit's CMP" and were "previously covered in *OVEC v. Aracoma,* 556 F.3d 177 (4th Cir. 2009)."  Id.  "Page 37 is the first comment the Corps identified as specific to the re-issued PN, and not previously resolved in the November 2009 Order."  Id.  The Corps ignored Plaintiffs' comments and evidence prior to page 37 that coal mining in Appalachian is causing significant degradation, cumulative impacts, water quality impairment, and increased conductivity and toxicity below mine sites.  The Corps also ignored Plaintiffs' discussion of recent EPA findings in its 2010 guidance documents and 2011 Spruce mine veto decision on mining impacts, recent scientific articles on adverse mining impacts (such as elevated conductivity), scientific opinion on the difficulty of stream creation as mitigation for mining impacts, the Corps' lack of any scientific basis for its IFAA method for assessing stream functions, and many other important issues.  OVEC Comments, Pl. Ex. 3, pp. 4-37.  The Corps further ignored several issues after page 37 of Plaintiffs' comments, including the effect of mining in causing elevated selenium discharges and the correlation between mountaintop mining activities and negative impacts on the health of nearby residents.  Id. at 42-49.  For the few issues that the Corps did address, the Corps failed to cite any scientific evidence to support its position and instead merely repeated the same conclusory statements that it made in its initial CDD.  SCDD, pp. 20-22.

   Most significantly, the Corps refused to evaluate Plaintiffs' comments that Loadout's mine would adversely affect downstream water quality and biological integrity and Loadout's mitigation plan failed to mitigate those impacts.  OVEC Comments, pp. 9-20, 32-33.  EPA

similarly commented that Loadout's mitigation plan failed to include water quality protection measures, and that such measures were needed to prevent stream degradation because "[m]ined areas typically contribute suspended sediments, metals, and high ion concentrations." SCDD, p. 15. The Corps summarily dismissed these comments with no evidence or explanation other than that "[t]he state issued NPDES permit will protect water quality according to its statutory responsibilities" and that water quality "is under the purview of the WVDEP." Id. at 16, 21.

## Argument

To obtain a temporary restraining order or preliminary injunction, a plaintiff must show: "'[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.' And all four requirements must be satisfied." Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)), vacated, 130 S.Ct. 2371 (2010), reinstated in part, 607 F.3d 355 (4th Cir. 2010). Plaintiffs satisfy those four requirements here.

**I.     Plaintiffs Are Likely to Succeed on the Merits**

    **A.     The Corps Violated This Court's Remand Order by Failing to Reconsider Loadout's Entire Permit and Mitigation Plan**

The Corps' remand decision displays an astonishing defiance of this Court's remand order. This Court ordered the Corps to re-issue a public notice, receive and respond to public comments, and "reconsider each permit with any new comments in mind." 674 F. Supp. 2d at 815. Instead, the Corps reissued a public notice, ignored most of Plaintiffs' comments, and reconsidered only a small part of Loadout's permit and mitigation plan. That defiance is sufficient by itself to demonstrate Plaintiffs' likelihood of success on the merits.

It is even more disturbing that the Corps' rationale for its defiance is so disingenuous. The Corps' pretext for not reconsidering most of the permit impacts and related mitigation is that those impacts had already occurred, the Court and the parties "were aware of the CMP required to mitigate for those impacts," and the Court had already decided that the Loadout permit process was not arbitrary and capricious "except for a procedural flaw." SCDD, p. 2. That pretext is simply ridiculous. This Court's order did not distinguish between past and future permit impacts, and this Court squarely held that the Corps could not rely on Loadout's CMP to justify its permit decision because the public had not been aware of it or had an adequate opportunity to comment on it during the original public comment period. 674 F. Supp.2d at 803-04, 813-14 (compensatory mitigation "is the single most important 'material issue related to the justification'" of a § 404 permit and "the minimum standard for public review and comment [on that issue] was not met").

The real reason for the Corps' failure to reconsider all of the permit impacts and related mitigation is because Loadout's stream creation plan violated the Corps' 2008 Mitigation Rule.[2] Apparently, the Corps does not believe that denying a permit for a mining company is ever a viable option. So it chose to make up a pretext so that it could evade the Mitigation Rule's rejection of stream creation and issue the permit regardless. As Judge Haden stated eleven years ago, this kind of agency misconduct in coal mine permitting evidences "a climate of lawlessness, which creates a pervasive impression that continued disregard for federal law and statutory requirements goes unpunished, or possibly unnoticed." West Virginia Highlands Conservancy v.

---

[2] The Corps admitted that the Rule applied to Loadout, because it applied the Rule to Mech Fork impacts and Fork Creek mitigation. SCDD, p. 4. But the Corps made up a new requirement that the Rule only applies to uncompleted work and future impacts, not completed work and past impacts on the same project. Id. at 2, 4. There is nothing in the Rule to support that distinction.

Norton, 161 F. Supp.2d 676, 684 (S.D. W.Va. 2001). The Corps had two lawful choices for complying with its 2008 Mitigation Rule. It could have rejected the Loadout's stream creation plan and denied the permit, or it could have rejected the stream creation plan, required alternative mitigation sufficient to comply with the Rule and NEPA, and then considered whether to reissue the permit. The Corps arbitrarily rejected both of those lawful choices. Instead, it ignored its own Rule and issued an illegal permit that fails to comply with that Rule.

> B. **The Corps Violated This Court's Remand Order by Failing to Respond to Plaintiffs' Comments**

This Court's remand order required the Corps to "receive and respond to comments on the revised notices." 674 F. Supp.2d at 815. The Corps flouted this order by ignoring more than 37 pages of Plaintiffs' comments, including comments directly pertinent to Loadout's mitigation plan. For example, the Corps refused to respond to Plaintiffs' comments on the difficulty of stream creation, the lack of any scientific basis for the Corps' IFAA method for assessing stream functions, and the failure to mitigate for human health effects. Pl. Ex. 3. In addition, to the extent the Corps did respond, its response was conclusory and merely repeated the same statements as those in its original decision, with no investigation into the facts and no weighing or citation of any scientific data or studies to rebut those presented by Plaintiffs.

This is not the "hard look" at potential environmental consequences that NEPA requires. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). "The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgement of potential environmental harms." Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 185 (4th Cir. 2005). Instead, the Corps' entire response is based on denial and deflection of comments, with no factual investigation or scientific analysis.

Most significantly, the Corps failed to respond to EPA's and Plaintiffs' comments that Loadout has failed to mitigate for the adverse effects of valley fills on downstream water chemistry (including conductivity and selenium) and biological integrity. The Corps deflected these comments with the assertion that water quality is the state's exclusive province and Loadout's NPDES permit conclusively provides all the protection that is required. The Corps cannot conclusively rely on a state's water quality certification or issuance of an NPDES permit when EPA has "advise[d] of other water quality aspects to be taken into consideration." 33 C.F.R. § 320.4(d). EPA's July 2011 letter specifically advised the Corps that "[b]ased on the best available science available today, surface coal mining practices like the Nellis Surface Mine can significantly affect downstream ecological communities and water quality," that "further degradation is likely," and that "the CMP should include water quality protection measures and/or improvements." SCDD, p. 15. The Corps therefore could not summarily reject this advice by relying on WVDEP's issuance of an NPDES permit. The Corps provided no evidence whatsoever that rebuts EPA's opinion that this mine will cause significant stream impairment. Nor did the Corps include any water protection measures to reduce sediments, metals or high ion concentrations. As a result, the Corps still does not have any rational basis for its conclusion that the Nellis Mine will have insignificant environmental effects under NEPA and will not cause significant degradation under the CWA.

**II.     The Other Three Equitable Factors Support Temporary Injunctive Relief**

In denying Loadout's prior motion for a stay of this Court's order, the Court found that Plaintiffs would suffer irreparable harm if Loadout continued to operate under its procedurally-flawed permit. The "Court finds that allowing Loadout to complete the Dave Fork Valley Fills

15

would result in significant environmental harm." 674 F. Supp.2d at 819. This Court also found that the balance of equities favored Plaintiffs and the public interest supported a continuing injunction against Loadout's mining activities. "[N]either Loadout's expenditures to date nor the public interest warrant granting [Loadout's] motion." Id. at 821. Nothing has occurred to change these conclusions. The Corps' remand decision has not corrected its legal errors, and the threat of further mining activities is imminent unless a temporary restraining order is granted prior to May 5, 2012.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a temporary restraining order that (1) suspends the April 16, 2012 reissued Loadout § 404 permit, and (2) restrains, preliminarily enjoins, and prohibits Loadout from allowing and proceeding with any activities that disturb the environment at its Nellis Surface Mine site and exceed the scope of activities previously authorized by this Court.

Respectfully submitted,

/s/ Derek O. Teaney
JOSEPH M. LOVETT
DEREK O. TEANEY
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
dteaney@appalmad.org

JAMES M. HECKER
Public Justice
1825 K Street, N.W. Suite 200
Washington, D.C. 20006
(202) 797-8600
jhecker@publicjustice.net

Counsel for the Plaintiffs

16

## CERTIFICATE OF SERVICE

I, Derek O. Teaney, hereby certify that on April 25, 2012, I electronically filed the foregoing Plaintiffs' Memorandum in Support of its Motion for a Temporary Restraining Order Against the Loadout Nellis Surface Mine with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Cynthia J. Morris
Sean Martin
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986

Ann D. Navaro
U. S. Army Corps Of Engineers
Great Lakes and Ohio River Division
P. O. Box 1159
Cincinnati, OH 45201

Robert McLusky
Jackson Kelly PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322

James Crockett
Allyn Turner
Spilman, Thomas & Battle, PLLC
Post Office Box 273
Charleston, WV 25321-0273

Terry R. Sammons
Sammons Law Offices, PLLC
P.O. Box 1747
Gilbert, West Virginia 25621

W. Howard Sammons, II
Law Office of W. Howard Sammons II, PLLC
2768 Pennsylvania Avenue

Charleston, West Virginia 25302

Edward P. Tiffey
Edward P. Tiffey, PLLC
205 Capitol Street, Fourth Floor
Post Office Box 3785
Charleston, West Virginia 25337-3785

Nicholas S. Preservati
Preservati Law Offices, PLLC
P. O. Box 1431
Charleston, West Virginia 25325

/s/ Derek O. Teaney