IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, et al.,

               Plaintiffs,

v.                                 CIVIL ACTION NO.  3:08-0979

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

               Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' cross-motion for summary judgment (ECF No. 264), the cross-motion by Defendant Loadout, LLC for summary judgment (ECF No. 267), and Defendant Army Corps of Engineers' cross-motion for summary judgment (ECF No. 275). For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** the parties' motions. More specifically, the Court **RULES** as follows:

1. The Court **FINDS** that the Corps violated the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA") by failing to reconsider mitigation under the Compensatory Mitigation Plan ("CMP") for Loadout's § 404 permit impacts. This failure also violated the Court's earlier Remand Order, and was inconsistent with the re-issued public notice.

2. The Court additionally **FINDS** that the Corps violated the CWA, NEPA, and the Administrative Procedure Act ("APA") by failing to sufficiently address Plaintiffs'

comments concerning the mitigation plan. This failure was also a violation of the Court's earlier Remand Order.

3. Therefore, the Court **GRANTS in part** Plaintiffs' motion for summary judgment (ECF No. 264), as to Count One of their Fifth Supplemental Complaint (that is, Plaintiffs' claim that the re-issued permit violated the Remand Order by ignoring most of Plaintiffs' comments and reconsidering just a portion of the mitigation plan and permit). Accordingly, the Court **DENIES in part** Loadout's (ECF No. 267) and the Corps' (ECF No. 275) cross-motions for summary judgment as to Count One.

4. The Corps erred in only reevaluating mitigation for Mech Fork, but not for the other forks. The Corps additionally erred by not properly responding to Plaintiffs' comments regarding the CMP. Therefore, this Court **REMANDS** the re-issued Loadout permit to the Corps for the limited purpose of 1) reevaluating mitigation for Dave Fork and Wilderness Fork, and 2) properly responding to Plaintiffs' comments, especially those concerning stream creation.

5. The Court also **DENIES** Plaintiffs' request to suspend mining activities. The only issue before the Court now is mitigation under the CMP and the Corps' response to comments and reconsideration of the permit. The Court permitted mining activities to continue after the Remand Order, and so it is not proper for Plaintiffs at this time to object to mining impacts that have already occurred. Furthermore, since the Court finds that the Corps' reconsideration of mitigation measures for Mech Fork complies with the Remand Order, the CWA, and NEPA, mining activities there may proceed under the SCDD.

6. Because this Court is again remanding the permit to the Corps for reconsideration consistent with this opinion, the Court need not reach the merits of Count Two (Plaintiffs' claim that the Corps' decision that the CMP will prevent significant water degradation and not contribute to CWA violations is illegal, arbitrary, and capricious, in violation of the CWA and APA) and Count Three (Plaintiffs' claim that the Corps' decision that the CMP will prevent significant impacts pursuant to NEPA is illegal, arbitrary, and capricious, in violation of the NEPA and APA) of the Fifth Supplemental Complaint. Therefore, the Court **DISMISSES without prejudice** those claims and **DENIES as moot** the parties' motions for summary judgment on Counts Two and Three.

## I.   Background

### A.   Initial Complaints and Remand Order

Plaintiffs Ohio Valley Environmental Coalition ("OVEC"), Coal River Mountain Watch, West Virginia Highlands Conservancy, and the Sierra Club (collectively "Plaintiffs") commenced the instant litigation in August 2008 against the Army Corps of Engineers ("USACE" or "the Corps"), seeking declaratory and injunctive relief. ECF No. 1. Plaintiffs have amended their complaint multiple times,[1] and several parties have been added and terminated over the course of the ensuing litigation.[2] Most pertinent to this opinion, mining company Loadout, LLC ("Loadout") intervened as a defendant in November 2008.[3] ECF No. 91.

_____

[1] Plaintiffs filed four amended complaints prior to this Court's 2009 Remand Order. ECF Nos. 16 (first amended complaint), 58 (second), 120 (third), 121 (fourth). The Fifth Supplemental Complaint was filed after the Remand Order. ECF No. 258.

[2] Hobet Mining Company, LLC intervened as a defendant in September 2008, and Fola Coal Company, LLC intervened as a defendant the following month. ECF Nos. 32, 57. Fola was

Plaintiffs' allegations regarding Loadout stemmed from a § 404 permit for Loadout's Nellis Surface Mine in Boone County, West Virginia. The Corps issued a 15-page public notice regarding the proposed permit in June 2006, which stated that the mining activities pursuant to the permit would permanently fill 11,194 linear feet of streams. ECF No. 95-5. The public notice also explained that Loadout had not yet submitted a CMP explaining the measures that would be taken to mitigate the adverse environmental effects of these mining activities. Despite the omission of the CMP, Plaintiffs—with the exception of the Sierra Club—together submitted comments to the Corps, arguing that the permit should not be issued. ECF No. 95-6. In June 2007—nearly a year after the comment period ended—Loadout submitted a CMP, ECF No. 86-2, which was supplemented via letter in December 2007 and March 2008, ECF Nos. 86-13, 278-1. Loadout also submitted an Environmental Information Document ("EID") to the Corps, which was not included in the public notice. ECF No. 86-5. The Corps issued Loadout's § 404 permit in April 2008, ECF No. 86-6, along with a Combined Decision Document ("CDD") which discussed the decision to issue the permit, ECF Nos. 86-3, 86-4. The CMP was a crucial component of the Corp's ultimate decision to approve the permit. As explained by Plaintiffs, "[s]even of the eighteen Special Conditions in the permit are based on the CMP. Special Condition 12 incorporates the entire CMP by reference." Third Am. Compl. ¶ 51, ECF No. 120.

---

severed from this case on June 25, 2012. ECF No. 266. Coal River Mining, LLC intervened as a defendant in November 2008. ECF No. 91. Hobet and Coal River were terminated pursuant to the Fifth Supplemental Complaint. ECF No. 258. Kanawha Energy Company intervened as a defendant in October 2011, ECF No. 222, but was terminated pursuant to the Fifth Supplemental Complaint.

[3] Discussion of background information in this case will focus on those actions most closely pertaining to the Loadout permit, which is the subject of the pending cross-motions for summary judgment.

4

Plaintiffs objected to the Corps' issuance of the permit, alleging that the public could not meaningfully comment on the CMP and EID for Loadout's proposed permit before the permit was actually issued; therefore, they claimed, the Corps' public notice and opportunity to comment violated the CWA and NEPA.[4] *Id.* ¶¶ 73-75 (Count Five). Additionally, Plaintiffs alleged that the Corps' determination that Nellis Surface Mine's environmental impacts would not violate the CWA and NEPA was arbitrary and capricious, and therefore violated the CWA, NEPA, and APA. *Id.* ¶¶ 76-79 (Counts Six and Seven).

In November 2009, this Court issued a memorandum opinion and order resolving several pending motions for summary judgment. *OVEC v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783 (S.D. W. Va. 2009) (hereinafter "Remand Order"). As part of this Remand Order, the Court granted Plaintiffs' motion for partial summary judgment against Loadout on Count Five of the Third Amended Complaint, finding that the Corps failed to allow for adequate public notice and comment regarding Loadout's proposed § 404 permit, in violation of the CWA and NEPA. *Id.* at 786. The Court noted that "[c]ompensatory mitigation is critical to the Corps' determination that a § 404 permit for a mountaintop coal mine will not cause or contribute to significant environmental degradation." *Id.* at 803. Therefore, because the notices omitted any substantive mitigation information, Plaintiffs could not provide meaningful comments, and the public comment process for this permit was fatally flawed. *Id.* at 804. The Court remanded the Loadout permit to the Corps to fix this procedural flaw. *Id.* at 815. Specifically, the Corps was ordered to:

---

[4] For discussion of the regulatory frameworks behind the CWA and NEPA, see sections I(B)(1) and (2) of this Court's November 2009 Remand Order. *OVEC v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 789-93 (S.D. W. Va. 2009).

"(1) re-issue an amended notice for each permit, (2) receive and respond to comments on the revised notices, and (3) reconsider each permit with any new comments in mind." *Id.*

As to Counts Six and Seven, the Court granted Loadout's motion for summary judgment on those counts "insofar as it is controlled by the Fourth Circuit's decision in *Ohio Valley Environmental Coalition v. Aracoma Coal Co.,* 556 F.3d 177 ([4th Cir.] 2009)." *Id.* at 786. In *Aracoma*, the Fourth Circuit explained that courts must be highly deferential when they review how an agency interprets its own regulations. Furthermore, "[i]n matters involving complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" 556 F.3d at 201 (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 103 (1983)). This Court allowed mining activities to proceed in the meantime while the Corps reconsidered the permit.

### B.  Revised Public Notice, Comments, and Re-Issued Permit

The Corps issued a 3-page revised public notice regarding Loadout's § 404 permit in June 2011, stating that its purpose was to inform the public about the CMP and to solicit comments about the plan. ECF No. 223-1 at 1. This revised public notice also stated that it was amended from the earlier notice, pursuant to this Court's Remand Order. *Id.* The notice stated that mitigation would include stream creation and stream enhancement, and specified that the project impacts three streams: Wilderness Fork, Dave Fork, and Mech Fork. *Id.* at 2. It further stated that "[t]he applicant has not yet initiated the mitigation activities," and it did not indicate the progress, if any, that had been made on each of these forks. *Id.* at 3.

The U.S. Environmental Protection Agency ("EPA") submitted two pages of comments, voicing concerns over the sufficiency of the CMP. ECF No. 233-2. Plaintiffs provided over 50

6

pages of comments in response to the revised public notice. ECF No. 233-3. Plaintiffs' comments incorporated by reference many exhibits, and particularly focused on how stream creation was an insufficient method by which to mitigate the harmful effects of mining activity and valley fills.

The Corps subsequently reinstated the permit, with modification, in April 2012. ECF No. 233-4. In its Supplement to the Combined Decision Document ("SCDD"), the Corps stated that "[i]n reconsideration of the Nellis Permit, a distinction shall be made between those activities that involved the discharge of fill material into waters of the United States that have substantially begun and/or completed prior to the remand and those which have not begun." ECF No. 233-5 at 2 (hereinafter "SCDD"). The Corps would "rely on the compensatory mitigation as originally approved by the Nellis Permit for impacts that were completed or were substantially completed prior to the remand," namely, impacts as to Wilderness Fork and much of Dave Fork.[5] *Id.*

A short paragraph in the SCDD stated that the Corps "reevaluated" Wilderness Fork and Dave Fork activities, namely by recalculating the credits and debits using a tool called the Interim Functional Assessment Approach ("IFAA"). *Id.* at 3. The SCDD devoted more discussion and explanation to Mech Fork's reevaluation in line with the 2008 Mitigation Rule and utilizing updated analysis tools. *Id.* at 4-5. The SCDD did modify mitigation regarding Mech Fork, but summarily reaffirmed the Corps' earlier conclusion that stream creation was an

---

[5] Table 1 in the SCDD stated that the Wilderness Fork Valley Fill and Pond (which together comprise Wilderness Fork) were 100% complete. Dave Fork Valley Fills 1 and 2 were 60% and 47% complete, respectively, and the Dave Fork Pond was 100% complete (together comprising Dave Fork). The Mech Fork Valley Fill and Pond (collectively known as Mech Fork) had not been started yet. SCDD at 2.

adequate method of mitigation. The Corps stated that OVEC's public comments in response to the revised public notice "included many generic comments regarding compensatory mitigation" already resolved by *Aracoma*. *Id*. at 19. Furthermore, the Corps stated that unresolved comments responsive to the amended public notice did not appear until page 37 of Plaintiffs' comments. *Id.* The Corps then discussed comments on page 37 and thereafter that it deemed to be responsive to the CMP.

### C. Plaintiffs' Allegations Regarding the Re-issued Permit

Plaintiffs filed a Fifth Supplemental Complaint in May 2012, requesting this Court to take the following action:

> (1) declare that the Corps has failed to comply with the Court's remand order, and has violated the APA, CWA and NEPA, (2) order the Corps to suspend Loadout's reinstated § 404 permit and reconsider its decision again and comply fully with the Court's remand order, (3) enjoin and prohibit Loadout from proceeding with any activities that disturb the environment at its Nellis Surface Mine site and exceed the scope of activities previously authorized by this Court, until at least 30 days after the Corps issues a new decision, and (4) award to Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness fees.

Fifth Supplemental Compl. ¶ 2, ECF No. 258. In support of this relief, Plaintiffs argue that the SCDD "responded to EPA's comments, but ignored most of Plaintiffs' comments." *Id.* ¶ 43. Plaintiffs specifically allege as follows:

> 45. In its remand decision, the Corps did not reconsider the entire Loadout permit, or even most of it. The Corps refused to reconsider its decision for three of the four valley fills and two of the three sediment control ponds. SCDD, pp. 2-3. . . .

> 47. The Corps limited its remand decision to "any future discharge of fill material into waters of the United States in Mech Fork associated with the Mech Fork Valley Fill and the Mech Fork Pond." SCDD, p. 2. . . .

> 50. The Corps ignored most of Plaintiffs' comments in response to the re-issued public notice. . . .

> 51. The Corps also ignored 13 pages of Plaintiffs' comments that focused entirely on mitigation issues. This included Plaintiffs' discussion of recent EPA findings in its 2010 guidance documents and 2011 Spruce mine veto decision on mining impacts, recent scientific articles on adverse mining impacts (such as elevated conductivity), scientific opinion on the difficulty of stream creation as mitigation for mining impacts, the Corps' lack of any scientific basis for its IFAA method for assessing stream functions, and many other important issues. Id. at 20-37. The Corps further ignored several issues after page 37 of Plaintiffs' comments, including the effect of mining in causing elevated selenium discharges and the correlation between mountaintop mining activities and negative impacts on the health of nearby residents. Id. at 42-49.
>
> 52. For the few issues that the Corps did address, the Corps failed to cite any scientific evidence to support its position and instead merely repeated the same conclusory statements that it made in its initial CDD. SCDD, pp. 20-22. . . .

Id. Plaintiffs claim that the re-issued permit violated the Remand Order by ignoring most of Plaintiffs' comments and reconsidering just a portion of the mitigation plan and permit. Id. ¶ 54 (Count One). Plaintiffs further claim that the Corps' decision that the CMP will prevent significant water degradation and not contribute to CWA violations is illegal, arbitrary, and capricious, in violation of the CWA and APA. Id. ¶¶ 55-56 (Count Two). Lastly, they allege that the Corps' decision that the CMP will prevent significant impacts pursuant to NEPA is illegal, arbitrary, and capricious, in violation of the NEPA and APA. Id. ¶¶ 57-58 (Count Three).

Pending before the Court is Plaintiffs' cross-motion for summary judgment on Counts One, Two, and Three of the Fifth Supplemental Complaint. ECF No. 264. Loadout has also filed a cross-motion for summary judgment, ECF No. 267, as has the Corps, ECF No. 275. The last of these motions became ripe for decision on August 22, 2012. The Court heard oral argument regarding the cross-motions on March 6, 2013, and is now prepared to rule on these cross-motions.

## II. Standard of Review

### A. Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### B. The Administrative Procedure Act

As this Court explained in the Remand Order, "[c]laims challenging federal agency action under the CWA and NEPA are subject to judicial review under the APA." *Aracoma*, 556 F.3d at 192 (citations omitted). When issuing § 404 permits, the Corps is engaged in informal rule-making under Section 4 of the APA. *Id.* (citing 5 U.S.C. § 553). This informal rule-making

is reviewed pursuant to Section 10 of the APA, "which establishes that, as a general rule, 'agency action, findings, and conclusions' will be set aside only when they are 'found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)) (also citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971)). "Review under this standard is highly deferential, with a presumption of finding agency action valid." *Id.* (citing *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993)).

The "arbitrary and capricious" standard applies to an agency's review of public comments as well. Specifically, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to 'relevant' and 'significant' public comments." *City of Portland, Or. v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (quoting *Pub. Citizen, Inc. v. FAA,* 988 F.2d 186, 197 (D.C. Cir. 1993) (citations omitted)). The District of Columbia Circuit has discussed at length the extent to which agencies must respond to public comments in order to satisfy this standard:

> With regard to responding to public comments, it is settled that "the agency [is not required] to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking." *Automotive Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330, 338 (D.C. Cir. 1968); *cf. Simpson v. Young,* 854 F.2d 1429, 1435 (D.C. Cir. 1988) ("[t]he agency need only state the main reasons for its decision and indicate it has considered the most important objections"). Instead, the agency's response to public comments need only "enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Automotive Parts,* 407 F.2d at 335. Indeed, the agency need not respond at all to comments that are "purely speculative and do not disclose the factual or policy basis on which they rest." [*Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 n.58 (D.C. Cir. 1977), *cert. denied,* 434 U.S. 829 (1977).]

*Pub. Citizen*, 988 F.2d at 197.

### III. Analysis

In the Remand Order, this Court ordered the Corps to do the following: "(1) re-issue an amended notice for each permit, (2) receive and respond to comments on the revised notices, and (3) reconsider each permit with any new comments in mind." Remand Order at 815. The Corps' re-issued public notice complies with the notice requirements of the CWA and NEPA.[6] The parties disagree, however, about whether the Corps properly responded to Plaintiffs' comments on the revised public notice, and whether the Corps did in fact adequately reconsider the permit.[7] As will be explained below, this Court finds that the Corps violated the Remand Order by failing to reevaluate mitigation for the completed and substantially completed mining activities. Furthermore, this Court finds that the Corps failed to properly respond to Plaintiffs' comments concerning the mitigation, specifically those about stream creation, and the Corps failed to justify stream creation as a method of mitigation.

---

[6] The CWA's public notice requirements are presented in 33 C.F.R. § 325.3(a) (stating in part that "[t]he notice must . . . include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."). While public notices may not require inclusion of a CMP in all instances, a description of the proposed mitigation *is* required when the mitigation is a critical component of the Corps' decision to issue the permit. Furthermore, in order to satisfy NEPA, environmental review agencies must involve the public in their efforts. 40 C.F.R. §§ 1501.4(b), 1506.6(a) & (d). To this end, public notices "must concentrate on the issues that are truly significant to the action in question." 40 C.F.R. § 1500.1(b). Therefore, to satisfy NEPA, this public notice was required to include mitigation information. Plaintiffs do not dispute the sufficiency of the re-issued public notice, and the Court finds that the re-issued public notice meets the Court's Remand Order. For further discussion of notice requirements under the CWA and NEPA, see the Remand Order at pages 799-814.

[7] Also, the Court emphasizes that the only issue before the Court now is mitigation under the CMP and the Corps' response to comments and reconsideration of the permit. Mining activities were permitted to continue after remand, and so mining impacts have already occurred. Those impacts were commented on by Plaintiffs and considered by the Corps in its first CDD. The Remand Order denied Plaintiffs' claims other than the defective public notice and the Corps' approval of the CMP.

### A. Reevaluation of Mitigation

The re-issued public notice stated that the Corps was soliciting comments from the public "regarding the CMP," and that the CMP was available for public review. ECF No. 223-1 at 1. The notice additionally specified the three forks impacted by the project—Wilderness Fork, Dave Fork, and Mech Fork—but did not mention the progress made on each fork. *Id.* at 2. It further stated that "[t]he applicant has not yet initiated the mitigation activities." *Id.* at 3. The plain language of the revised public notice indicates that the Corps was soliciting comments regarding *any and all parts* of the CMP, and that the entire mitigation plan was subject to consideration. While the notice was silent as to the progress made on fill activities, it suggested that the public could comment on any mitigation measures proposed in the CMP, and—more importantly—that the Corps would consider all pertinent comments. In other words, the public notice explicitly acknowledged that the Corps would consider comments on any aspect of the mitigation proposed in the CMP and implicitly that the Corps could alter any of its mitigation requirements.

The SCDD issued in conjunction with the re-issued permit, however, bifurcated past and future activities in a way that the revised public notice never mentioned. It stated that "[i]n reconsideration of the Nellis Permit, a distinction shall be made between those activities that involved the discharge of fill material into waters of the United States that have substantially begun and/or completed prior to the remand and those which have not begun." SCDD at 2. The Corps would "rely on the compensatory mitigation as originally approved by the Nellis Permit for impacts that were completed or were substantially completed prior to the remand," namely, impacts at Wilderness Fork and Dave Fork. *Id.* At oral argument, the Corps argued that this

13

distinction was necessary because it was impossible to reevaluate fill activities that were already completed. This is why, it claimed, the IFAA was used both in the original analysis and in the credit re-calculation on remand. The fact that additional field work was completed in order to reevaluate yet-to-be-started Mech Fork lends support to this position that impacts had already been determined for the other forks. *See* SCDD at 4-5.

The Corps' distinction between completed and future activities is problematic for two reasons. First, the Corps failed to identify any reason for its decision not to reevaluate mitigation *credits* for Wilderness Fork and Dave Fork. It may be that the impact of the fill activities (or *debits*) cannot be reevaluated using tools other than the IFAA, and the Court finds it appropriate to treat this portion of the Corps' decision with deference. However, the same is not true of the Corps' approach to *credits* for mitigation in Wilderness Fork and Dave Fork. As the Corps stated during oral argument, mitigation in Wilderness and Dave Forks is not yet begun. It is not necessary to use the same methods to calculate both the credits and the debits for a given mining fill; the use of the IFAA to calculate debits does not preclude the use of other tools to calculate credits. Also, the Corps retains the authority under this permit to modify the mitigation plan at any time. Nothing prevents mitigation from being reevaluated, even if the debits cannot be re-analyzed at this point. Therefore, the Court finds that the Corps acted arbitrarily and capriciously in refusing to reevaluate the mitigation for these two forks. Second, mitigation in Mech Fork only involves stream enhancement, not stream creation. Therefore, although it may be commendable that the Corps reevaluated the plans for Mech Fork using updated methodologies and analysis tools other than IFAA, the Mech Fork reevaluation does nothing to justify the stream creation that is the crux of the CMP and the Corps' mitigation conclusions. The Court

14

therefore finds that this distinction is arbitrary and capricious.

The Corps argues that its "reevaluation" of the credits and debits for Wilderness and Dave Forks using the same analysis tool as before qualifies as reconsideration consistent with the Remand Order. *See* SCDD at 3. Based on that approach, the Corps stated it did not see any indication that the mitigation plan already in place would not be successful or sufficient. The Corps is adamant that although it did not modify its mitigation plan for Wilderness and Dave Forks, this does not mean that it did not reconsider the plan. The Court notes, however, that the Corps gave no explanation, either in the SCDD or the original CDD, as to *why* the existing mitigation plan, particularly stream creation, would be successful for the site as a whole. The short paragraph on page 3 of the SCDD provides no justification for stream creation as a viable means of mitigation. This flaw ties to the second way in which the Corps violated the Remand Order: the Corps did not properly consider and respond to Plaintiffs' comments on remand.

## B. Response to Plaintiffs' Comments

Stream enhancement and creation are the mitigation centerpieces of Loadout's CMP.[8] Stream enhancement improves aspects of existing streams, and includes efforts to "improve habitat, bank stability, sediment deposition, embeddedness, and channel flow status." ECF No. 86-2 at 68. Stream creation entails constructing new intermittent and ephemeral stream channels by re-purposing and modifying on-site drainage control structures. *Id.* at 69-70. The vast majority of mitigation credits under Loadout's CMP come from stream creation at the Wilderness and Dave Fork valley fills rather than stream enhancement. SCDD at 3, Table 2

---

[8] The CMP also originally included stream restoration, but a letter supplementing the CMP stated that restoration was no longer part of the CMP. ECF No. 86-13, Dec. 19, 2007.

(stating that under the original calculation, stream creation will account for over 35,000 credits, while stream enhancement will account for 6,675 credits). Therefore, it is especially critical for the Corps to sufficiently justify the decision to heavily rely on stream creation in the CMP, in the context of responding meaningfully to Plaintiffs' relevant comments.

The original public notice did not mention that Loadout would engage in stream enhancement and stream creation to mitigate the impacts of this project. ECF No. 95-5. Plaintiffs' original comments noted that the CMP was not yet available, but Plaintiffs nonetheless anticipated that "[m]itigation typically includes" stream enhancement and stream creation and proceeded to attack the adequacy of mitigation generally to make up for environmental damage. ECF No. 95-6 at 9-10.  As part of this attack, Plaintiffs stated that "there is no evidence provided that [created streams] will function as healthy streams" and noted with disapproval the "assumption that function will follow creation of form." *Id.* at 11, 12 (quoting Dr. Palmer, Ex. T, discussing CMPs for a similar project and critiquing stream creation); *see also id.* at 15 (noting that the Fish and Wildlife Service has before disapproved of stream creation as an adequate means of mitigation), 16 (Dr. Palmer again critiquing stream creation), 20 (noting that "the applicant and the Corps have failed to identify a single example of successful stream . . . . creation, as measured by a functional stream analysis").

The Corps stated at oral argument that it did not justify stream creation in the SCDD because it felt it had sufficiently justified this method of mitigation when issuing the original permit. However, the Court finds that this argument is without merit. The original CDD discussed anticipated stream creation, including its specific environmental components and performance standards. *See, e.g.,* CDD at 18, 22, 35. The CDD never addressed, however, the

16

viability of stream creation itself, and did not otherwise justify stream creation in the face of Plaintiffs' comments. *See, e.g.,* Corps' Resp. to Comments on Loadout Appl. 17, 23, ECF No. 138-1.

Plaintiffs' comments to the revised public notice again attack stream creation. A large portion of these criticisms are the same ones found in the original comments. *See, e.g.,* ECF No. 233-3 at 28 (discussing Dr. Palmer's criticisms of de novo stream creation). Other comments, however, are new. *See, e.g., id.* at 30 (discussing the EPA's veto to the Spruce No. 1 Mine, which occurred after the original round of public comments ended). Even though many of Plaintiffs' comments about stream creation already appeared in the first round, this does not negate the necessity for the Corps to provide a proper response; this is because the original comments were made without the benefit of Plaintiffs' viewing the CMP. Even though the first-round comments about stream creation were relevant to the CMP that eventually emerged, the Corps nonetheless had to issue a revised public notice to give Plaintiffs a true opportunity to comment on the CMP. As this Court stated in the Remand Order:

> [W]hen responding to Plaintiffs' comments [to the Loadout and Fola notices], the Corps repeatedly criticizes Plaintiffs' comments for their lack of project-specific information and analysis. . . . [T]he Court finds that the Corps' responses to Plaintiffs' comments are more indicative of the deficiency of the relevant notices, rather than a lack of diligence on the part of the Plaintiffs, because it is clear that: (1) Plaintiffs attempted, to the best of their ability, to provide meaningful comments on the *expected* adverse impacts of and mitigation associated with the companies' proposed projects; and (2) Plaintiffs were forced to make general comments which lacked project-specific information because such project-specific information was not provided to them.

Remand Order at 808 (emphasis in original). Therefore, the fact that many of the comments to the reissued public notice were based on earlier comments does not matter, because the Corps

17

did not properly respond to those comments earlier.

As mentioned previously, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to 'relevant' and 'significant' public comments." *City of Portland,* 507 F.3d at 713 (quoting *Pub. Citizen,* 988 F.2d at 197 (citations omitted)). The Corps need not "discuss every item of fact or opinion included in the submissions made to it in informal rulemaking." *Pub. Citizen*, 988 F.2d at 197 (quoting *Automotive Parts,* 407 F.2d at 338). The Corps' response is sufficient if it "enable[s] us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Id.* (quoting *Automotive Parts,* 407 F.2d at 335).

In *Public Citizen, Inc. v. FAA,* the District of Columbia Circuit examined certain aviation security rules promulgated by the Federal Aviation Administration ("FAA"), including the FAA's decision not to disclose certain information about security programs. The Court of Appeals noted the deference due to the FAA, and that the FAA was prohibited from acting arbitrarily and capriciously. 988 F.2d at 196-97. In finding that the FAA did not act arbitrarily and capriciously, the Court of Appeals noted that the FAA provided a rational and sufficient explanation in response to critiques of its decision to keep certain security system information secret. *Id.* at 197. Also, the Court stated that the FAA was not required to respond to speculative comments, suggesting that speculative comments are those that provide no reasoning to underlie the argument being made. *See id.* ("We reiterate that to require response by the agency, comments must do more than simply state that the agency's premises or conclusions are wrong; they must explain why and on what basis the agency assertedly has erred.") (citing *Home Box Office,* 567 F.2d at 35 n.58).

18

Similar reasoning is evident in *City of Portland, Oregon v. EPA*, where the District of Columbia Circuit examined an EPA rule regulating drinking water contaminants. Two cities challenged this rule, claiming that the EPA ignored certain public comments:

> [T]he cities argue that EPA ignored a comment that questioned the Agency's rejection of an infectivity estimate developed by one of its scientists in a 2001 study. They also argue that in estimating the occurrence of cryptosporidiosis, EPA ignored their public health data. We disagree on both counts. In the final rule, EPA explained that more recent studies led it to believe that Cryptosporidium was more infective than the Agency previously thought. 71 Fed. Reg. at 662. EPA also explained that based on evidence from the Milwaukee outbreak and various studies, it believed that underreporting of cryptosporidiosis was severe. *Id.* at 660–61. Though New York and Portland cogently attack the merits of EPA's responses, the Agency clearly thought about the cities' objections and provided reasoned replies—all the APA requires. *See Public Citizen,* 988 F.2d at 197 ("[T]he agency's response to public comments need only 'enable us to see what major issues of policy were ventilated ... and why the agency reacted to them as it did.'" (quoting *Auto. Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330, 338 (D.C. Cir. 1968))).
>
> Moreover, whether EPA adequately responded to these comments makes no difference because the Agency had no obligation to respond to them in the first place. "'EPA is required to give reasoned responses to all *significant* comments in a rulemaking proceeding.'" *Int'l Fabricare Inst. v. EPA,* 972 F.2d 384, 389 (D.C. Cir. 1992) (quoting *PPG Indus., Inc. v. Costle,* 630 F.2d 462, 466 (6th Cir. 1980)) (emphasis added). Significant comments are those "which, if true, raise points relevant to the agency's decision *and which, if adopted, would require a change in an agency's proposed rule*." *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 n.58 (D.C. Cir. 1977) (emphasis added). Measured by this standard, the comments Portland and New York point to are insignificant. Because the SDWA ["Safe Water Drinking Act"] requires EPA to impose the most stringent feasible treatment technique for Cryptosporidium, and because neither comment showed the techniques imposed here to be infeasible, the comments were incapable of affecting the final rule, and EPA could disregard them.

507 F.3d at 714-15.

The Fourth Circuit explored the sufficiency of an agency's response to public comments in *HLI Lordship Industries, Inc. v. Committee for Purchase from the Blind & Other Severely Handicapped*, 791 F.2d 1136 (4th Cir. 1986). In that case, the Committee had published a

proposal in the Federal Register regarding items to be placed on a procurement list; items on the list could only thereafter be obtained from certain nonprofit agencies instead of through the competitive bidding process. Lordship provided written comments opposing the proposal and pointing out: the possible unreliability of the company proposed to supply the items; that company's inability to meet statutory requirements about the portion of labor provided by handicapped individuals; loss to Lordship; and the high price that would be charged under the proposal. In the end, the Committee adopted the proposal, providing the following explanation:

> After consideration of the relevant matter presented, the Committee has determined that the commodities listed below are suitable for procurement by the Federal Government under 41 U.S.C. 46–48c, 85 Stat. 77.
> I certify that the following actions will not have a significant impact on a substantial number of small entities. The major factors considered were:
> a. The actions will not result in any additional reporting, recordkeeping or other compliance requirements.
> b. The actions will have [sic] a serious economic impact on any contractors for the commodities listed.
> c. The actions will result in authorizing small entities to produce commodities procured by the Government.

*Id.* at 1139 (quoting Committee's published explanation). Having stated earlier that the APA required the agency to "incorporate in the rules adopted a concise general statement of their basis and purpose" "[a]fter consideration of the relevant matter presented," citing APA § 553(c), the Court of Appeals found that the Committee's explanation violated the APA:

> We think it obvious that the Committee's response was far less than "a concise general statement" of the basis of its decision. It is literally no response. By stating flatly that the listed medals were "suitable for procurement," the Committee failed to articulate "what major issues of policy were ventilated by the informal proceedings," [*State of S.C. ex rel. Tindal v. Block,* 717 F.2d 874, 886 (4th Cir. 1983)] (quoting *Automotive Parts,* 407 F.2d at 338), despite the fact that Lordship and others raised numerous objections relevant to that decision. The Committee did respond to Lordship's claim of economic hardship by concluding that "[t]he actions will [not] have a serious economic impact on any contractors

20

for the commodities listed." But this cryptic and perfunctory statement, no more than the Committee's silence as to the other issues, hardly explains "*why* the agency reacted to [the claim of economic hardship] the way it did." *Block,* 717 F.2d at 886 (emphasis added) (quoting *Automotive Parts,* 407 F.2d at 338). Though "[t]he APA does not require an exhaustive explanation of an administrator's reasoning," *Block,* 717 F.2d at 886, nor a review of every objection raised to a proposed action, the present explanation provides no evidence that the Committee even "examine[d] the relevant data," [*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 33 (1983)], and would require this court to "formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution." *Automotive Parts,* 407 F.2d at 338.

*Id.* at 1141.

Based on the standards articulated above, this Court believes that the Corps did not sufficiently address Plaintiffs' comments, and in doing so the Corps acted arbitrarily and capriciously. Unlike the situation in *Public Citizen,* here Plaintiffs' comments are not "speculative," but instead provide extensive argument and factual information to support the comments. Additionally, unlike *Public Citizen* and *City of Portland* but like *Lordship Industries,* here the Corps did not provide a rational explanation for why stream creation was approved to be a significant part of the CMP and why the Corps chose to rely on its earlier decision as to the sufficiency of mitigation for already-undertaken fill activities. Instead, the Corps' SCDD response to Plaintiffs comments about stream creation is a broken record insufficient to justify stream creation. For example, on page 10 of the SCDD, the Corps stated that its rationale for stream creation could be found in Section 1 (Introduction), and Section 2 (Determination of Impacts and Compensatory Mitigation) of that same document.[9] However, neither section

---

[9] The Corps also referred to 33 CFR § 332.3 as a "rationale" on page 10 of the SCDD, but this provision merely sets forth the parameters for permit conditions, and does not otherwise justify the particular mitigation chosen here.

explained why the Corps selected stream creation. Also, Section 2, which included brief discussion of credit recalculation for Wilderness and Dave Forks, merely suggested that the Corps was reaffirming its earlier decision to engage in stream creation, but does not explain why. This same "rationale" was repeated three times in response to EPA's comments. SCDD at 16, 18 (all three times stating "[t]he rational[e] for the reevaluation of the compensatory mitigation in response to the Re-Issued PN is included in the *1. Introduction* and *2. Determination of Impacts and Compensatory Mitigation* sections of this document."). The Corps' "rationale" is devoid of any real explanation and bears similarity to the insufficient response to public comments that the Court of Appeals noted in *Lordship Industries*. The Corps' decision to adhere to stream creation as a method of mitigation is unsupported, and therefore arbitrary and capricious.

Although the Corps claims that Plaintiffs do not actually respond to the new public notice until page 37 of their comments, this Court has found multiple comments before page 37 which do respond to the new public notice and were not resolved in the previous CDD. When the Corps did respond to a comment from Plaintiffs' about stream creation, it again pointed to Sections 1 and 2. SCDD at 20.[10] This conclusory approach to stream creation pales in comparison to the thorough justification of stream enhancement found in Section 3 of the SCDD. The closest that the Corps comes to explaining reliance on stream creation is on page 21, where it quoted from the original CDD. Again, however, this is not sufficient to find that the Corps properly responded to Plaintiffs' comments about stream creation.

---

[10] See also page 22, where the Corps responds to another of Plaintiffs' comments by stating "[t]he rational[e] for the reevaluation of the compensatory mitigation plan in response to the re-issued PN has been previously discussed."

22

These comments attacking stream creation are "significant," under *City of Portland*, because if indeed stream creation is not an adequate means of mitigation, then this would require the Corps to modify the CMP. *See City of Portland*, 507 F.3d at 715 ("Significant comments are those 'which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule.'" (quoting *Home Box Office*, 567 F.2d at 35 n.58)) Therefore, the Corps acted arbitrarily and capriciously.

## IV.    Remedy

Based on the discussion above, the Court **FINDS** that the Corps violated the CWA and NEPA by failing to reconsider mitigation under the CMP for Loadout's § 404 permit impacts. This failure also violated the Court's earlier Remand Order, and was inconsistent with the re-issued public notice. The Court additionally **FINDS** that the Corps violated the CWA and NEPA by failing to sufficiently address Plaintiffs' comments concerning the mitigation plan. This failure was also a violation of the Court's earlier Remand Order.

Therefore, the Court **GRANTS in part** Plaintiffs' motion for summary judgment (ECF No. 264), as to Count One of their Fifth Supplemental Complaint (that is, Plaintiffs' claim that the re-issued permit violated the Remand Order by ignoring most of Plaintiffs' comments and reconsidering just a portion of the mitigation plan and permit). Accordingly, the Court **DENIES in part** Loadout's (ECF No. 267) and the Corps' (ECF No. 275) cross-motions for summary judgment as to Count One.

To remedy these failures, the Court **REMANDS** the re-issued Loadout permit to the Corps for the limited purpose of 1) reevaluating mitigation for Dave Fork and Wilderness Fork, and 2) properly responding to Plaintiffs' comments, especially those regarding stream creation.

23

The Court **DIRECTS** the Corps to provide to the Court and the parties by **April 11, 2013**, its proposed timeline for conducting its reevaluation and responding to Plaintiffs' comments.

Because the Court is again remanding the permit to the Corps for reconsideration consistent with this opinion, the Court need not reach the merits of Count Two (Plaintiffs' claim that the Corps' decision that the CMP will prevent significant water degradation and not contribute to CWA violations is illegal, arbitrary, and capricious, in violation of the CWA and APA) and Count Three (Plaintiffs' claim that the Corps' decision that the CMP will prevent significant impacts pursuant to NEPA is illegal, arbitrary, and capricious, in violation of the NEPA and APA) of the Fifth Supplemental Complaint. Therefore, the Court **DISMISSES without prejudice** Counts Two and Three and **DENIES as moot** the parties' motions for summary judgment on Counts Two and Three.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: March 28, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE

24